# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.
                                **SUPERIOR COURT DEPARTMENT**
                                **CIVIL ACTION NO. 08-4306**

JANET BAKER AND JAMES BAKER,.

        **Plaintiff,**

v.

GOLDMAN SACHS & CO.,
GOLDMAN SACHS GROUP, INC., and.
GOLDMAN SACHS & CO., LLC

## REMOVAL TO U.S. DISTRICT COURT

**Commonwealth of Massachusetts**
**SUPERIOR COURT DEPARTMENT**
**THE TRIAL COURT**
**WOBURN**

MICV *2008-4306*

I, C. Andrew Johnson, Deputy Assistant Clerk of the Superior Court, within and for

said County of Middlesex, do certify that the annexed papers are true copies made by

photographic process of pleadings entered in the Superior Court on this *18th* Day

of *November* in the year of our Lord *2008* .

In testimony whereof, I hereunto set my hand
and affix the seal of said Superior Court, at
Woburn, in said County, this *22nd* Day of
*January* , in the year of our Lord
Two Thousand Nine.



_____
C. Andrew Johnson
Deputy Assistant Clerk



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JANET BAKER AND JAMES BAKER,

      Plaintiffs,

    v.

GOLDMAN, SACHS & CO., THE
GOLDMAN SACHS GROUP, INC., and
THE GOLDMAN, SACHS & CO.
L.L.C.,

      Defendants.

Civil Action No. _____

> FILED
> IN THE OFFICE OF THE
> CLERK OF COURTS
> FOR THE COUNTY OF MIDDLESEX
>
> JAN 1 2009
>
> _____
> CLERK

## NOTICE OF REMOVAL

    Defendants Goldman, Sachs & Co. ("Goldman"), The Goldman Sachs Group, Inc., and

The Goldman, Sachs & Co. L.L.C. (collectively the "Defendants") hereby remove the above-

captioned civil action filed in the Middlesex County Superior Court of the Commonwealth of

Massachusetts to the United States District Court for the District of Massachusetts, pursuant to

28 U.S.C. § 1332 and 28 U.S.C. § 1441 *et seq.*  As grounds for removal, the Defendants state as

follows:

## STATEMENT OF GROUNDS FOR REMOVAL

    1.    Goldman, Sachs & Co., The Goldman Sachs Group, Inc., and The Goldman,

Sachs & Co. L.L.C. are defendants in a civil action captioned *Janet Baker et al. v. Goldman,*

*Sachs & Co., et al.*, Civil Action No. 08-4306 (the "Action"), pending in the Massachusetts

Superior Court for Middlesex County.  The Complaint alleges that Goldman entered into an

engagement to serve as a financial advisor to Dragon Systems, Inc. ("Dragon"), a corporation of

which the named plaintiffs Janet and James Baker claim to have been shareholders. Dragon is

not a party to the Action.

2.    The Complaint purports to advance nine causes of action against Goldman:

breach of fiduciary duty (Count I); violation of Mass. Gen. Laws ch. 93A (Count II); breach of

contract (Count III); breach of contract/third-party beneficiary (Count IV); breach of the implied

covenant of good faith and fair dealing (Count V); negligence (Count VI); negligent

misrepresentation (Count VII); intentional misrepresentation (Count VIII); and gross

negligence, willful misconduct, and bad faith (Count IX). The only allegations in the

Complaint against defendants The Goldman Sachs Group, Inc. and The Goldman, Sachs & Co.

L.L.C. are that they are general partners of Goldman. *See* Comp. ¶ 7.[1]

3.    Plaintiffs filed the Complaint in this Action in the state court on November 18,

2008. The Defendants have not yet been served with a summons and copy of the Complaint.

This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b). A copy of the

Complaint is attached hereto as Exhibit A.

## I.    THIS ACTION MAY BE REMOVED BECAUSE DIVERSITY JURISDICTION EXISTS.

4.    This Action is one of which the district court has original jurisdiction on the

grounds of the diverse citizenship of the parties. *See* 28 U.S.C. § 1441(a) ("[A]ny civil action

brought in a State court of which the district courts of the United States have original

jurisdiction, may be removed by the defendant or the defendants . . . .").

5.    Here, diversity jurisdiction exists because: (a) the Plaintiffs and the Defendants,

respectively, are citizens of different states; and (b) the aggregate amount in controversy,

---

[1] The allegation is false. The Goldman Sachs Group, Inc., is not a general partner of Goldman, Sachs & Co. It is a limited partner.

exclusive of interest and costs, as alleged in the Complaint, exceeds $75,000. *See* 28 U.S.C §
1332(a).

### A.    The Parties Are Citizens Of Different States.

6.    For diversity jurisdiction to exist, the action must be between "citizens of
different States." 28 U.S.C. § 1332(a)(1).

7.    According to the allegations of the Complaint, the Plaintiffs Janet and James
Baker are citizens of either Florida or Massachusetts. Compl. ¶ 3.

8.    Defendant Goldman, Sachs & Co. is a New York limited partnership with a
principal place of business at 85 Broad Street, New York, New York. No limited partner of
Goldman, Sachs & Co. is a citizen of the Commonwealth of Massachusetts or the State of
Florida.

9.    Defendant The Goldman Sachs Group, Inc. is incorporated under the laws of
Delaware with its principal place of business at 85 Broad Street, New York, New York.

10.    Defendant The Goldman, Sachs & Co. L.L.C. is a Delaware limited liability
company with a principal place of business at 85 Broad Street, New York, New York. No
members of the limited liability company are citizens of the Commonwealth of Massachusetts.

11.    Accordingly, there is now, and was at the time of the commencement of this
Action, complete diversity of citizenship between the Plaintiffs and the Defendants.

### B.    The Amount In Controversy Exceeds $75,000.

12.    Diversity jurisdiction also requires that "the matter in controversy exceeds the
sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. 1332(a). As alleged in the
Complaint, the amount in controversy easily satisfies this threshold requirement.

13.    The Complaint alleges that Goldman's alleged actionable conduct caused the Plaintiffs to exchange their interest in Dragon, claimed to have been "worth hundreds of millions of dollars," for "artificially inflated and worthless stock" of Lernout & Hauspie Speech Products, N.V., and its U.S. subsidiary.  Compl. ¶ 2.

14.    Accordingly, based upon the allegations contained in the Complaint, the amount in controversy satisfies the minimum threshold required for diversity jurisdiction.

15.    Because both complete diversity of citizenship exists and the statutory amount in controversy is satisfied, diversity jurisdiction exists.  *See* 28 U.S.C. § 1332(a).  This Action accordingly may be removed pursuant to 28 U.S.C. § 1441 *et seq.*[2]

16.    In accordance with 28 U.S.C. § 1446(d), the Defendants certify that a Notice of Filing of Notice of Removal will be sent promptly to the Clerk of the Court for the Middlesex County Superior Court for filing and will be served promptly on the Plaintiffs through their counsel of record.

17.    Included with this Notice of Removal is the filing fee of $350, as required by 28 U.S.C. § 1914.

18.    Pursuant to Local Rule 81.1(a), within thirty (30) days from the filing of this Notice of Removal, the Defendants will file certified or attested copies of all records and proceedings in the Middlesex County Superior Court and a certified or attested copy of all docket entries in the Middlesex County Superior Court.

WHEREFORE, Defendants respectfully request that this case be removed from state court to the United States District Court for the District of Massachusetts.

---

[2] Venue in this District is proper pursuant to 28 U.S.C. § 1441(a) because the Action is pending within a state court located within this District.

Respectfully Submitted,

GOLDMAN, SACHS & CO.,
THE GOLDMAN SACHS GROUP, INC., and
THE GOLDMAN, SACHS & CO. L.L.C.,

By their attorneys,


/s/ Annmarie A. Tenn
John D. Donovan, Jr. (BBO# 130950)
Annmarie A. Tenn (BBO # 658789)
Matthew McGinnis (BBO # 666120)
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624
Telephone:  (617) 951-7000
Fax:  (617) 951-7050
john.donovan@ropesgray.com
annmarie.tenn@ropesgray.com
matthew.mcginnis@ropesgray.com


Dated: January 14, 2009

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on this 14th day of

January, 2009 by first-class mail, postage prepaid, upon the following counsel of record:

Terence K. Ankner
Partridge, Ankner & Horstmann, LLP
The Berkeley Building
200 Berkeley Street
16th Floor
Boston, MA 02116-5022

Alan K. Cotler
Joan A. Yue
Steven T. Voigt
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103


/s/ Annmarie A. Tenn
Annmarie A. Tenn

# MASSACHUSETTS SUPERIOR COURT
## MIDDLESEX COUNTY



JANET BAKER AND JAMES BAKER,

Plaintiffs,

v.

GOLDMAN SACHS & CO.,
GOLDMAN SACHS GROUP, INC., and
GOLDMAN SACHS & CO., LLC,

Defendants.

Civil Action No. MICV2008-08-04306

### NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE that on January 14, 2009, Defendants Goldman, Sachs & Co.,

The Goldman Sachs Group, Inc., and The Goldman, Sachs & Co. L.L.C. have filed the attached

Notice of Removal with the United States District Court for the District of Massachusetts.

Respectfully Submitted,

GOLDMAN, SACHS & CO.,
THE GOLDMAN SACHS GROUP, INC., and
THE GOLDMAN, SACHS & CO. L.L.C.,

By their attorneys,

John D. Donovan, Jr. (BBO# 130950)
Annmarie A. Tenn (BBO # 658789)
Matthew McGinnis (BBO # 666120)
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624
Telephone: (617) 951-7000
Fax: (617) 951-7050

Dated: January 14, 2009

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on this 14th day of

January, 2009 by first-class mail, postage prepaid, upon the following counsel of record:

Terence K. Ankner
Partridge, Ankner & Horstmann, LLP
The Berkeley Building
200 Berkeley Street
16th Floor
Boston, MA 02116-5022

Alan K. Cotler
Joan A. Yue
Steven T. Voigt
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Annmarie A. Tenn

MASSACHUSETTS SUPERIOR COURT
MIDDLESEX COUNTY

08-4306

JANET BAKER and JAMES BAKER      :

      Plaintiffs,      :      **JURY TRIAL DEMANDED**

                     1817A000011/18/08CIVIL      240.00
v.                           1819A000011/18/08SURCHARGE  15.00
                           1819A000011/18/08SECC     20.00
GOLDMAN SACHS & CO.,      :      Civil Action No. _____
GOLDMAN SACHS GROUP, INC., and      :
GOLDMAN SACHS & CO., LLC      :

      Defendants.      :

> FILED
> IN THE OFFICE OF THE
> CLERK OF COURTS
> FOR THE COUNTY OF MIDDLESEX
> NOV 1 8 2008
>
> _____ CLERK

                           1826A000011/18/08SUMMONS  15.00

**COMPLAINT**

      Plaintiffs, Janet Baker and James Baker (collectively, the "Bakers" or "Plaintiffs"), who

were the founders of Dragon Systems, Inc. ("Dragon"), owners of the majority of the shares of

Dragon and members of Dragon's Board of Directors, by their undersigned attorneys, state as

follows:

## I.    NATURE OF THIS ACTION

      1.    In this action, the Bakers seek recovery for damages they sustained as a result of

Goldman Sachs & Company's ("Goldman") improper actions, omissions, negligence, gross

negligence, bad faith, willful misconduct, breach of contract, and breach of its fiduciary duty as

the investment banker exclusively engaged to provide comprehensive financial advice to

Dragon's Board of Directors, senior management and principal owners in connection with the

year 2000 acquisition of Dragon by a European-headquartered company, Lernout & Hauspie

Speech Products, N.V. ("N.V."). The parties to this case entered into a Tolling and Document

Preservation Agreement on July 31, 2002. This Agreement is attached hereto as Exhibit "A" and

incorporated herein by reference.

2.     Goldman's grossly improper and actionable conduct caused the Bakers to exchange their 51% interest in Dragon and all of their rights to Dragon's unique and valuable intellectual property, worth hundreds of millions of dollars, for artificially inflated and worthless stock of N.V. and its U.S. subsidiary, L&H Holdings USA, Inc. ("Holdings") (collectively N.V. and Holdings are referred to as "L&H").

## II.    PARTIES

3.     Plaintiffs Janet Baker and James Baker are individuals who reside in Maitland, Florida and Newton, Massachusetts. They were the founders of Dragon and owned 51% of the stock of Dragon. James Baker served for many years as Dragon's Chairman and CEO. Janet Baker served as Dragon's President and succeeded James Baker as Chairman and CEO. Janet Baker was a member of Dragon's Board of Directors at the time of Goldman's engagement and through the closing of the Dragon merger into L&H on June 7, 2000.

4.     Dragon was a closely held corporation whose headquarters were located in Newton, Massachusetts. L&H acquired Dragon through a merger of Dragon into Holdings on June 7, 2000. The Bakers were issued 5,109,713 shares of L&H stock for their 51% ownership interest in Dragon. The Bakers were permitted to sell a small amount of their L&H stock soon after the closing but they were required to hold approximately 40% of the L&H shares for a period of four months and the balance for one year following the closing.

5.     Goldman Sachs & Co. ("Goldman") is a New York limited partnership that has a principal branch and conducts business in Massachusetts. Goldman's office in Massachusetts is at 53 State Street, Boston, Massachusetts.

6.     Goldman is engaged in investment banking and financial advisory services, securities trading, investment management, and other financial activities and services. Goldman

was the exclusive financial advisor for Dragon, its Board, senior management, and principal

shareholders in connection with the potential sale of or strategic investment in Dragon, and

represented and advised Dragon and Plaintiffs in the execution of the March 27, 2000 Merger

Agreement and the June 7, 2000 merger of Dragon with L&H.

7.    Goldman Sachs Group, Inc. and Goldman Sachs & Co., LLC are the General

Partners of the limited partnership that does business as Goldman Sachs & Co. and are liable as

such for the debts and liabilities of Goldman Sachs & Co.

## III.    GOLDMAN BREACHED ITS LEGAL AND CONTRACTUAL OBLIGATIONS AND DUTIES AS EXCLUSIVE FINANCIAL ADVISOR

### A.    The Bakers Developed Dragon Into a Market Leader in Speech Recognition

8.    The Bakers are recognized pioneers and innovators in the speech recognition

industry.  They founded Dragon in 1982 and went on, through Dragon, to revolutionize speech

recognition technology.  At the time of Dragon's acquisition by L&H, Dragon was a leading

worldwide developer and supplier of speech and language technology and a market leader in

speech recognition software.

9.    In 1998, MIT's Magazine of Innovation reported: "Speech recognition's arrival a

few years ahead of schedule is largely due to the perseverance of Jim and Janet Baker, the couple

who founded Dragon back in 1982.  As researchers, the pair helped to invent some of the

fundamental algorithms used today by all speech recognition products.  As entrepreneurs, they

fought to commercialize the technology years ahead of anyone's schedule.  Now that speech is

on the desktop, it's clear that our computing future will be shaped in no small part by Dragon

Systems and the husband-and-wife team that gave birth to it." Fortune wrote: "Dragon is

responsible for a breakthrough in speech-recognition software.  Its application,

NaturallySpeaking . . . could radically alter the way people interact with their computers – and

ultimately with other devices in their lives. . . . it was the first dictation software to allow for a normal manner of speaking on any subject."

10.     Unlike many high technology companies at the time, Dragon had an existing product line that was deep and broad, offering numerous products across different marketing channels. Dragon also had an extensive research and development pipeline for future products and opportunities – Dragon's "golden eggs" – which had significant value for the company.

11.     Dragon's innovative technology and its position as a market leader in speech recognition made it an attractive merger partner in the speech technology sector and other sectors that were, or were interested in, using and developing speech recognition technology.

12.     In the fall of 1999, Dragon was approached by L&H about merging Dragon into L&H and was also discussing a potential merger with Visteon, a subsidiary of Ford. Dragon's Board of Directors, senior management, and the Bakers valued Dragon at no less than $600 million for purposes of an acquisition and decided to engage the services of an investment banker to give them comprehensive financial advice and assistance in any potential transaction.

**B.    Goldman's Engagement as Exclusive Financial Advisor**

14.     In November 1999, Goldman began pitching to serve as the exclusive investment banker for a potential acquisition of or strategic investment in Dragon by another company. Goldman sent a draft engagement agreement to Janet Baker and others at Dragon and touted Goldman's experience, expertise in investment banking, high reputation for professionalism, international resources, and the "real value" it would add "in maximizing transaction value and negotiating definitive agreements." Goldman proposed a three million dollar base "incentive" fee for a six hundred million dollar deal, which, in Goldman's view, was a good deal for Dragon because three million dollars is "not . . . a lot of money."

15. Goldman knew that Dragon was privately held, that the Bakers were Dragon's founders and majority owners, and that any transaction would require the Bakers' approval. Goldman also knew that Janet Baker would be acting as point person for herself and for James Baker on business and financial aspects of any transaction.

16. On December 8, 1999, Goldman was contractually engaged to serve as exclusive financial advisor to Dragon's Board of Directors, senior management, and the Bakers in connection with the potential acquisition of Dragon or negotiation of a joint venture between Dragon and a strategic investment partner.

17. In the Engagement Agreement, which Goldman drafted, Goldman agreed to provide comprehensive financial advice and assistance, including but not limited to searching for an acceptable purchaser or investment partner, assisting in negotiating the financial aspects of the transaction, coordinating site visits, and doing analyses of the value of any potential transaction to Dragon shareholders. By contract and otherwise, Goldman agreed comprehensively to protect Dragon's and Plaintiffs' interests to the fullest, achieving the best possible financial results, and to provide them the most comprehensive protection in return for a fee of $150,000 per quarter against $5 million upon completion of a transaction. A copy of the Engagement Agreement and amendment is attached hereto as Exhibit "B" and is incorporated herein by reference.

18. In addition to Goldman's obligations created by the Engagement Agreement, Goldman also had obligations that were established through Goldman's position of trust as exclusive financial advisor, through Goldman's knowledge that the Bakers were Dragon's founders and majority owners and that they and Dragon were relying on Goldman's investment banking experience and superior expertise in mergers and acquisitions and strategic investment

transactions, and through Goldman's communications and course of interacting with the Dragon Board of Directors, senior management, and the Bakers.

19.    As Dragon's exclusive investment banker, Goldman was obligated to provide the same level of comprehensive financial advice and assistance had Goldman itself been the target of an acquisition.

20.    Plaintiffs and Dragon relied on Goldman, and communicated to Goldman that they were relying on it, to take full control of and drive the entire transaction process to ensure that the transaction was properly structured and share value maximized, and to do all the work and investigation necessary to fully and completely protect Plaintiffs and Dragon financially in any transaction.

21.    Goldman was engaged as exclusive financial advisor, among other reasons, because Goldman was and is a reputable and respected firm that Plaintiffs and Dragon believed was well-qualified and competent to advise them during negotiations with L&H or any other company. Goldman was and is one of the largest and most reputable investment banking firms in the world with assets in the billions of dollars.

22.    Goldman was uniquely positioned to act as exclusive financial advisor in a merger and acquisition of Dragon. Goldman marketed itself as "a leading investment bank in worldwide mergers and acquisitions;" it had branches around the world, including Europe, South Korea, and Singapore where L&H reported substantial business; and it touted its experience in the technology sector and M&A transactions involving intellectual property assets.

23.    The Bakers and Dragon trusted Goldman, and Goldman invited and expected that trust. Indeed, Goldman's number one "business principle" is the best interest of its clients. In Goldman's words, "Our client's interests always come first."

24.    Goldman knew or should have known that Dragon and the Bakers were relying on Goldman to perform its undertaking as exclusive financial advisor competently and diligently, to provide comprehensive financial advice and assistance in connection with the contemplated transaction, to properly structure the transaction so that Dragon's and Plaintiffs' financial and property interests were fully protected, and to carry out all obligations set forth in the Engagement Agreement and as otherwise required by law. Goldman knew or should have known that Dragon and the Bakers were relying on Goldman's superior knowledge and expertise in investment banking and in performing valuation analyses, conducting financial and business analyses, and structuring deals. Goldman knew or should have known that the Bakers and Dragon expected and were relying on Goldman to provide them the same level of care as though Goldman itself were in the position Plaintiffs and Dragon were in.

25.    Goldman knew and understood the need for and importance of thorough and careful investigation, analysis, and due diligence in any transaction, and in particular a transaction involving the exchange of stock. Goldman knew and understood the need for and importance of verifying "the true state of a company's assets, operations, and other claims" and uncovering and addressing "hidden concerns in the overall picture of a company, its industry, its suppliers, its customers, its partners, and its competitors." Goldman knew and understood that in a transaction where the seller was receiving stock in the buyer, valuing the consideration required more investigation, analysis, and due diligence than a cash transaction to evaluate the true worth of the buyer's enterprise and the strength of its operations. Goldman knew and understood that in a stock-for-stock transaction, liquidity and stability of the value of the stock received was an important consideration for the shareholders in the acquired company. Goldman knew and understood that in a merger of technology companies and, in particular, a merger

where the entire consideration was stock in the acquiring company, the parties exchanging their intellectual property rights for stock should have protective strategies for their intellectual property and for the value of the stock received.

26.    Goldman knew and understood what it was legally and contractually obliged to do as exclusive financial advisor in a transaction involving the exchange of stock and the sale of intellectual property assets but did nothing to protect Dragon and the Bakers in the all-stock L&H merger, which Goldman knew and understood was a high risk transaction with a company with serious red flags.

27.    Goldman structured the Engagement Agreement to ensure that it received its fee regardless of the work it did – or did not do – or the quality of its representation.

28.    The Engagement Agreement, which Goldman drafted, provided Goldman would get a $5 million fee, even if Dragon terminated its engagement, so long as a transaction was consummated with a merger or strategic investment partner that Goldman either listed as a prospective buyer in any memorandum or had any discussions with about the transaction. Goldman required that all communication be passed through it, thereby ensuring that it would have discussions with any party and therefore ensuring it would be paid regardless of how little it did. The Engagement Agreement also provided that Goldman would be paid $150,000 per quarter, plus its out-of-pocket expenses, which would be applied against its multi-million dollar fee at closing but was not contingent on a transaction. For these fees, Goldman did virtually nothing to carry out its legal obligations and duties under law and the Engagement Agreement and left Dragon and the Bakers completely unprotected in the merger of Dragon into L&H. Goldman got $5 million in cash when the transaction closed. Plaintiffs got hundreds of millions

of dollars of worthless L&H stock and lost the intellectual property that had been the result of their life's work for 18 years.

**C.    Goldman Did Virtually No Investigation, Research, Or Valuation Analyses of L&H and L&H's Stock And Finances, in Gross Violation Of Its Legal Obligations And Contractual Duties**

29.    L&H was among several companies that Dragon was considering as a merger or joint venture partner even before Goldman was engaged.

30.    Once engaged, Dragon and the Bakers expected Goldman as "exclusive financial advisor" to drive the analysis of the L&H deal and give them comprehensive, complete and competent advice and assistance in negotiating and consummating Dragon's merger with L&H.

31.    Goldman, as exclusive financial advisor, held a special position in relation to Dragon and to the Bakers as Dragon's majority owners.  The Engagement Agreement precluded Dragon from initiating any discussions related to its possible sale "without first consulting Goldman Sachs."  In addition, Goldman instructed L&H's bankers that they should not communicate with the Bakers directly but could only do so through Goldman.  Consequently, Dragon's Board of Directors, senior management, and the Bakers depended and relied on Goldman.

32.    Dragon and Plaintiffs depended and relied on Goldman to undertake the comprehensive and thorough investigation, research, review, and analysis of L&H necessary to advise them whether L&H would be an acceptable acquisition partner for Dragon and whether any deal reached was properly structured and fully protected Dragon's and Plaintiffs' interests.  Goldman was legally and contractually obligated to do such a comprehensive and complete investigation, research, review, and analysis.  Instead, Goldman did virtually nothing.

33.    Goldman certainly knew and understood the "issues" that it was required to investigate to properly and competently do valuation analyses of L&H and a full financial

analysis of the L&H transaction. Indeed, Goldman expressly identified issues related to L&H in several emails and memos during the course of its engagement.

34.     Goldman also knew and understood from the outset that a merger with L&H would include a significant stock component as part of the acquisition consideration and that it was, consequently, important for Goldman as exclusive financial advisor to verify the value of L&H's stock by investigating, researching, reviewing, and analyzing in detail L&H's business and the representations L&H was making to Dragon and the Bakers about financial data and otherwise, which determined the value of the L&H stock.

35.     Goldman knew that Dragon and Plaintiffs expected and relied on Goldman as exclusive financial advisor to investigate, research, review, and analyze fully all areas of L&H's business, including those Goldman expressly identified in its emails and memoranda and those that Plaintiffs and others at Dragon raised during the course of the negotiations through the closing. These included, among other areas of L&H's business, the recent growth of L&H's Asian revenues in Singapore and South Korea, the amount of revenue L&H received from affiliated entities, and the proportion and effect of L&H's growth that was derived from acquisitions. In fact, and without Dragon's or Plaintiffs' knowledge, Goldman did virtually nothing to properly investigate the propriety of the L&H transaction both as to issues Goldman had itself raised in its memos and emails and issues raised by Dragon and Plaintiffs.

36.     From early in the negotiations, the consideration L&H was offering for Dragon was a 50/50 mix of cash and stock. That changed in early March 2000, when L&H's investment bankers informed Dragon and the Bakers that L&H would need to increase the percentage of stock in the deal because L&H was involved in another merger/acquisition deal that would soon be announced. At a critical meeting between Dragon and L&H on March 8, 2000, L&H

- 10 -

informed Dragon and the Bakers that in light of the other transaction, the deal consideration for the Dragon merger would have to change to all stock with no cash component.

37.    Goldman knew that L&H wanted to increase the amount of stock consideration for Dragon and that principals of both Dragon and L&H and their advisors would be at the meeting on March 8, 2000. Goldman knew that L&H principals were coming from Europe and that the purpose of the meeting was to strike a deal in principle on price and consideration. Despite the importance of the meeting and even though Goldman knew it was legally and contractually obligated to advise and protect Plaintiffs and Dragon in their dealings with L&H and in the transaction, Goldman intentionally failed to attend or participate by phone because the members of the Goldman banking team were going on vacation or were otherwise unavailable.

38.    Abandoned by their financial adviser at this crucial meeting, Dragon and Plaintiffs agreed to an all-stock deal with L&H. Goldman never advised Dragon and Plaintiffs against the all-stock deal, and never advised Dragon and Plaintiffs on how to protect themselves in such a deal.

39.    Goldman knew that a merger transaction involving stock required a higher level of investigation, analysis, and due diligence than a cash transaction and that the change on March 8, 2000 to an all-stock transaction with L&H made it even more crucial to accurately and properly value L&H's stock, to verify "the true state of [L&H's] assets and operations," and to accurately and properly evaluate L&H's business and the strengths and weaknesses of its operations, including its suppliers, customers, and partners.

40.    Goldman was, legally and contractually, in the best position to evaluate an all-stock transaction and to structure a deal that fully protected Dragon's and Plaintiffs' interests. Goldman also knew that it was legally and contractually obligated to provide comprehensive

financial advice and assistance to Dragon and Plaintiffs in the merger with L&H with the same level of care and diligence as though Goldman itself were investing in L&H. Goldman gave no advice whatsoever to protect Plaintiffs against the risks of the all-stock transaction with L&H or about strategies to protect Plaintiffs' $300 million investment in L&H and their interest in Dragon's unique and valuable intellectual property.

41.    Goldman knew that investment in L&H carried a high risk. Indeed, in a representation in 1998 for GE Capital, a large and sophisticated institutional client, Goldman devised various strategies for GE Capital, to "hedge some of the stock price risk" with its investment in L&H. Goldman discussed "several alternatives" with GE Capital, including an "Equity Collar Strategy" which would have placed a cap on any potential losses in GE Capital's proposed investment. Goldman intentionally failed to give any such advice to Dragon or the Bakers to protect their interests, even though Goldman knew that Dragon and the Bakers were much less sophisticated than GE Capital, that the value of Dragon was at least 24 times the sum GE Capital was considering investing in L&H, and that, unlike the GE Capital investment which was a fractional sliver of GE Capital's worth, the investment Dragon and the Bakers were making in L&H was the entire value of their interest in Dragon.

42.    Goldman's disparate representation of Dragon and Plaintiffs in a transaction involving the exchange of a company worth at least $600 million dollars for volatile stock in a company with numerous red flags and with no protective strategy demonstrates that Goldman was completely derelict in its duty to provide the same level of care to Dragon and Plaintiffs that it provided to more sophisticated clients and would have provided to itself if Goldman were investing $600 million in L&H. In fact, the change in the structure of the deal signaled to

Goldman that L&H could not raise the amount of cash needed for a part-stock/part-cash

transaction, which is a significant red flag that the stock is not worth its trading price.

43.    Goldman made a show throughout its engagement of working to protect the

interests of Dragon and Plaintiffs in the L&H transaction when in fact and unknown to Dragon

and Plaintiffs at the time, Goldman totally abdicated its legal and contractual duties to Plaintiffs.

Although the banking team Goldman assigned to the Dragon engagement attended meetings of

Dragon's board, had discussions and meetings with the Bakers and Dragon directors and senior

management, and wrote memos and emails listing questions and issues about L&H, the Goldman

team was inexperienced, incompetent, and incapable of providing the comprehensive advice and

assistance necessary to protect Dragon and Plaintiffs in the L&H transaction.  The Goldman

team did virtually no investigation of the problems, questions, and issues raised by Plaintiffs and

others at Dragon, and identified by Goldman itself, as critical concerns for any transaction with

L&H.

44.    Goldman knew going into the engagement that a transaction with L&H would

require extensive investigation and an experienced banking team.  Goldman knew that L&H had

problems with transparency and began compiling lists of areas of L&H's business that it would

need to investigate, research, review, and analyze even before the Engagement Agreement was

executed.  Among the areas Goldman included in a December 1, 1999 outline of L&H issues for

investigation, research, review, and analysis were: product and service offerings, geographic

business, existing and future market opportunities and targets, historic and prospective strategies,

expected market growth, sources of revenue, planned acquisitions, major customers and

customer contracts, new products in development, key license agreements and royalty

arrangements, partnerships and investors, partner relationships (investor, customer, etc.),

historical financials, 1999 and 2000 quarterly forecasts and assumptions, percentage of revenue from the top five customers and the top customers by quarter, off-balance sheet assets and liabilities, and revenue recognition and accounting policies.

45.    On December 14, 2000, shortly after execution of the Engagement Agreement, Goldman sent to Janet Baker, James Baker, and others at Dragon a list of "Due Diligence Questions" that targeted the following issues for inquiry and analysis of L&H: historical financials (income statement, balance sheet, cash flow statement) for the past 3 years and year-to-date 1999, organic sales growth and the key factors affecting this growth, all assets and liabilities including increases in accounts receivable and collection of A/R, outstanding debt and credit agreements, off balance sheet assets/liabilities, major customers and the nature of the contracts, R&D budgets, development processes, key license agreements, royalty arrangements, acquisitions made in the past couple years and how the acquisitions were integrated into L&H's business.

46.    On December 16, 1999, Goldman submitted a memorandum to Janet Baker, James Baker, and Dragon's Board of Directors, which compared and contrasted possible acquisitions of Dragon by L&H and Visteon. The memo identified several specific "issues" with L&H that Goldman was required to investigate as part of its valuation analyses of L&H and L&H stock, including: the "value" and "volatility" of L&H's stock; "loss certainty"; L&H's "Past accounting practices re: R&D [research and development] write-offs"; the "true health" of L&H; whether L&H's growth was "organic" or based on "acquisition(s)"; that less was known about L&H due to differences between European and U.S. accounting and reporting requirements; and L&H's "ability to raise cash to pay for the acquisition," among others.

47.     In the December 16, 1999 memorandum to the Bakers and Dragon's Board of

Directors, Goldman also made the following representations about L&H:

- "Microsoft's $5m investment in L&H and the follow-on partnership are major public endorsements of L&H's leadership position in the voice recognition market";

- "L&H is assembling the broadest array of language pairs for its translation service business that may be unmatched by any of its competitors. Its linguistic services group can translate 70 languages overall, while machine translation now boasts translation services for 15 language pairs";

- "New OEM licensees of core technologies that build pipeline of recurring revenue"; and

- "Reported disappointing 3Q 1999 results with slower than expected organic sales and growing receivables."

48.     During its engagement, Goldman did nothing to investigate the representations in

its December 16, 1999 memorandum to confirm their accuracy. Goldman did not contact any of

L&H's "strategic partners," the so-called "Language Development Companies" and "Cross

Language Development Companies," which were supposedly developing translation capabilities

in numerous languages. Goldman had no basis to represent to the Bakers and Dragon's Board of

Directors that L&H and L&H's technology could translate "70 languages overall," "15 language

pairs," or any number of languages. It had no basis to represent that L&H "is assembling the

broadest array of language pairs" and that its language translation capabilities were

"unmatched."

49.     Goldman did not take any action to confirm that L&H had a "pipeline of recurring

revenue," as it had represented to James Baker, Janet Baker, and Dragon. Indeed, Goldman had

no basis for this statement or any other assurance about L&H's "revenues."

50.    Goldman did not conduct any meaningful research about the sources of L&H's growth, despite flagging L&H's "slower than expected organic sales" and "disappointing 3Q 1999 results" as "issues" and areas of concern in its December 16, 1999 memorandum.

51.    In the December 16, 1999 memorandum, Goldman also provided specific figures for L&H's earnings per share, revenue, income, and cash and cash equivalents. Goldman's memorandum presented these calculations as Goldman's own – the memorandum did not disclaim that they were taken from a third party source. Goldman presented these numbers knowing that James Baker, Janet Baker, and Dragon would rely on them, even though Goldman took no action that would have enabled it to make or verify any of these financial statements.

52.    On the following day, December 17, 1999, Goldman sent an additional memorandum to Janet Baker and Dragon. This memorandum, titled "Discussion Materials for the Board of Directors," was written for Janet Baker, James Baker, and Dragon's Board of Directors, and included many of the same issues that were in the December 16, 1999 memorandum, including those described above in paragraph 46. The December 17 memorandum also included a "Merger Analysis" stating Goldman's year 2000 and 2001 estimates for "Sales/Share," "EPS," "Total Debt," and "Debt/EBITDA" for a combined company if L&H purchased Dragon with "100% Stock," "100% Cash," or "50% Stock/50% Cash." When it provided these calculations to the Bakers and Dragon's Board of Directors for their reliance, Goldman had not done any of the investigation, research, review, and analysis that would have supported these calculations. Moreover, at no time during its engagement did Goldman properly complete the investigation, research, review, and analysis it needed, and was obliged, to do to verify the reasonableness and/or accuracy of these calculations.

53.    During its engagement, Goldman assured Dragon and Plaintiffs that fluctuation in the price of L&H stock was not based on any issue related specifically to L&H but rather reflected "overall market movements." In a January 20, 2000 memorandum, Goldman advised Janet Baker and others at Dragon that "We have been discussing with Charles Elliott [a Goldman analyst who authored analyst reports regarding L&H] the recent movements in the LHSP stock and the European technology sector as a whole. He points out that there has been very little in the way of specific catalysts affecting the L&H stock price but rather that investors have been mostly focused on overall market movements. He believes that for the most part European technology stocks have been swept about along with the Nasdaq, both falling significantly last week then rising this week . . . Please let us know if you have any questions."

54.    Goldman knew it was obligated by law and contract to thoroughly investigate, research, review, and analyze L&H to properly advise Dragon and Plaintiffs. Goldman also knew that Dragon and Plaintiffs were relying on Goldman to do the job it was contractually engaged and legally obliged to do. For example, on February 17, 2000, Dragon's Chief Financial Officer e-mailed the Goldman banking team as well as Janet Baker a list of some of the specific questions that Dragon expected and relied on Goldman to address in its investigation, research, review, and analysis of L&H. This e-mail stated, in part:

> To follow are some of the thoughts I have on our diligence of them [L&H] . . . Overall, I am approaching this that we are trying to punch enough holes in the 2000 so that we are comfortable with what they are projecting as their EPS and can make our determination as to what we believe will happen with the stock. Additionally, we need to look at the combined company, the synergy's [sic] they are projecting and determine the effect on the stock price . . .
>
> P.S. We means I am expecting GS to drive and analyze so to that end . . . following in the book they previously gave us . . .
>
> Update for Q4 results.
>
> Get a comparison of the budget for Q4 and the actuals with a variance explanation.

<u>Need to understand how much of '99 was organic growth and when
acquisitions came to play so we can evaluate the 2000 plan</u>

Need the final 2000 plan by line of business and by quarter. Distinctly
show how much depends on an acquisition.

Need to understand how much of the plan is acquisition driven . . . i.e. what
revenue is secure and what is at risk . . .

Compare their EPS budget to the street expectation and determine the effect on
the stock.

What is 2000 Y over Y organic growth?

<u>2000 plan had $122m in for a new acquisition that was done in Q4 . . . in Korea . .
. what was the performance in Q4 for Korea</u>

What was the inventory in the channel at 12/31? How many weeks did it
represent? What reserves if any were against this inventory/sale? . . .

Have them address when they are going to bring the SAIL on to the income
statement in entirety and the expected market effect.

Has the 1999 audit been completed? Any findings?

Has the 10K been drafted and can we review it? . . .

<u>There is a start.</u>  (emphasis added).

55.    After this February 17, 2000 email from Dragon's Chief Financial Officer,

Goldman continued to lead Plaintiffs and Dragon to believe that Goldman was in fact conducting

an extensive investigation of L&H that would support its advice about the potential transaction.

On February 21, 2000, Goldman e-mailed Janet Baker and James Baker advising of the status of

Goldman's investigation of L&H and soliciting the Bakers' "input":

> As you know, we are going to conduct our reverse due diligence
> on Light [L&H] this week, probably on Wednesday. Ellen
> mentioned that she passed on to you a copy of the Light materials
> which were distributed in December in Belgium. Based on that, I
> was wondering if you had any additional questions for them,
> beyond the list we gave them in December (I have attached that
> here for you below) and beyond the questions Ellen has already
> listed below. I will be sending SG Cowen [L&H's investment
> banker] a first draft of our list this weekend, but if you don't get
> this email until Mon or Tuesday, I would still appreciate your input
> because I can still add more questions to our list prior to our
> Wednesday meeting.

56.     On February 23, 2000, Goldman faxed another list of "Due Diligence Questions"

to Janet Baker which identified the following issues for investigation, research, review, and

analysis:

a.      Review third and fourth quarter 1999 results (income statement, balance sheet, case flow statement)

b.      What have been the key trends?

c.      Compare Q4 actuals vs. budget.  Discuss variance

d.      Discuss organic vs. acquisition growth . . . How much of 1999 was organic growth?  What have been the key factors affecting this growth?  When in the year did acquisitions close and impact results? . . .

* * *

a.      Review the final 2000 quarterly plan by line of business

b.      Explain sales projections, including projected sales by business segment and product in dollar and unit terms.  Provide Q4 1999 unit and pricing data as well as compare to 2000 projections.

c.      Detail how much of plan is acquisition driven and the timing and impact of those acquisitions . . .

d.      Discuss 2000 year over year organic growth and the key assumptions in forecasting that growth

e.      Review expense budget by function.  Provide final schedules which explain or no longer include a "cost savings" line.  Include detail on consultants/services expenses as well.

f.      Review capital expenditure forecast . . .and

4) Review all assets and liabilities including collection of A/R (increase in A/R), etc.; 5) Review outstanding debt and credit agreements; 6) Discuss any off balance sheet assets/liabilities; 7) Discuss the timing of bringing SAIL on to the income statement in entirety and the expected impact; . . . 11) Has the 1999 audit been completed?  Any findings?; 12) Has the 10K been drafted and can we review it?; 18) Discuss major customers, nature of contracts [and] a. Give detail on the percent of revenue from the top ten customers over the past several quarters; b. List top ten OEM and ISV customers; . . . 20) Review market share in all business segments in U.S. and worldwide; . . . 23) Review key license agreements, royalty arrangements; . . . 24) Specifically how is the transaction going to be financed

- 19 -

> and what is the timing for getting that completed?; 25) If
> there is significant EPS dilution from goodwill, will the
> market look through to Cash EPS?; 31) Review all
> acquisitions made in the past few years, a. Timing, size and
> acquisition multiples . . . and b. Discuss how these
> acquisitions have been integrated into your business.
> Discuss any relevant synergies, benefits, difficulties.

As with its December 14, 1999 due diligence list, Goldman was legally and contractually

obligated to completely investigate, research, review, and analyze the issues on this list it

prepared. It did not.

57.    A few days later, on February 29, 2000, Goldman sent a memorandum to Dragon

and Plaintiffs that purported to outline a plan of action for analysis of L&H but was essentially a

cut and paste of issues that Dragon had requested and expected Goldman to investigate. That

memorandum listed the following tasks, among others, for completion before the closing of the

acquisition:

- "Review of 'Business Acquisitions' including detail behind summary financials therein; reconstruct similar analysis for acquisitions from 1/1/1999 through present.  (1999 deals alone account for roughly 25% of sales on a run-rate basis.)"

- "'Intangibles,' these assets (including goodwill, licenses and pre-paid royalties) account for over 40% of 1998 year-end total assets and 55% of 1999A [sic] total assets."

- "Review of 'New Accounting Pronouncements' and their impact on Light [L&H] (including SFAS 130, SOP 97-2, SOP 98-1)."

- "Review of 'Related Party Transactions,' including Microsoft, Oldco NV, formerly L&H Holding NV and Flanders Language Valley Fund, especially where [L&H] buys or sells goods or services from companies or affiliates of shareholders or directors."

- "Review of [L&H's] Corporate Expense ($75 million in 2000E)."

- "Reconcile information in the due diligence book and the public financials, including purchase price, profits and assets acquired for all acquisitions (1/1/97 to present)."

- "Accounting treatment and methodology of each acquisition listed above (i.e., purchase, pooling, provisions, write-offs, etc.); reconcile to public financials."

- "Review 'Contribution From Acquisitions' analysis; [L&H's] states that two-thirds of their growth is internal versus acquisition-related; verify."

58.    Goldman was required to perform, supervise, and manage all of the tasks identified in its February 29, 2000 memo in return for its $150,000 quarterly fee and $5 million payment at acquisition.  Yet Goldman improperly sought to shift responsibility for the tasks in the February 29, 2000 memorandum to Dragon even though Goldman knew those tasks were Goldman's responsibility as exclusive financial advisor.  Goldman knew that it had been engaged because of its superior investment banking expertise and that neither Dragon nor Dragon's other advisors had the specialized experience, resources, and capabilities of Goldman. Although unknown to Dragon and the Bakers at the time, Goldman failed to properly investigate, research, review, and analyze these and other issues that were critical to a proper analysis of the financial health of L&H and the actual value of the L&H stock.  Goldman abdicated its legal responsibilities and contractual obligations to Dragon and Plaintiffs and charged $5 million for doing virtually nothing.  Goldman essentially wrote a few "to do" memos without doing the work to implement them.  Goldman gave the appearance of doing work – when in reality it did nothing for its
$5 million.

59.    Goldman's communications after the February 29, 2000 memo continued to mislead Dragon and Plaintiffs into believing that Goldman was performing its obligations and conducting a thorough investigation, research, review, and analysis of L&H.  For example, on March 13, 2000, Goldman e-mailed a list of "follow-up diligence questions" to Janet Baker, James Baker, and others at Dragon.  Goldman's e-mail advised that Goldman had sent the list to

L&H "a week ago" but was sending the list to Janet Baker, James Baker, and others at Dragon "in anticipation of tomorrow's meetings." The subject line of the e-mail was "Due Diligence" and targeted the previously identified areas of concern:

1.  Review third and fourth quarter 1999 results (MD&A).  Provide specific detail on components of revenue

2.  Compare Q4 actuals vs. budget.  Explain variance.

3.  Discuss the timing of bringing SAIL on to the income statement in entirety and the expected impact . . .

5.  Give overview of Retail P&L for 1999 for both US and Europe

6.  Review of channel inventory at distributors and retail level and current analysis of sell-through rates

    a.  What was the inventory in the channel at 12/31/99?  How many weeks did it represent?  What reserves if any were against this inventory/sale?

    b.  Discuss historical level of product returns relative to sell-through rates . . .

10.  Full detail on exclusives and market leadtime contracts . . .

14.  Most recent data on acquisitions from Section 2 of the Light materials.  Also, still need price paid for acquisitions and corresponding multiples paid . . .

16.  Provide detail on insider ownership (including MSFT and Intel holdings) and more exact detail on current float . . .

18.  Detail historical and projected foreign exchange income?  How is foreign exchange income accounted for?

19.  Details on the components of Technology and Solutions (T&S).  Explanation on T&S growth . . .

21.  Provide details on components of the Far East Project.  How are projections made on the Far East Project?

Goldman did not properly investigate, research, review, or analyze any of the outstanding items on its own "Due Diligence" list.

60.    Goldman knew that L&H had not produced the information and data that Goldman requested in the due diligence lists, but Goldman did nothing to ensure that it got the

information it needed to properly and adequately advise, assist, and protect Plaintiffs and Dragon in the transaction with L&H. Goldman never demanded the documentation, never demanded any higher level of due diligence from L&H, never required L&H to produce the data and information underlying the summaries L&H provided during the due diligence process, and never advised Plaintiffs and Dragon against the transaction.

61.    Goldman knew at all times that the L&H transaction involved a significant stock component and knew, after March 8, 2000, that the transaction would be an all-stock deal that required a high level of investigation, analysis, and due diligence. Goldman also knew that the merger with L&H entirely for L&H stock was a high risk transaction but Goldman never advised against Dragon's merger into L&H or conveyed any concern about an all-stock no-cash transaction or about L&H's business strength and financial health. Instead, Goldman expressly told and represented to Plaintiffs and Dragon – with no competent investigation or valuation analyses – that L&H's stock value was not an open issue or a concern. Goldman prepared a few lists of questions and went to a few meetings for its $5 million. It did nothing to protect or advise Dragon and Plaintiffs against this fatal merger.

62.    Goldman knew that representations by L&H and L&H's bankers were unreliable and required investigation of the underlying data, but Goldman intentionally and recklessly failed to conduct the investigation, research, review, and analysis of multiple areas of L&H's business that it was required to complete as part of the valuation analyses and comprehensive financial advice and assistance Goldman committed to provide under law and contract. These included, but were not limited to:

- The actual value of L&H's stock;

- L&H's accounting practices regarding research and development write offs;

- 23 -

- L&H's accounting treatment for its acquisitions of other companies prior to its acquisition of Dragon;

- Whether L&H's revenue derived from organic growth as opposed to acquisitions;

- The existence of real customers of L&H;

- L&H's relationships with customers;

- L&H's revenues in Far East Asia, including Korea and Singapore;

- The effect of the recently-purchased Bumil on L&H's Korean revenues and business;

- L&H's relationship with any related party entities and whether L&H was using related parties to conduct off-balance sheet and off-income statement research and development; and

- The reasons for and the accounting treatment of L&H's relationships with any related party entities.

63.     The Bakers believed when they agreed to an all-stock deal, executed the Merger Agreement, and closed on the merger that Goldman had performed the proper investigations and properly valued the consideration for the transaction, and that the L&H stock Dragon shareholders would receive represented fair value for Dragon's 600 million dollar price. The Bakers were not at all aware that Goldman had not and was not fulfilling its duty, had done inadequate or no investigation, research, review, and analysis, and had failed to properly value the consideration that Dragon shareholders would receive in return for their company and its valuable assets.

### 1.     Goldman Intentionally Failed to Analyze and Verify L&H's Asian Revenues

64.     Goldman knew that L&H reportedly experienced significant Asian growth in 1999 and early 2000.

65.     The Bakers, Dragon's Board of Directors, and Dragon senior management expected and relied on Goldman to, among other things, analyze and verify L&H's purported exceptional growth in Asian revenues and the questions about L&H's Asian revenues that arose in multiple meetings with L&H, SG Cowen, and KPMG.

66.     Investigating and understanding L&H's Asian growth were necessary and critical to a proper valuation analysis of L&H stock. Goldman was legally and contractually obligated, as part of its comprehensive financial advice and assistance, to analyze and verify L&H's revenues, including its Asian revenues. This information and analysis was crucial to assist in negotiating the financial aspects of the transaction.

67.     Goldman was uniquely positioned to investigate, research, review, and analyze L&H's Asian growth and revenues because Goldman had offices in Singapore and South Korea, where L&H's Asian growth was concentrated.

68.     The Bakers believed that Goldman, with its global resources, had conducted a careful and thorough analysis of L&H's Asian revenues and that there were no open issues or areas of potential concern.

69.     Goldman either did nothing to verify these critical Asian revenues, or it conducted such a careless, incompetent, and grossly negligent analysis that it failed to discover what a Wall Street Journal reporter learned with only a few phone calls – that most of L&H's Asian business was a sham and much of the rest of L&H's business was based on phony revenue.

70.     In fact, L&H had fabricated much of its supposed 1999 Asian revenue by creating fake license agreements with non-existent entities and by self-dealing with shell entities that it created and owned. Had Goldman done the investigation, research, review, and analysis it was legally and contractually required to do, Goldman would have or should have known that L&H's

Asian growth and revenues were manufactured. Plaintiffs would not have agreed to merge

Dragon with L&H and would not have lost hundreds of millions of dollars and their unique and

valuable intellectual property.

71.    The Bakers relied on and were damaged by Goldman's derelict investigation,

research, review, and analysis of L&H's Asian revenues and Goldman's intentional bad faith and

failure to caution them, Dragon's Board of Directors, and Dragon management about L&H's

illegitimate Asian revenues.

### 2.    Goldman Intentionally Failed to Analyze and Verify the Propriety of L&H's Strategic Partnerships and Related Party Revenue

72.    The Bakers, Dragon's Board of Directors, and Dragon senior management

expected and relied on Goldman to investigate, research, review, and analyze the relationship

between L&H and L&H's so-called "strategic partners," including Dictation Consortium,

Brussels Translation Group, Flander's Language Valley Fund, Lernout and Hauspie Investment

Company, SAIL Labs, numerous Language Development Companies, and numerous Cross

Language Development Companies. This included investigating whether L&H derived revenue

from these entities, whether the entities were affiliated with or controlled by L&H, and whether

the entities had independent operations of their own. Goldman admitted this investigation,

research, review, and analysis had to be done and it was expected that Goldman – with its

worldwide reputation and resources, investment banking experience, superior skills, and for a

$5 million fee – would do it. Instead, Goldman did virtually nothing.

73.    Investigating and understanding L&H's related party revenue were necessary and

critical to a proper valuation analysis of L&H stock. Goldman was legally and contractually

obligated, as part of its comprehensive financial advice and assistance, to investigate, research,

review, and analyze L&H's strategic partners and related party revenue. This investigation,

research, review, and analysis was crucial to assist in negotiating the financial aspects of the transaction.

74.    Under L&H's business model, some of L&H's strategic partners were supposedly developing translation capabilities for numerous languages and language dialects around the world, including Greek, Polish, Czech, Hungarian, Slavic, Thai, Hindi, Vietnamese, Turkish, Malay, Farsi, Arabic, Japanese, Tamil, Mandarin Chinese, Portuguese, Russian, Swedish, Finnish, and Italian, among others.  Goldman did nothing to confirm that these strategic partners were capable of or were actually developing the technology that L&H claimed they were developing.

75.    Others of these strategic partners were entities that supposedly licensed L&H's technology to develop it.  Goldman never confirmed that these entities, their investors, and sources of funding were independent of L&H.  Goldman never investigated the business arrangements, the accounting treatment of this research and development, or whether licenses actually existed that were negotiated between actual entities.

76.    Many of L&H's strategic partners were fictional entities that existed only on paper and had no business.  Goldman intentionally and in bad faith did virtually nothing to verify the bona fides of L&H's "strategic partners."  Among other things, Goldman did not contact the officers of the strategic partners, did not make site visits to or otherwise verify the offices of the strategic partners, did not review and assess the strategic partners' employee lists and agreements, did not review and assess the strategic partners' financial books and records, did not review and assess the technology or technological capability of the strategic partners, did not review L&H's license and development agreements with the strategic partners, and did not review and assess other business aspects of those entities.

- 27 -

77.     Goldman already knew from past work for another entity that at least one of L&H's strategic partners was related to L&H.  In late 1997 and early 1998, a venture capital company unrelated to Dragon or the Bakers engaged Goldman to consider a potential strategic investment in L&H of up to $25 million.  During its research and analysis of L&H for the venture capital company in 1997 and 1998, Goldman discovered that Flanders Language Valley ("FLV"), a supposed third party investment entity, was actually related to L&H.  In an internal memorandum, Goldman expressed concern that FLV was a party related to L&H and commented that Jo Lernout and Pol Hauspie resigned from the board of FLV "due to the conflicts of interest that had become apparent."

78.     FLV's role in L&H's fraud began to unravel for the public in December 2000, after the Dragon/L&H merger, when the Wall Street Journal reported that FLV was the undisclosed related party behind 30 start-ups that accounted for 10% of L&H's revenue in 1998 and 25% in 1999.  Goldman intentionally and in bad faith never conveyed to the Bakers and Dragon what it already knew about FLV before Dragon merged with L&H.

79.     Goldman's research analysts were also concerned about another strategic partner, Brussels Translation Group or BTG.  On October 29, 1999, only a little over one month before Goldman's engagement for the Dragon deal, Goldman's Robert Smithson wrote about his concerns with BTG in an analyst report:

> In L&H's earnings release, the company went to great pains to emphasize pre-goodwill EPS, which grew 25% to $0.31.  We would caution against such an approach as L&H acquired Brussels Translation Group for $59m.  BTG had previously paid for a great deal of L&H's research and development:  In the transaction, L&H effectively bought the R&D it had itself done, for twice the money it was paid for doing the research.  By using earnings ex goodwill, investors ignore the (very real) cost of the R&D.

Goldman never conveyed these concerns to Dragon and Plaintiffs and never investigated these

concerns during its supposed due diligence.

80.    In a subsequent report on November 15, 1999, Goldman research analysts Robert Smithson and Charles Elliot again expressed caution about entities "that exist around L&H" including not only BTG and FLV, but also LHIC (Lernout & Hauspie Investment Company), Dictation Consortium, and Sail (Speech, Artificial Intelligence and Language). Again, Goldman never conveyed these concerns to Dragon and Plaintiffs, and never investigated these concerns during its supposed due diligence. Goldman intentionally did nothing, except assure Plaintiffs in bad faith that there were no concerns and open issues.

81.    In fact, L&H's "strategic partner" revenue was a significant portion of L&H's supposed revenue. Because this purported revenue came from entities that L&H owned or controlled, the revenue was in fact fictional and not true revenue at all.

82.    The Bakers expected and relied on Goldman to bring to this engagement its superior skill and investment banking expertise and to perform its legal and contractual obligations carefully, competently, and diligently. Instead, Goldman intentionally and in bad faith failed to warn the Bakers about dangers with L&H and caused them to believe that L&H's related party revenue was non-existent or nominal and that there were no open issues or concerns with the sources of L&H's revenue. Instead of protecting Dragon and Plaintiffs, as it was legally and contractually obliged to do for its $5 million fee, Goldman did nothing and steered Dragon into oblivion and Plaintiffs into financial disaster.

83.    Had Goldman done the job it committed to do, and was legally and contractually obligated to do, and adequately and competently investigated and verified L&H's so-called "strategic partners," Goldman would have or should have known that the entities were shams.

Plaintiffs would not have agreed to merge Dragon with L&H and would not have lost hundreds of millions of dollars and their unique and valuable intellectual property.

84.    The Bakers relied on and were injured by Goldman's derelict investigation, research, review, and analysis of L&H's "strategic partner" relationships and related party revenue and Goldman's intentional and bad faith failure to warn them, Dragon's Board of Directors, and Dragon senior management about L&H's financial health.

### 3.    Goldman Intentionally Failed to Analyze and Verify L&H's Customer Relationships

85.    As part of its comprehensive financial advice and assistance, Goldman was legally and contractually obligated to fully and completely analyze and verify L&H's customer relationships. This was especially important because Dragon was a competitor of L&H in certain markets and could not do so directly. Goldman did virtually nothing with regard to this crucial issue.

86.    Investigating and understanding L&H's customer relationships were necessary and critical to any proper valuation analysis of L&H stock. This information was crucial to assist in negotiating the financial aspects of the transaction.

87.    Goldman intentionally and in bad faith never contacted any of L&H's supposed customers and its analysis of L&H's customer relationships was careless, incompetent, and virtually non-existent.

88.    Goldman knew the names of some, and should have known the names of all, of L&H's supposed customers. L&H and its bankers provided lists of some of L&H's customers to Goldman and some were listed in published newspaper articles. Goldman did not demand a listing of all of L&H's customers nor did it contact these supposed customers to determine whether they in fact were customers of L&H and to understand their relationships with L&H.

- 30 -

World-renowned investment banker Goldman, with offices in Korea and Singapore where L&H purportedly did business and had licensing agreements which reportedly generated substantial revenues, did not do even this bare minimum for its $5 million fee. The Wall Street Journal reporters contacted L&H's purported customers for nothing and unearthed the massive fraud that led to L&H's collapse.

89.     Goldman certainly understood the importance of contacting and interviewing L&H's purported customers. Goldman even prepared a script of questions for L&H's customers including: "What do you use L&H technologies/ products for?;" "How long have you been using L&H technologies?;" "How did you come to the decision to use L&H's speech technologies?;" "What do you regard as the most important aspects of speech technology products? How does L&H meet these criteria?;" "What do you believe L&H's strengths and weaknesses are?;" "Why did you choose L&H?;" "What is the state of the relationship with L&H? Do you have any concern?;" "Do you have any comments about L&H management team?;" "How much have you spent on your projects overall? How much went to L&H? What do you expect for the future?"

90.     Goldman gave the appearance of working diligently to protect Plaintiffs and Dragon pursuant to its legal and contractual obligations when, in fact, it did not do for Plaintiffs and Dragon what it had done for other more sophisticated clients or what it would have done if it were contemplating an investment in L&H. Goldman did not use a script of questions, did not contact any of L&H's supposed customers, and did not advise Plaintiffs and Dragon against proceeding with the merger without contacting L&H's customers and verifying L&H's customer relationships.

- 31 -

91.     During its investigation of L&H in 1998 on behalf of an institutional client,

Goldman contacted at least two L&H customers.  A Goldman memorandum summarizing

discussions with one of the customers was titled "Customer Checking."  Notably, the

institutional client was a sophisticated institutional investor and was considering an investment

of $25 million or less, which was 24 times smaller than the Dragon transaction and, unlike the

Dragon transaction which involved Dragon's entire value, represented a mere sliver of the

institutional client's $300 billion in assets in 1998.  Had Goldman done at least as much for

Dragon as it did for its other client, Goldman would have or should have learned that L&H had

grossly misrepresented its customer relationships.  Plaintiffs would not have agreed to merge

Dragon with L&H and would not have lost hundreds of millions of dollars and their unique and

valuable intellectual property.

92.     The Bakers relied on and were injured by Goldman's derelict investigation,

research, review, and analysis of L&H's customers and L&H's customer relationships and by

Goldman's intentional and bad faith failure to warn the Bakers and Dragon officers about L&H's

financial health.

### 4.    Goldman Intentionally Failed to Analyze and Verify Whether L&H's Growth Was Internal or Based on Acquisitions

93.     The Bakers, Dragon's Board of Directors, and Dragon management expected and

relied on Goldman to investigate, research, review, and analyze how much of L&H's growth was

based on acquisitions of other companies as opposed to the growth that was from within L&H, or

organic, and the effect of that growth on L&H's business and financial health.

94.     Investigating and understanding whether L&H's growth was internal or

acquisition-based were necessary and critical to a proper valuation analysis of L&H stock.  As

part of its comprehensive financial advice and assistance, Goldman was legally and contractually

obligated to analyze and verify the nature of L&H's growth. This information and analysis was crucial to assist in negotiating the financial aspects of the transaction.

95.    Goldman intentionally and in bad faith never conducted a financial analysis of L&H's organic-versus-acquisition-related growth, or conducted a careless, incompetent, and grossly negligent analysis. Had Goldman adequately and competently investigated and verified L&H's growth as it was legally and contractually obligated to do, Goldman would have or should have known that L&H's growth was largely acquisition-based. Plaintiffs would not have agreed to merge Dragon with L&H and lost hundreds of millions of dollars and their cutting edge intellectual property.

96.    The Bakers relied on and were injured by Goldman's derelict investigation, research, review and analysis of the nature of L&H's growth and by Goldman's intentional and bad faith failure to warn them, Dragon's Board of Directors, and Dragon management about L&H's financial health.

### 5.    Goldman Intentionally Failed to Examine the Effect of the Dictaphone Acquisition

97.    Goldman was aware, or should have been aware had it done a proper analysis and investigation, that L&H began negotiating to acquire Dictaphone Corporation in February 2000 and entered into purchase agreement with Dictaphone on or about March 7, 2000. The total consideration for this acquisition, which closed on or about May 5, 2000, was approximately $855 million. L&H paid for the acquisition using $435 million in L&H common stock and the remainder in loans, facilities, and other financial instruments.

98.    Goldman should have but never conducted a financial analysis to determine the impact of the Dictaphone transaction on L&H's finances or otherwise it conducted a careless, incompetent, and grossly negligent analysis. Goldman had no basis to provide advice about

L&H's value to the Bakers, Dragon's Board of Directors, and Dragon management without an analysis of the effect of the Dictaphone transaction. Among other things, Goldman never determined whether this transaction diluted L&H's stock, expended L&H's available cash, or added a significant debt load to L&H's portfolio that would have affected the value of the stock that Dragon received in its transaction. Had Goldman done the job it committed to do, and was legally and contractually obligated to do, and adequately and competently investigated the effect of the Dictaphone acquisition, Goldman would have or should have known that the Dictaphone transaction had a negative effect on the value of L&H's stock. Plaintiffs would not have agreed to merge Dragon with L&H and would not have lost hundreds of millions of dollars and their unique and valuable intellectual property.

99.    The Bakers relied on Goldman and were injured by Goldman's intentional and bad faith failure to investigate, analyze, and warn them about the impact of the Dictaphone deal on L&H's financial health.

### 6.    Goldman Intentionally Failed to Investigate, Research, Review, And Analyze Other Areas of L&H

100.    The Bakers, Dragon's Board of Directors, and Dragon management expected and relied on Goldman to investigate, research, review, analyze, and verify other areas of L&H's business, including but not limited to the synergies between L&H and companies that L&H had acquired, whether L&H's licensing revenue was based on recurring royalties or initial contract payments, the amount of cash that L&H had available to run its operations, L&H's research and development, and L&H's historical and prospective financial numbers and the bases and fundamentals behind those financial numbers.

101.    Investigating and understanding these areas of L&H's business were necessary and critical to any proper valuation analysis of L&H stock. As part of its comprehensive

financial advice and assistance, Goldman was legally and contractually obliged to investigate, research, review, and analyze all of these areas of L&H's business. This information and analysis was crucial to assist in negotiating the financial aspects of the transaction.

102.    Although Dragon requested access to all of L&H's financial and business information in the months prior to the execution of the acquisition agreement, L&H allowed Dragon only limited access to L&H's business information and denied Dragon access to L&H's auditor work papers. Goldman should have insisted on full access to L&H's business and financials for complete investigation, research, review, and analysis and should have advised Dragon's management, Dragon's Board of Directors, and the Bakers about the risks and consequences of proceeding with the transaction without access to the L&H business and financial information that was withheld. Goldman never did.

103.    In addition, Goldman failed to investigate, analyze, and perform due diligence regarding the quality of L&H's research and development and whether such research and development was actually occurring. In its representation of GE Capital in 1998, Goldman determined that L&H did not have any "'star' quality researchers." Goldman intentionally and in bad faith did not conduct the same investigation for Plaintiffs and Dragon nor did Goldman caution Plaintiffs and Dragon about the impact of this deficiency on L&H's business.

104.    Goldman should have advised Plaintiffs and Dragon about strategies to protect their investment and their intellectual property in the event financial expectations were not met. Goldman never did. Had Goldman adequately and competently investigated, researched, reviewed, and analyzed L&H's business and operations as it was legally and contractually obligated to do, Goldman would have or should have known that there were numerous red flags

against a merger with L&H. Plaintiffs would not have agreed to the merger and would not have lost hundreds of millions of dollars and their unique and valuable intellectual property.

105.    The Bakers relied on and were injured by Goldman's derelict investigation, research, review, and analysis of these areas of L&H's business and Goldman's intentional and bad faith failure to warn them, Dragon's Board of Directors, and Dragon management about the financial health and strength of L&H.

### D.    Goldman Intentionally and in Bad Faith Reassured Dragon and the Bakers that L&H's Representations Were Accurate

106.    Goldman knew or should have known that the Bakers, Dragon's Board of Directors, and Dragon management were depending and relying on Goldman to lead the investigation, research, review, and analysis of L&H's business, L&H's stock, and the financial aspects of the deal.

107.    In its role as exclusive investment banker for Dragon and the Bakers, Goldman demanded the lead on communications with L&H and L&H's bankers and took control over the transfer of information to and from L&H and L&H's consultants. Goldman told SG Cowen, L&H's investment banker, that all of SG Cowen's and L&H's communications to Dragon must be directed to Goldman.

108.    Throughout its engagement, Goldman gave the appearance of complying with its legal and contractual obligations as exclusive financial adviser, when, in fact, Goldman did virtually nothing. Goldman invited and encouraged Plaintiffs' trust in and reliance on Goldman's investment banking expertise, providing advice about L&H and about representations made by L&H and L&H's advisors and even endorsing the merger without conducting the investigation, research, review, and analysis it was legally and contractually obliged to do to justify its advice.

- 36 -

109.    Goldman attended by teleconference a December 17, 1999 Dragon Board of Directors meeting. Goldman presented historical financial information about L&H and financial forecasts if the merger occurred. Goldman discussed "open issues" in the L&H merger "proposal, the areas where clarification or additional information [was] required, and the benefits and drawbacks" of the potential merger. James Baker and Janet Baker were present at this meeting.

110.    Goldman also attended by teleconference a December 20, 1999 Dragon Board of Directors meeting. Numerous aspects of the potential merger with L&H were discussed, including "the price, financing contingency, employment matters, break up fees, employee reaction to Light [L&H], and certain other aspects of the Light proposal" as well as "the advantages and disadvantages of each proposal [the L&H proposal and the proposal by the Ford subsidiary Visteon], including . . . potential synergies and negative synergies between the Company and each acquirer." James Baker and Janet Baker were present at this meeting.

111.    Goldman participated in and gave favorable advice about L&H and the merger at the March 27, 2000 meeting of Dragon's Board of Directors, where Dragon approved the Merger Agreement. James Baker and Janet Baker were present at this meeting. As noted in the Dragon meeting minutes:

> The Goldman, Sachs representatives . . . noted that the combination of the Corporation and Lernout would create a significant critical mass of technology leadership. They noted that the currency for the Merger, the Lernout shares, was rather volatile, but noted that market conditions in Europe for Lernout were quite favorable.

112.    Goldman participated in other meetings and had other conversations and communications with Dragon management, the Bakers, L&H's investment banker, and L&H, discussing aspects of L&H's business from the time it was engaged until the deal closed on June

7, 2000. Although unknown to Plaintiffs and Dragon at the time, Goldman's advice and favorable representations about L&H were not supported by adequate and diligent investigation, research, review, and analysis and were contrary to Goldman's cautious statements and concerns in private research memoranda that were prepared for other Goldman clients.

113.    For instance, a Goldman investment research memorandum in May 1999 stated "we reiterate our cautious stance. L&H needs to demonstrate sustained organic earnings growth in order for us to be more positive on the stock." In another investment publication from 1998, a Goldman analyst wrote of concerns with transparency at L&H and confidence in L&H's estimates of financial performance: "This new structure is the third we have seen since initiation of coverage two years ago; such frequent changes lower visibility and reduce our confidence in estimates." This is a significant red flag that Goldman should have observed and communicated to Dragon and Plaintiffs, but did not. Goldman never advised Dragon and Plaintiffs against the merger with L&H and did nothing to protect Dragon and Plaintiffs against the risks presented by these significant red flags.

114.    In his October 29, 1999 analyst report, just a few weeks before Goldman's engagement as exclusive financial advisor for a possible Dragon merger with L&H, Goldman research analyst Robert Smithson wrote of his concerns with L&H:

- Slower-than-anticipated organic sales growth and growing receivables are our principal concerns with L&H. Management blamed acquisitions and some large services contracts that completed near the end of the quarter for the rise of receivables. It vowed to get DSOs down to near the 100 mark by year end. We note that at first-quarter 1999 results, where DSOs were 112, management made a similar pledge.

- In L&H's earnings release, the company went to great pains to emphasize pre-goodwill EPS, which grew 25% to $0.31. We would caution against such an approach as L&H acquired Brussels Translation Group for $59m. BTG had previously paid for a great

deal of L&H's research & development: In the transaction, L&H effectively bought the R&D it had itself done, for twice the money it was paid for doing the research. By using earnings ex goodwill, investors ignore the (very real) cost of that R&D.

- While L&H management emphasizes its focus on vertical markets, such as the medical and legal industries, we believe the bulk of the speech technology market growth will come from telephony, which is just a fraction of L&H's sales.

115.    In a November 15, 1999 investment research report, Goldman research analysts Robert Smithson and Charles Elliott expressed caution about L&H:

> We remain cautious about L&H . . . We questioned L&H management at length about its accounting policies, some of which we have criticized in the past . . . We expressed our concerns about The Dictation Consortium and Brussels Translation Group transactions where off-balance sheet entities funded R&D and were then acquired. Management assured us that there would be no repetition of these types of transactions. However, with a growing number of entities such as Sail (Speech, Artificial Intelligence and Language), LHIC (Lernout & Hauspie Investment Company) and Flanders Language Valley Fund that exist around L&H, we believe investor concerns about the visibility of L&H earnings will continue.

This is a significant red flag that Goldman should have observed and communicated to Dragon and Plaintiffs.

116.    Goldman expressed no such caution to Plaintiffs and Dragon. With a $5 million fee at stake, Goldman did just the opposite: Goldman actively took steps to allay concerns by Janet Baker, James Baker, and others at Dragon about L&H by arranging for a teleconference with Goldman's analysts in Europe who covered L&H for these investment research memoranda and knew L&H. Contrary to the statements of concern and caution in the research memoranda, Goldman's analysts intentionally and in bad faith provided positive representations about L&H and L&H's business to bolster the Bakers' and Dragon's confidence in Dragon's merger with L&H.

117.    The Bakers executed the Merger Agreement with L&H on March 27, 2000 and proceeded to close the deal on June 7, 2000, because they had been advised and reassured by Goldman that L&H was a strong merger partner and that the L&H stock they would receive was the best value for their interest in Dragon.

118.    The Bakers and Dragon had no questions about the transaction and believed that Goldman had done its job. The Bakers and Dragon were not aware that Goldman had been completely derelict in its undertaking, had done virtually nothing to properly investigate, research, review, analyze, and verify the representations made by L&H and its advisors, had misrepresented what it knew about L&H, and had completely failed to advise them as it had another client about the problems and risks of an all-stock deal with L&H or about strategies to protect their investment and their intellectual property.

119.    Had Goldman done the job it committed to do, and was legally and contractually obligated to do, Plaintiffs would not have agreed to merge Dragon into L&H and would not have lost hundreds of millions of dollars and their unique and valuable intellectual property.

E.    **Goldman Intentionally Failed to Disclose Conflicts of Interest**

120.    Prior to its engagement as exclusive financial advisor for the Dragon transaction, Goldman provided financial advisory services to L&H, sometimes on an "exclusive" basis. Goldman promoted L&H's stock privately to individuals and entities "interested in investing in LHS." Among other things, Goldman drafted a 36-page investment packet containing detailed information about L&H's business. This packet included information about L&H's structure, products, position in the speech technology field, market strategy, and management. Goldman received compensation from L&H for drafting this packet and for promoting L&H's stock to potential investors.

121.    In 1999, the very year Goldman undertook the engagement as exclusive financial advisor for a sale of Dragon, and, in other years before and after 1999, Goldman was one the largest traders of L&H stock, trading approximately 5.2% of the total volume of L&H stock exchanged in 1999.

122.    In late 1999 and early 2000, Goldman had business opportunities from L&H. L&H's legal advisor, Brown Rudnick, added Goldman to a select list of bankers who would underwrite L&H's purchase of Dictaphone, a deal which closed shortly before the Dragon merger. Although a consortium of European banks, not including Goldman, subsequently underwrote the Dictaphone deal, a Goldman investment fund was the default investment location for the $2.4 million of escrow funds for L&H's acquisition of another entity, Omni-Med, which occurred soon after the Dictaphone deal.

123.    Goldman did not disclose any of these conflicts of interest to the Bakers and/or Dragon. Goldman also failed to disclose that it had provided financial advisory services to L&H in the past and was a large trader in L&H's stock.

124.    Goldman profited or will profit from sales of technology in which it acquired an interest during L&H's bankruptcy. In 2001, the bankrupt L&H began to dispose of its technology assets. Many of these assets were sold to a company known as Lionbridge Technologies, which obtained financing for its purchases by selling preferred stock to Goldman and Goldman affiliates.

125.    The Engagement Agreement that Goldman drafted also created a conflict because Goldman's $5 million fee was contingent on closing a deal. Consequently, Goldman's principal goal was getting a deal closed rather than competently, diligently, and properly protecting Dragon and Plaintiffs in the deal.

## IV.    L&H'S MANUFACTURED GROWTH AND REVENUE

126.    In 1997, 1998, and 1999, L&H reported growth and increased revenues.  As the public learned when L&H's fraud was subsequently exposed, L&H's growth was manufactured and its revenues were phony.

### A.    L&H's Growth Consisted of Non-Existent License Revenues from "Strategic Partners" It Created

127.    One scheme L&H employed to manufacture revenues involved the creation of "strategic partners" to contract with L&H.  These "strategic partners" were so-called Language Development Companies ("LDCs") and Cross Language Development Companies ("CLDCs"), which were supposed to develop the company's software for specific applications and/or languages.  The strategic partners would pay licensing fees to L&H, which L&H would record as revenue, and then the strategic partners would purportedly "develop" the software.  At the end of the contract term, L&H would have the option – which it usually exercised – to acquire the strategic partner and the developed product.  Through this scheme, L&H was able to avoid recording the expenses associated with developing the software, and to record revenue.

128.    The revenue derived from these "strategic partner" relationships was substantial, accounting for 10% of L&H's reported revenues in 1998 and 25% of its reported revenues in 1999.

129.    In fact, the strategic partners were corporate fictions, and the reported revenue was entirely phony.  The LDCs and CLDCs were actually funded by L&H and parties related to L&H, including FLV.  The entire arrangement was a sham designed to move research and development expenses off the books of L&H and to allow L&H to artificially inflate its revenues.  The LDCs and CLDCs had no employees and no ability to develop software independently of L&H.  All the development work under the contracts was done by L&H, and

because the source of the funding for the LDCs and CLDCs was L&H and parties related to

L&H, L&H was essentially paying itself to do research and then recognizing this as revenue.

130.    The Bakers would not have approved the merger with L&H if they did not have

complete comfort about the legitimacy of L&H's relationships with its strategic partners. The

Bakers relied on Goldman's representations, actions, and omissions in deciding to proceed with

the transaction.

### B.    L&H's Growth Consisted of Fictitious Revenue from Asia

131.    In 1999, L&H focused on what it claimed to be its early and successful

penetration of a fast-growing Asian market, particularly Korea and Singapore. L&H's growth in

Asia was a key component of its sales pitch to Dragon management. Out of its 1999 revenue of

$344 million, L&H claimed that Korea and Singapore contributed $142 million. The prior year,

the two countries combined had contributed less than $300,000 in sales. Notably, L&H made no

significant acquisition in Singapore during the period.

132.    On September 13, 1999, L&H announced that it had expanded its Pacific Rim

presence by acquiring Bumil, a Korean company. Immediately after this acquisition, L&H

purportedly entered into a number of large contracts with a variety of Korean and Far East

customers. The purported revenue generated by L&H's so-called customers from Korea and the

Far East in 1999 accounted for 42% of the Company's fourth quarter 1999 revenues. Of the

$344 million in revenue that L&H recorded in 1999, approximately $63 million, or 18% was

attributed to sales in Korea. Sales in Singapore accounted for $80 million.

133.    Many of L&H's large Asian license agreements were patently bogus. For

example, on numerous Singapore license agreements, the same individual, Tony Snauwart,

signed as the "director" or "managing director" on behalf of licensees. Likewise, on numerous

multi-million dollar license agreements with Singapore licensees, there was no business address listed for the licensees. On other agreements, the licensees had the same address in Singapore.

134.    The Bakers would not have approved the merger with L&H if they did not have complete comfort about the legitimacy of L&H's reported growth in Asia. The Bakers relied on Goldman's representations, actions, and omissions in deciding to proceed with the transaction.

### C.    L&H's Fraud Is Exposed By Telephone Calls To Purported Customers

135.    In late summer and fall of 2000, the investing public began to learn pieces of the true story behind L&H's purported success. The public revelation that the growth in L&H's revenues derived substantially from burgeoning Asian sales prompted reporters from *The Wall Street Journal* to investigate some of those figures.

136.    On August 8, 2000, *The Wall Street Journal* reported that "some companies L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says." *The Wall Street Journal* made telephone calls to 18 of 30 companies that L&H claimed as its customers in Korea and discovered that:

> Three of the companies say they aren't, in fact, L&H customers. . . . Three more companies say their purchases from L&H over the past three quarters were smaller than figures provided by Mr. Bastiaens [L&H's president] or Sam Cho, vice president of L&H Korea. One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims. Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the company itself, had purchased products from L&H. Later, the company retracted this initial version.

137.    The discrepancies reported by the Wall Street Journal between L&H's statements about its Asian revenue and what the phone calls to L&H's purported customers revealed include:

> • L&H reported $121.8 million from its Korean customers in 1999 and the first quarter of 2000, and said it expected second quarter revenue to exceed $58.9 million. Total sales from the 13

companies responding to the Wall Street Journal yielded roughly $32 million in revenues.

- L&H stated it received revenue in the range of $5 million to $10 million from Korea Securities Computer Corp., or Koscom, a government-regulated clearing house for stock trades in three quarters through June 30, 2000. A Koscom official estimated L&H and Bumil's share of the revenue at roughly $1.5 million in 1999.

- L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." Two Samsung officials said their firm never made any purchases from L&H.

- L&H claimed LG Electronics as a customer. The contact at LG Electronics (provided by L&H) said LG briefly worked on a joint project with L&H for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," akin to labor costs for L&H's share of the work on the failed project. LG never bought products or licenses from L&H.

- L&H said revenue from Hung Chang Co., a maker of communications equipment, was in the range of $5 million to $10 million over the three quarters prior to August 2000. The Hung Chang official whom L&H identified as its contact, said that Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Although Hung Chang was Spia's largest shareholder when it was formed, L&H Korea became the largest less than two months later.

- L&H identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But Hyundai Securities stated their purchases amounted to just over $1 million. Hanvit Bank said the only contract it signed was for $150,000.

**D.    The Magnitude Of The L&H Fraud**

138.    On November 9, 2000, L&H "provided an update on the status of the mid-year audit of the Company that it had commissioned last August [2000] and of the ongoing audit committee inquiry" and announced that "[a]s a result of certain errors and irregularities identified

- 45 -

in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000."

139.    That day, NASDAQ suspended trading in L&H shares. Just before the suspension, L&H shares were trading at $3.525, more than 95% below the record high of $72.50 in March, when the company claimed a market capitalization of more than $10 billion and Dragon approved the Merger Agreement. The slide wiped out more than $9 billion of the company's stock market value.

140.    On November 20, 2000, the Audit Committee presented a report (the "Audit Committee Report") concluding that at least $277 million – or one third of L&H's revenue over the prior 2½ years – had been improperly recorded.

141.    On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the United States Bankruptcy Code.

142.    On December 19, 2000, the *Wall Street Journal* reported that the Audit Committee Report, coupled with another audit report, "together present the broadest and deepest case to date that the rise of Lernout & Hauspie was based on artifice and deceit – and not on dazzling advances in computerized speech recognition, as the company had purported."

143.    On April 27, 2001, L&H announced at an extraordinary shareholders meeting in Ieper, Belgium, that in addition to the $277 million identified in the November 20, 2000 Audit Committee Report as being misreported, an additional $96 million of income had been reported which did not exist.

144.    Jo Lernout and Pol Hauspie, L&H's principals, and Nico Willaert, L&H's CFO, were arrested in Belgium and charged with forgery and stock manipulation. Gaston Bastiaens, L&H's president, was arrested by United States officials in Winchester, Massachusetts, in

response to a Belgian warrant and was subsequently extradited to Belgium, where he was

charged with fraud, insider trading, stock market manipulation and accounting law violations.

145.    L&H reversed at least 13% of its reported revenues for fiscal 1998 and at least

70% of its reported revenues for fiscal 1999.

146.    In its Form 8-K Current Report Pursuant to Section 13 or 15(d) of the Securities

Exchange Act of 1934, dated April 27, 2001, filed with the SEC on May 3, 2001, the Company

revealed:

> . . . the Company has prepared restated financial statements for its
> revenues for 1998, 1999 and the first two quarters of 2000. As a
> result of this exercise, **of $535 million of revenues reported by
> the Company** (excluding the Company's Mendez translation unit,
> the acquired Dragon Systems Inc. and subsidiaries business, the
> US transcription business and certain other less significant
> subsidiaries) during this period, **$373 million have been reversed**.
> A portion of the revenue reversed as a result of the restatement will
> be recognized in later periods. **The revenues reversed included
> all revenues recorded by the Company's Korean subsidiary
> during this period, since a substantial portion of such revenues
> could not be substantiated**.

(Emphasis added).

## V.    CAUSES OF ACTION

### COUNT I – Breach of Fiduciary Duty

147.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 146 of this

Complaint as though fully set forth at length herein.

148.    Goldman stood in a fiduciary relationship to the Bakers, stemming from, among

other things, Goldman's role in the transaction as Dragon's exclusive financial advisor, the

Bakers' status as the majority shareholders of Dragon, owners of Dragon, members of Dragon's

Board of Directors, and members of Dragon's senior management, Goldman's communications

and representations directly to the Bakers, and the Bakers' trust, confidence, and reliance on

Goldman.

149.    Goldman was, and is, reputed to possess exceptional skill, experience, and knowledge in the fields of investment banking, mergers, and acquisitions, and as such, Goldman was in a position to influence the Bakers' decisions.

150.    Goldman knew that the Bakers were the majority shareholders and owners of Dragon, that Janet Baker was a member of Dragon's Board of Directors, and that the Bakers both influenced and were affected by Dragon's management decisions.  Goldman knew that the Bakers were consequently relying on Goldman to provide comprehensive financial advice and assistance, and among other things, to conduct valuation analyses of L&H and L&H stock to ensure that the L&H stock Dragon's shareholders would receive in the transaction was the best value for Dragon and at least $600 million, to ensure that the deal was properly structured and that Plaintiffs' financial and intellectual property interests were fully and completely protected, to advise Plaintiffs honestly and in good faith about the merits and risks of a merger with L&H, to uncover and warn Plaintiffs of any problems and concerns about L&H's business practices and financial health, to advise Plaintiffs honestly and in good faith about the risks of an all-stock deal with L&H and about protective strategies, to give Plaintiffs' investment in L&H the same high degree of care and attention that Goldman gave to other clients considering investment in L&H and gives to its own investments, to actually complete all of the due diligence that Goldman represented needed to be done and Goldman would do, to put the interests of Plaintiffs and Dragon first, and to fulfill all of Goldman's contractual and common law obligations.

151.    This fiduciary duty obligated Goldman to act in the best interests of Dragon and Plaintiffs at all times during its engagement and to act as Goldman would have acted for itself if it were in Dragon's and the Bakers' position.

152.    Goldman breached its fiduciary duty by, among other things:

- failing to conduct careful and proper valuation analyses of L&H stock;

- failing to carefully and properly investigate, research, review, and analyze L&H's business and the source of L&H's growth and revenues;

- failing to investigate, research, review, and analyze L&H's strategic partner relationships and related party revenue;

- failing to investigate, research, review, and analyze L&H's Asian revenues;

- failing to investigate, research, review, and analyze L&H's customer relationships;

- failing to investigate, research, review, and analyze whether L&H's growth was internal or based on acquisitions;

- failing to investigate, research, review, and analyze the effect of L&H's acquisition of Dictaphone on L&H;

- failing to investigate, research, review, and analyze the synergies between L&H and companies that L&H acquired;

- failing to investigate, research, review and analyze whether L&H's licensing revenue was based on recurring royalties or initial contract payments;

- failing to investigate, research, review, and analyze the amount of cash that L&H had available to run its operations;

- failing to investigate, research, review, and analyze L&H's research and development;

- failing to investigate, research, review, and analyze all of the areas of L&H's business that Goldman said it needed to and was investigating researching, reviewing, and analyzing;

- failing to conduct the investigation, analysis, and due diligence that would have been necessary to support Goldman's statements and representations to the Bakers, Dragon's Board of Directors, and Dragon senior management;

- failing to disclose all of the red flags that Goldman uncovered in Goldman's representation of GE Capital;

- failing to communicate and act upon significant red flags known to Goldman analysts;

- causing its research analysts to make misrepresentations and provide assurances to the Bakers and Dragon that were contrary to the reports that Goldman published to its private client investors;

- providing false assurances and making misrepresentations to the Bakers, Dragon's Board of Directors, and Dragon senior management about the value of L&H's stock and L&H's financial and business health;

- failing to disclose to the Bakers, Dragon's Board of Directors, and Dragon senior management Goldman's concerns about L&H's financial health and business practices;

- causing the Bakers to undertake risks that were obvious to Goldman and could have been avoided;

- failing to advise the Bakers about strategies to protect their financial and intellectual property interests in Dragon which they were trading entirely for high risk L&H stock;

- undertaking the engagement without fully disclosing the conflicts of interest created by its prior and concurrent undertakings for L&H; and

- providing advice to the Bakers, Dragon's Board of Directors, and Dragon's senior management that was not in Dragon's or the shareholders' best interest and was otherwise careless and ill-advised.

Goldman put its own interests first and did nothing to protect Plaintiffs and their company in what Goldman knew was a high risk transaction.

153.    Goldman's breach of its fiduciary duty caused the Bakers to lose not only their entire three hundred million dollar interest in the company they founded and grew into a market leader in speech recognition technology but also their rights and interest in Dragon's unique and valuable intellectual property. Goldman's conduct was wanton, willful, and egregious and warrants punitive damages.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, punitive damages, and such other relief that the Court deems just and proper.

## COUNT II – Violation of Massachusetts Unfair Trade Practices Statute

154.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 153 of this Complaint as though fully set forth at length herein.

155.    Goldman, by its acts and conduct described in this Complaint, was engaged in trade or commerce.

156.    Goldman's acts and conduct described in this Complaint constituted unfair and deceptive acts and practices, declared unlawful by Chapter 93A, Section 2, of the General Laws of the Commonwealth of Massachusetts.

157.    Plaintiffs were selling their business assets and effectuating a corporate merger and were therefore engaged, pursuant to Chapter 93A, Section 11, in trade and commerce in the Commonwealth of Massachusetts in their dealings with Goldman out of which the claims in this action arise.

158.    Any one of the following acts or omissions constitutes actionable conduct under Chapter 93A: unfair or deceptive acts or practices, deception, intentional misrepresentation, negligent misrepresentation, innocent misrepresentation, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and breach of the duty to speak. Goldman's actions and omissions described in the complaint constituted a violation of Chapter 93A under each and every one of the foregoing types of prohibited conduct. Among other things, Goldman:

- failed to conduct careful and proper valuation analyses of L&H stock;

- failed to carefully and properly investigate, research, review, and analyze L&H's business and the source of L&H's growth and revenues;

- failed to investigate, research, review, and analyze L&H's strategic partner relationships and related party revenue;

- failed to investigate, research, review, and analyze L&H's Asian revenues;

- failed to investigate, research, review, and analyze L&H's customer relationships;

- failed to investigate, research, review, and analyze whether L&H's growth was internal or based on acquisitions;

- failed to investigate, research, review, and analyze the effect of L&H's acquisition of Dictaphone on L&H;

- failed to investigate, research, review, and analyze the synergies between L&H and companies that L&H acquired;

- failed to investigate, research, review and analyze whether L&H's licensing revenue was based on recurring royalties or initial contract payments;

- failed to investigate, research, review, and analyze the amount of cash that L&H had available to run its operations;

- failed to investigate, research, review, and analyze L&H's research and development;

- failed to investigate, research, review, and analyze all of the areas of L&H's business that Goldman said it needed to and was investigating researching, reviewing, and analyzing;

- failed to conduct the investigation, analysis, and due diligence that would have been necessary to support Goldman's statements and representations to the Bakers, Dragon's Board of Directors, and Dragon senior management;

- failed to disclose all of the red flags that Goldman uncovered in Goldman's representation of GE Capital;

- failed to communicate and act upon significant red flags known to Goldman analysts;

- caused its research analysts to make misrepresentations and provide assurances to the Bakers and Dragon that were contrary to the reports that Goldman published to its private client investors;

- provided false assurances and made misrepresentations to the Bakers, Dragon's Board of Directors, and Dragon senior management about the value of L&H's stock and L&H's financial and business health;

- failed to disclose to the Bakers, Dragon's Board of Directors, and Dragon senior management Goldman's concerns about L&H's financial health and business practices;

- caused the Bakers to undertake risks that were obvious to Goldman and could have been avoided;

- failed to advise the Bakers about strategies to protect their financial and intellectual property interests in Dragon which they were trading entirely for high risk L&H stock;

- undertook the engagement without fully disclosing the conflicts of interest created by its prior and concurrent undertakings for L&H; and

- provided advice to the Bakers, Dragon's Board of Directors, and Dragon's senior management that was not in Dragon's or the shareholders' best interest and was otherwise careless and ill-advised.

Goldman put its own interests first and did nothing to protect Plaintiffs and their company in what Goldman knew was a high risk transaction.

159.    Plaintiffs relied on Goldman's acts and omissions in deciding to merge Dragon into L&H in an all-stock transaction. But for Goldman's misleading acts and conduct as more fully described in the Complaint, Plaintiffs would not have agreed to merge Dragon with L&H and would not have lost hundreds of millions of dollars and their unique and valuable intellectual property. Even absent reliance, Goldman's acts and omissions as more fully described in this Complaint had a tendency to deceive and could reasonably have caused Plaintiffs to act differently from the way they otherwise would have acted.

160.    Plaintiffs have suffered substantial loss and damage as a direct and foreseeable consequence of Goldman's acts and omissions in violation of Chapter 93A.

161.    Plaintiffs are entitled to recover their reasonable costs of bringing this action, including attorneys' fees and expenses.

162.    In addition, because Goldman acted knowingly and willfully, Plaintiffs are entitled to a trebling of their actual damages, or at least two times such damage.

- 53 -

163.    Goldman's conduct was wanton, willful, and egregious and warrants punitive damages.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, treble damages, and such other relief that the Court deems just and proper.

### COUNT III – Breach of Contract

164.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 163 of this Complaint as though fully set forth at length herein.

165.    A valid and enforceable contract existed between Goldman and the Bakers. The contract is attached as Exhibit "B."

166.    The contract was supported by valuable consideration.

167.    Among other things, Goldman was obligated under the contract to provide comprehensive financial advice and assistance to the Bakers, including but not limited to searching for a purchaser or investment partner for Dragon acceptable to the Bakers and Dragon, assisting in negotiating the financial aspects of the transaction, and doing analyses of the value of any potential deal to the Bakers and Dragon's shareholders.

168.    Goldman failed to perform its obligations under the contract in every material respect.

169.    Goldman's breach of its contractual obligations caused the Bakers substantial injury and loss. The Bakers exchanged their $300 million interest in Dragon and their unique and valuable intellectual property for worthless L&H stock.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, punitive damages,

and such other relief that the Court deems just and proper.

### COUNT IV – Breach of Contract/Third Party Beneficiary

170.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 169 of this Complaint as though fully set forth at length herein

171.    Alternatively, the Bakers were third party beneficiaries of Goldman's performance under the contract. Goldman knew that the Bakers were Dragon's founders, owners and majority shareholders, that Janet Baker was a member of the Board of Directors, that the Bakers both influenced and were affected by Dragon's management decisions, and that no transaction for the sale of Dragon could proceed without the Bakers' agreement. Consequently, the Bakers were known and intended recipients of the supposed benefits of Goldman's performance and Goldman's performance was intended to benefit the Bakers.

172.    Goldman failed to perform its obligations under the contract in every material respect.

173.    Goldman's breach of its contractual obligations caused the Bakers substantial injury and loss. The Bakers exchanged their $300 million interest in Dragon and their unique and valuable intellectual property for worthless L&H stock.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, punitive damages, and such other relief that the Court deems just and proper.

### COUNT V - Breach of the Implied Covenant of Good Faith and Fair Dealing

174.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 173 of this Complaint as though fully set forth at length herein.

175.  Goldman had a duty to deal fairly and in good faith with Plaintiffs in the performance of its contractual duties.

176.  Goldman breached its duty of good faith and fair dealing because Goldman, among other acts and omissions:

- failed to conduct careful and proper valuation analyses of L&H stock;

- failed to carefully and properly investigate, research, review, and analyze L&H's business and the source of L&H's growth and revenues;

- failed to investigate, research, review, and analyze L&H's strategic partner relationships and related party revenue;

- failed to investigate, research, review, and analyze L&H's Asian revenues;

- failed to investigate, research, review, and analyze L&H's customer relationships;

- failed to investigate, research, review, and analyze whether L&H's growth was internal or based on acquisitions;

- failed to investigate, research, review, and analyze the effect of L&H's acquisition of Dictaphone on L&H;

- failed to investigate, research, review, and analyze the synergies between L&H and companies that L&H acquired;

- failed to investigate, research, review and analyze whether L&H's licensing revenue was based on recurring royalties or initial contract payments;

- failed to investigate, research, review, and analyze the amount of cash that L&H had available to run its operations;

- failed to investigate, research, review, and analyze L&H's research and development;

- failed to investigate, research, review, and analyze all of the areas of L&H's business that Goldman said it needed to and was investigating researching, reviewing, and analyzing;

- failed to conduct the investigation, analysis, and due diligence that would have been necessary to support Goldman's statements and representations to the Bakers, Dragon's Board of Directors, and Dragon senior management;

- failed to disclose all of the red flags that Goldman uncovered in Goldman's representation of GE Capital;

- failed to communicate and act upon significant red flags known to Goldman analysts

- caused its research analysts to make misrepresentations and provide assurances to the Bakers and Dragon that were contrary to the reports that Goldman published to its private client investors;

- provided false assurances and made misrepresentations to the Bakers, Dragon's Board of Directors, and Dragon senior management about the value of L&H's stock and L&H's financial and business health;

- failed to disclose to the Bakers, Dragon's Board of Directors, and Dragon senior management Goldman's concerns about L&H's financial health and business practices;

- caused the Bakers to undertake risks that were obvious to Goldman and could have been avoided;

- failed to advise the Bakers about strategies to protect their financial and intellectual property interests in Dragon which they were trading entirely for high risk L&H stock;

- undertook the engagement without fully disclosing the conflicts of interest created by its prior and concurrent undertakings for L&H; and

- provided advice to the Bakers, Dragon's Board of Directors, and Dragon's senior management that was not in Dragon's or the shareholders' best interest and was otherwise careless and ill-advised.

Goldman put its own interests first and did nothing to protect Plaintiffs and their company in what Goldman knew was a high risk transaction.

177.    Goldman's failure to perform the contract in good faith and deal fairly with Plaintiffs caused them substantial injury and loss. The Bakers exchanged their $300 million interest in Dragon and their unique and valuable intellectual property for worthless L&H stock.

178.    Goldman's conduct was wanton, willful, and egregious and warrants punitive damages.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, punitive damages, and such other relief that the Court deems just and proper.

## COUNT VI – Negligence

179.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 178 of this Complaint as though fully set forth at length herein.

180.    Goldman owed the Bakers a duty of reasonable care in its undertaking as Dragon's exclusive financial advisor and, in particular, in rendering advice and assistance in the L&H transaction. Goldman knew that the Bakers were the majority shareholders and owners of Dragon, that Janet Baker was a member of the Board of Directors, that the Bakers both influenced and were affected by Dragon management decisions, and that the Bakers would be relying on Goldman's advice as Dragon's exclusive financial advisor in deciding whether to agree to Dragon's merger with L&H and to accept L&H stock as the sole consideration for the transaction.

181.    Goldman breached its duty of care to the Bakers because Goldman, among other things:

- failed to conduct careful and proper valuation analyses of L&H stock;

- failed to carefully and properly investigate, research, review, and analyze L&H's business and the source of L&H's growth and revenues;

- failed to investigate, research, review, and analyze L&H's strategic partner relationships and related party revenue;

- failed to investigate, research, review, and analyze L&H's Asian revenues;

- failed to investigate, research, review, and analyze L&H's customer relationships;

- failed to investigate, research, review, and analyze whether L&H's growth was internal or based on acquisitions;

- failed to investigate, research, review, and analyze the effect of L&H's acquisition of Dictaphone on L&H;

- failed to investigate, research, review, and analyze the synergies between L&H and companies that L&H acquired;

- failed to investigate, research, review and analyze whether L&H's licensing revenue was based on recurring royalties or initial contract payments;

- failed to investigate, research, review, and analyze the amount of cash that L&H had available to run its operations;

- failed to investigate, research, review, and analyze L&H's research and development;

- failed to investigate, research, review, and analyze all of the areas of L&H's business that Goldman said it needed to and was investigating researching, reviewing, and analyzing;

- failed to conduct the investigation, analysis, and due diligence that would have been necessary to support Goldman's statements and representations to the Bakers, Dragon's Board of Directors, and Dragon senior management;

- failed to disclose all of the red flags that Goldman uncovered in Goldman's representation of GE Capital;

- failed to communicate and act upon significant red flags known to Goldman analysts;

- caused its research analysts to make misrepresentations and provide assurances to the Bakers and Dragon that were contrary to the reports that Goldman published to its private client investors;

- provided false assurances and made misrepresentations to the Bakers, Dragon's Board of Directors, and Dragon senior management about the value of L&H's stock and L&H's financial and business health;

- failed to disclose to the Bakers, Dragon's Board of Directors, and Dragon senior management Goldman's concerns about L&H's financial health and business practices;

- caused the Bakers to undertake risks that were obvious to Goldman and could have been avoided;

- failed to advise the Bakers about strategies to protect their financial and intellectual property interests in Dragon which they were trading entirely for high risk L&H stock;

- undertook the engagement without fully disclosing the conflicts of interest created by its prior and concurrent undertakings for L&H; and

- provided advice to the Bakers, Dragon's Board of Directors, and Dragon's senior management that was not in Dragon's or the shareholders' best interest and was otherwise careless and ill-advised.

Goldman put its own interests first and did nothing to protect Plaintiffs and their company in what Goldman knew was a high risk transaction.

182.    Goldman's breach of its duty of reasonable care caused the Bakers substantial injury and loss. The Bakers exchanged their $300 million interest in Dragon and their unique and valuable intellectual property for worthless L&H stock

183.    Goldman's conduct was wanton, willful, and egregious and warrants punitive damages.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, punitive damages and such other relief that the Court deems just and proper.

## COUNT VII – Negligent Misrepresentation

184.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 183 of this Complaint as though fully set forth at length herein.

185.    Goldman provided incorrect, incomplete, improper, and false information, representations, and assurances to the Bakers, Dragon's Board of Directors, and Dragon management.

186.    Goldman knew and/or intended that the limited group of which the Bakers were members would rely on its information, representations, and assurances.

187.    Goldman failed to exercise reasonable care in providing incorrect, incomplete, improper, and false information, representations, and assurances.

188.    The Bakers justifiably relied on Goldman's representations, statements, information, and assurances.

189.    Goldman's misrepresentations and omissions caused the Bakers substantial injury and loss.  The Bakers exchanged their $300 million interest in Dragon and their unique and valuable intellectual property for worthless L&H stock.

190.    Goldman's conduct was wanton, willful, and egregious and warrants punitive damages.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, punitive damages and such other relief that the Court deems just and proper.

## COUNT VIII – Intentional Misrepresentation

191.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 190 of this Complaint as though fully set forth at length herein.

192.    Goldman provided incorrect, incomplete, improper, and false information, representations, and assurances to the Bakers, Dragon officers, and Dragon's Board of Directors for their guidance.

193.    Goldman made factual representations and assurances that were material.

194.    The Bakers justifiably relied on Goldman's representations, information, statements, and assurances.

195.    Goldman knew that its representations, information, statements, and assurances were false and were not based on the investigation, research, review, and analysis that would have supported or justified those representations, information, and assurances. In the alternative, if Goldman's representations, information, statements, and assurances were not made knowingly, they were made with reckless disregard for their truth or falsity.

196.    Goldman intended to induce the Bakers to act on its representations, information, statements, and assurances in approving and closing on the Dragon merger into L&H.

197.    Goldman's misrepresentations and omissions caused the Bakers substantial injury and loss. The Bakers exchanged their $300 million interest in Dragon and their unique and valuable intellectual property for worthless L&H stock.

198.    As a separate basis for intentional misrepresentation, Goldman had a duty to the Bakers and Dragon's Board of Directors to disclose either that it had conducted no valuation analyses or that the valuation analyses it did did not support or justify proceeding with an all-stock transaction.

199.    Goldman's conduct was wanton, willful, and egregious and warrants punitive damages.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, punitive damages, and such other relief that the Court deems just and proper.

### COUNT IX – Gross Negligence, Willful Misconduct, And Bad Faith

200.    Plaintiffs incorporate by reference the allegations of paragraphs 1 to 199 of this Complaint as though fully set forth at length herein.

201.    Based on Goldman's role in the transaction as the exclusive financial advisor for Dragon, the Bakers' status as the majority shareholders and owners of Dragon, Janet Baker's status as a member of Dragon's Board of Directors, Goldman's relationship with the Bakers and Dragon's Board of Directors and management, Goldman's representations to the Bakers and Dragon's Board of Directors and management, and the Bakers' trust, confidence, and reliance on Goldman, Goldman owed a duty of care to the Bakers and a duty to act in good faith.

202.    Goldman knew or should have known there was a substantial likelihood the Bakers would suffer harm as result of Goldman's failure to adequately and properly perform its undertaking as Dragon's exclusive financial advisor.

203.    Goldman's acts and omissions as exclusive financial advisor to Dragon and Plaintiffs in the L&H transaction as more fully described in this Complaint were such a deviation from its duty of care as to constitute gross negligence, willful misconduct, and bad faith.

204.    Goldman recognized and acknowledged its liability for gross negligence, willful misconduct and bad faith in the Engagement Agreement it drafted.

205.    Goldman committed a gross breach of its duty of care, and acted willfully and in bad faith, through its deliberate inattention and reckless indifference to the responsibilities and obligations it undertook as Dragon's exclusive financial advisor. Among other things, Goldman:

- failed to conduct careful and proper valuation analyses of L&H stock;

- failed to carefully and properly investigate, research, review, and analyze L&H's business and the source of L&H's growth and revenues;

- failed to investigate, research, review, and analyze L&H's strategic partner relationships and related party revenue;

- failed to investigate, research, review, and analyze L&H's Asian revenues;

- failed to investigate, research, review, and analyze L&H's customer relationships;

- failed to investigate, research, review, and analyze whether L&H's growth was internal or based on acquisitions;

- failed to investigate, research, review, and analyze the effect of L&H's acquisition of Dictaphone on L&H;

- failed to investigate, research, review, and analyze the synergies between L&H and companies that L&H acquired;

- failed to investigate, research, review and analyze whether L&H's licensing revenue was based on recurring royalties or initial contract payments;

- failed to investigate, research, review, and analyze the amount of cash that L&H had available to run its operations;

- failed to investigate, research, review, and analyze L&H's research and development;

- failed to investigate, research, review, and analyze all of the areas of L&H's business that Goldman said it needed to and was investigating researching, reviewing, and analyzing;

- failed to conduct the investigation, analysis, and due diligence that would have been necessary to support Goldman's statements and representations to the Bakers, Dragon's Board of Directors, and Dragon senior management;

- failed to disclose all of the red flags that Goldman uncovered in Goldman's representation of GE Capital;

- failed to communicate and act upon significant red flags known to Goldman analysts;

- caused its research analysts to make misrepresentations and provide assurances to the Bakers and Dragon that were contrary to the reports that Goldman published to its private client investors;

- provided false assurances and made misrepresentations to the Bakers, Dragon's Board of Directors, and Dragon senior management about the value of L&H's stock and L&H's financial and business health;

- failed to disclose to the Bakers, Dragon's Board of Directors, and Dragon senior management Goldman's concerns about L&H's financial health and business practices;

- caused the Bakers to undertake risks that were obvious to Goldman and could have been avoided;

- failed to advise the Bakers about strategies to protect their financial and intellectual property interests in Dragon which they were trading entirely for high risk L&H stock;

- undertook the engagement without fully disclosing the conflicts of interest created by its prior and concurrent undertakings for L&H;

- provided advice to the Bakers, Dragon's Board of Directors, and Dragon's senior management that was not in Dragon's or the shareholders' best interest and was otherwise careless and ill-advised; and

- put its own interests first and did nothing to protect Plaintiffs and their company in what Goldman knew was a high risk transaction.

206.    Goldman's gross negligence, willful misconduct, and bad faith caused the Bakers substantial injury and loss. The Bakers exchanged their $300 million interest in Dragon and their unique and valuable intellectual property for worthless L&H stock

207.    Goldman's conduct was wanton, willful, and egregious and warrants punitive damages.

WHEREFORE, Plaintiffs demand judgment against Goldman for damages in an amount to be determined at trial, together with interest, court costs, attorneys' fees, punitive damages, and such other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all counts.

PARTRIDGE, ANKNER & HORSTMANN, LLP

_(signature)_

Terence K. Ankner, Esq. (BBO# 552469)
The Berkeley Building
200 Berkeley Street
16th Floor
Boston, MA  02116-5022

and

REED SMITH LLP

_(signature)_

Alan K. Cotler, Esq.
Joan A. Yue, Esq. (BBO# 538220)
Steven T. Voigt, Esq.
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

Counsel for the Plaintiffs
Janet Baker and James Baker

Dated:  November 18, 2008

Exhibit A

## TOLLING AND DOCUMENT PRESERVATION AGREEMENT

THIS TOLLING AND DOCUMENT PRESERVATION AGREEMENT (the "Tolling Agreement") is made this 31st day of July, 2002, by and between JANET BAKER, JAMES BAKER, JKBAKER LLC and JM BAKER LLC, on behalf of themselves and their predecessors, assigns, successors, subsidiaries, parents and similar corporate affiliates (the "Baker Parties"); and GARY FILLER and LAWRENCE PERLMAN, Trustees of the TRA RIGHTS TRUST, on behalf of themselves and the TRA RIGHTS TRUST and their predecessors, assigns, successors, subsidiaries, parents and similar corporate affiliates (the "Filler Parties"), on the one hand (collectively, the "Dragon Shareholders"), and GOLDMAN, SACHS & CO., on behalf of itself and its predecessors, assigns, successors, subsidiaries, parents and similar corporate entities ("Goldman"), on the other hand.

WHEREAS, Goldman provided professional services pursuant to an engagement letter dated December 2, 1999 concerning Goldman's engagement by Dragon Systems, Inc. (the "Dragon Systems Engagement"); and

WHEREAS, the Dragon Shareholders and Goldman are engaged in discussions regarding disputes concerning the Dragon Systems Engagement; and

WHEREAS, the Dragon Shareholders and Goldman have determined that it is in their mutual interest (1) to forego commencing litigation now regarding any claims or defenses that the Dragon Shareholders or Goldman may have concerning the Dragon Systems Engagement (the "Claims and Defenses"), but without prejudice to the Dragon Shareholders' or Goldman's ability to pursue the Claims and Defenses at a future date; and (2) to preserve all documents that may be relevant to the Claims and Defenses.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and intending to be legally bound, the Dragon Shareholders and Goldman agree as follows:

1.      The period between July 31, 2002, and the Termination Date of this Tolling Agreement, as defined in paragraph 3 below, shall not be included in determining the applicability of any statute of limitations, laches or any other defense based on the passage or lapse of time in any suit, action or other dispute resolution proceeding between any of the Dragon Shareholders and Goldman that may be brought in connection with the Claims and Defenses.

2.      The Dragon Shareholders and Goldman agree that they will not assert that any of the Claims and Defenses are barred by: (a) any statute of limitations that had not expired as of July 31, 2002; or (b) any laches, estoppel or waiver or other defenses based on the passage of time from July 31, 2002 through the Termination Date of this Tolling Agreement as defined in paragraph 3 below. Nothing herein shall waive or affect in any way any defense or claim that the Dragon Shareholders or Goldman may have as of July 31, 2002 with regard to any of the

Claims and Defenses, including any defense based on any statute of limitations, laches, estoppel or waiver.

3.    This Tolling Agreement shall terminate on a date certain ("the Termination Date") specified in a written notice from either party to any other party, which date certain shall not be earlier than sixty (60) days after the date of actual receipt by the other party of the written notice.

4.    The Dragon Shareholders and Goldman acknowledge and agree that they are now and forever estopped and precluded from contesting and denying the validity and enforceability of this Tolling Agreement regardless of the forum where any action is brought or litigated and without regard to the applicability of any particular state's law to the substantive claims or any choice of law analysis. The Dragon Shareholders and Goldman expressly agree to waive, forego and give up any claim that this Tolling Agreement is unforceable because of any state, federal or common law or policy or statute or for any other reason whatsoever.

5.    This Tolling Agreement shall be governed by the laws of the Commonwealth of Massachusetts consistent with the provisions in Paragraph 4 above.

6.    Any written notice required herein shall be sent by hand delivery or overnight delivery service (with the obtaining of a receipt) to:

If to the Baker Parties:

Alan Cotler, Esq.                     Karen C. Dyer, Esq.
REED SMITH LLP                  BOIES, SCHILLER & FLEXNER
1650 Market Street                  Suite 905
Philadelphia, PA  19103          Orlando, FL  32801-456

If to Goldman:

Paul Vizcarrondo, Jr., Esq.
WACHTELL, LIPTON, ROSEN & KATZ
51 W. 52nd Street
New York, NY  10019

If to the Filler Parties:

Gregory P. Joseph, Esq.
GREGORY P. JOSEPH LAW OFFICES LLC
805 Third Avenue – 31st Floor
New York, NY  10022

-2-

7.     This Tolling Agreement may be terminated by any Party without the consent or approval of any other Party in accordance with the terms and conditions of paragraph 3 above.

8.     This Tolling Agreement may be executed in several counterparts, each of which shall be considered to be an original and total copy.  Any party to this Tolling Agreement may deliver their signed counterpart of this Tolling Agreement by facsimile transmission. Delivery by a party by facsimile transmission shall have the same legal effect as if a signed original was delivered by each party.

9.     The Dragon Shareholders and Goldman further agree to preserve the originals of all documents and electronic documents in their possession, custody and control as of the date of this Tolling Agreement (a) by the Dragon Shareholders, that relate to their investments in and operation of Dragon Systems, Inc., the Dragon Systems Engagement or Lernout & Hauspie; and (b) by Goldman, that relate to the Dragon Systems Engagement or to any actual investment banking project that Goldman opened in connection with Lernout & Hauspie.

10.     This Tolling Agreement, and all discussions, correspondence and negotiations relating to it, shall not be used by one party against the other party at any time except only insofar as is necessary to enforce its terms.

11.     This Tolling Agreement may be amended only in writing in a document signed by all parties.


_____   7/31/02        _____  7/31/02
Alan K. Cotler            Date           Paul Vizcarrondo, Jr.     Date
Reed Smith LLP                           Wachtell, Lipton, Rosen & Katz
Attorneys for the Baker Parties          Attorneys for Goldman


_____   Date
Gregory P. Joseph
Gregory P. Joseph Law Offices LLC
Attorneys for the Filler Parties


-3-

7.      This Tolling Agreement may be terminated by any Party without the consent or approval of any other Party in accordance with the terms and conditions of paragraph 3 above.

8.      This Tolling Agreement may be executed in several counterparts, each of which shall be considered to be an original and total copy. Any party to this Tolling Agreement may deliver their signed counterpart of this Tolling Agreement by facsimile transmission. Delivery by a party by facsimile transmission shall have the same legal effect as if a signed original was delivered by each party.

9.      The Dragon Shareholders and Goldman further agree to preserve the originals of all documents and electronic documents in their possession, custody and control as of the date of this Tolling Agreement (a) by the Dragon Shareholders, that relate to their investments in and operation of Dragon Systems, Inc., the Dragon Systems Engagement or Lernout & Hauspie; and (b) by Goldman, that relate to the Dragon Systems Engagement or to any actual investment banking project that Goldman opened in connection with Lernout & Hauspie.

10.     This Tolling Agreement, and all discussions, correspondence and negotiations relating to it, shall not be used by one party against the other party at any time except only insofar as is necessary to enforce its terms.

11.     This Tolling Agreement may be amended only in writing in a document signed by all parties.


_____        Date        _____        Date
Alan K. Cotler                                    Paul Vizcarrondo, Jr.
Reed Smith LLP                                    Wachtell, Lipton, Rosen & Katz
Attorneys for the Baker Parties                   Attorneys for Goldman


_____
~~Gregory P. Joseph~~ Susan M. Davies Date July 31, 2002
Gregory P. Joseph Law Offices LLC
Attorneys for the Filler Parties

2

Exhibit B

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-1000

Goldman
Sachs

PERSONAL AND CONFIDENTIAL

December 2, 1999

Ellen Chamberlain
Chief Financial Officer
Dragon Systems, Inc.
320 Nevada Street
Newton, MA  02460

Janet M. Baker, Ph.D.
Dragon Systems, Inc.
320 Nevada Street
Newton, MA  02460

Donald L. Waite
Executive Vice President and Chief Administrative Officer
Seagate Technology, Inc.
920 Disc Drive
P.O. Box 66360
Scotts Valley, CA  95067-0360

Ladies and Gentleman:

We are pleased to confirm the arrangements under which Goldman, Sachs & Co. ("Goldman Sachs") is exclusively engaged by Dragon Systems, Inc. (the "Company") as financial advisor in connection with the possible sale of all or a portion of the Company.

During the term of our engagement, we will provide you with financial advice and assistance in connection with this potential transaction, which may include performing valuation analyses, searching for a purchaser acceptable to you, coordinating visits of potential purchasers and assisting you in negotiating the financial aspects of the transaction.

In connection with this engagement, the Company shall pay us a quarterly fee of $150,000, payable in cash, commencing on February 1, 2000, which to the extent paid shall be applied against any transaction fee which may become payable pursuant to this letter agreement. If the purchase of 50% or more of the outstanding common stock or the assets (based on the book value thereof) of the Company is accomplished ("a sale of the Company") in one or a series of transactions, including, but not limited to, private purchases of stock, a merger or a

Dragon Systems, Inc.
Seagate Technology
December 2, 1999
Page Two

sale by the Company of its stock or assets, we will charge a transaction fee based on the eventual buyer ("the Buyer") of the Company as set forth below.

If the Buyer is Light or Alabama and its affiliates ("Alabama"), we will charge a transaction fee based on the following schedule.

| Aggregate Consideration | Fee Payable |
| --- | --- |
| Up to $560 million | Minimum Fee shall be $2 million (the "Minimum Fee"), and such Minimum Fee may be increased up to a total of $5 million at the sole discretion of the Company |
| Over $560 million | Minimum Fee plus 5% of the aggregate consideration in excess of $560 million |

If the Buyer is not Light or Alabama, we will charge a transaction fee based on the following schedule.

| Aggregate Consideration | Fee Payable |
| --- | --- |
| Less than $375 million | $3.25 million |
| $375 - $650 million | 0.87% of aggregate consideration |
| Over $650 million | $5.63 million plus 3% of the aggregate consideration in excess of $650 million |

If less than 50% of the outstanding common stock or the assets (based on the book value thereof) of the Company is acquired in the manner set forth above, we will charge a transaction fee to be mutually agreed upon by Goldman Sachs and the Company but in no event less than $2 million. Notwithstanding the foregoing, in the event that either Sony Corporation or Psion PLC, or their respective affiliates, invest $40 million or less in the Company through a private issuance of new shares by the Company, no fee shall be payable in connection with such transaction. Except as provided herein, a transaction fee will be paid to us in cash upon consummation of each transaction.

Dragon Systems, Inc.
Seagate Technology
December 2, 1999
Page Three

The aggregate consideration for purposes of calculating a transaction fee shall be:

(i)  in the case of the sale, exchange or purchase of the Company's equity securities, the total consideration paid for such securities (including amounts paid to holders of options, warrants and convertible securities), plus the principal amount of all indebtedness for borrowed money as set forth on the most recent consolidated balance sheet of the Company prior to the consummation of such sale, exchange or purchase, and

(ii) in the case of a sale or disposition by the Company of assets, the total consideration paid for such assets, plus the net value of any current assets not sold by the Company and the principal amount of all indebtedness for borrowed money expressly assumed by the purchaser.

Amounts paid into escrow and contingent payments in connection with any transaction will be included as part of the aggregate consideration. Fees on amounts paid into escrow will be payable (a) upon the establishment of such escrow or (b) upon the release of such amounts from escrow to the extent the related escrow agreement provides that the escrow agent shall pay such fees to Goldman Sachs at or prior to the payment of such amounts to the Company or its stockholders. For purposes of the foregoing sentence, Goldman Sachs shall not be entitled to fees on amounts released from escrow that are paid to the Buyer.  If the consideration in connection with any transaction may be increased by payments related to future events, the portion of our fee relating to such contingent payments will be calculated and paid if and when such contingent payments are made.  Aggregate consideration also shall include the aggregate amount of any (i) dividends or other distributions declared by the Company with respect to its stock after the date hereof, other than normal recurring cash dividends in amounts not materially greater than currently paid, and (ii) amounts paid by the Company to repurchase any securities of the Company outstanding on the date hereof.

In connection with a sale of the Company involving a purchase or sale of stock, the transaction fee will be payable and calculated under the definition of aggregate consideration set forth above as though 100% of the outstanding common stock on a fully diluted basis had been acquired for the same per share amount paid in the transaction in which 50% or more of the Company's outstanding common stock is acquired by a purchaser or group of affiliated purchasers.  Nevertheless, our services pursuant to this letter will continue after control is obtained to assist you with a second step merger or similar transaction.

If any portion of the aggregate consideration is paid in the form of securities, the value of such securities, for purposes of calculating the transaction fee, will be determined by the average of the last sales prices for such securities on the five trading days ending five days prior to the consummation of the transaction.  If such securities do not have an existing public trading market, the value of the securities shall be the mutually agreed upon fair market value on the day prior to the consummation of the transaction.

Dragon Systems, Inc.
Seagate Technology
December 2, 1999
Page Four

You also agree to reimburse us quarterly, commencing February 1, 2000, and upon consummation of the transaction or transactions contemplated hereby or upon termination of our services pursuant to this agreement, for our reasonable out-of-pocket expenses, including the fees and disbursements of our attorneys, plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in this letter.

In order to coordinate most effectively our efforts together to effect a transaction satisfactory to the Company, the Company and its management will promptly inform us of any inquiry they may receive concerning the availability of all or a portion of the stock or assets of the Company for purchase. Also, during the period of our engagement, neither the Company nor its management will initiate any discussions looking toward the sale of all or a portion of the stock or assets of the Company without first consulting with Goldman Sachs. In addition, we will not contact any party or initiate discussions regarding a sale of the Company without first identifying the potential buyer and receiving the authorization of the Company to do so.

Please note that any written or oral advice provided by Goldman Sachs in connection with our engagement is exclusively for the information of the Board of Directors and senior management of the Company, and may not be disclosed to any third party or circulated or referred to publicly without our prior written consent.

In connection with engagements such as this, it is our firm policy to receive indemnification. The Company agrees to the provisions with respect to our indemnity and other matters set forth in Annex A which is incorporated by reference into this letter.

As you know, Goldman Sachs is a full service securities firm and as such may from time to time effect transactions, for its own account or the account of customers, and hold positions in securities or options on securities of companies, which may be the subject of the engagement contemplated by this letter.

Our services may be terminated by you or us at any time with or without cause effective upon receipt of written notice to that effect. We will be entitled to the applicable transaction fee set forth above in the event that at any time prior to the expiration of 18 months after such termination an agreement is entered into with respect to a sale of all or a portion of the stock or assets of the Company which is eventually consummated and any of the purchasers or their affiliates were on the list of prospective buyers provided by Goldman Sachs to the Company during the term of its engagement or Goldman Sachs or the Company, its management, its directors or its affiliates had contact with the acquiring party, or any affiliate thereof, or any affiliate of the Company, regarding such a transaction during the period of our engagement.

Dragon Systems, Inc.
Seagate Technology
December 2, 1999
Page Five

Please confirm that the foregoing is in accordance with your understanding by signing and
returning to us the enclosed copy of this letter, which shall become a binding agreement
upon our receipt.  We are delighted to accept this engagement and look forward to working
with you on this assignment.

Very truly yours,                                        Confirmed:

_____                                 DRAGON SYSTEMS, INC.
(GOLDMAN, SACHS & CO.)

                                                        By: _____
                                                            Ellen Chamberlain
                                                            Chief Financial Officer

                                                        Date: _____


SEAGATE TECHNOLOGY, INC., STOCKHOLDER

AGREEING ONLY AS TO THE FIFTH SENTENCE
OF ANNEX A

By: _____
    Donald L. Waite
    Executive Vice President and
    Chief Administrative Officer

Date: _____

Dragon Systems, Inc.
Seagate Technology
December 2, 1999
Page Six

JANET M. BAKER, Ph.D., STOCKHOLDER

AGREEING ONLY AS TO THE FIFTH SENTENCE
OF ANNEX A.

By: _____
    Janet M. Baker, Ph.D., Stockholder

Date: _____8 Dec. 1999_____

Dragon Systems, Inc.
Seagate Technology
December 2, 1999
Page Seven

## *Annex A*

*In the event that Goldman Sachs becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including stockholders of the Company, in connection with or as a result of either our engagement or any matter referred to in this letter, the Company periodically will reimburse Goldman Sachs for its legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith. The Company also will indemnify and hold Goldman Sachs harmless against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of either our engagement or any matter referred to in this letter, except to the extent that any such loss, claim, damage or liability results from the gross negligence, willful misconduct or bad faith of Goldman Sachs in performing the services that are the subject of this letter. If for any reason the foregoing indemnification is unavailable to Goldman Sachs or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by Goldman Sachs as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of the Company and its stockholders on the one hand and Goldman Sachs on the other hand in the matters contemplated by this letter as well as the relative fault of the Company and Goldman Sachs with respect to such loss, claim, damage or liability and any other relevant equitable considerations. The reimbursement, indemnity and contribution obligations of the Company under this paragraph shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any affiliate of Goldman Sachs and the partners, directors, agents, employees and controlling persons (if any), as the case may be, of Goldman Sachs and any such affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, Goldman Sachs, any such affiliate and any such person. The Company, Seagate Technology and Janet M. Baker also agree that neither Goldman Sachs nor any of such affiliates, partners, directors, agents, employees or controlling persons shall have any liability to the Company, Seagate Technology, Inc., Janet M. Baker or any person asserting claims on behalf of or in right of the Company in connection with or as a result of either our engagement or any matter referred to in this letter except to the extent that any losses, claims, damages, liabilities or expenses incurred by the Company result from the gross negligence, willful misconduct or bad faith of Goldman Sachs in performing the services that are the subject of this letter. Prior to entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Annex A, the Company will notify Goldman Sachs in writing thereof (if not previously so notified) and, if requested by Goldman Sachs, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this paragraph, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions satisfactory to Goldman Sachs. Promptly after receipt by Goldman Sachs of notice of its involvement in any action, proceeding or investigation, Goldman Sachs shall, if a claim for indemnification in respect thereof is to be made against the Company under this Annex, notify the Company in writing of such involvement. Failure by Goldman Sachs to so notify the Company shall relieve the Company from the obligation to indemnify Goldman*

Dragon Systems, Inc.
Seagate Technology
December 2, 1999
Page Eight

Sachs under this Annex A only to the extent that the Company suffers actual prejudice as a result of such failure, but shall not relieve the Company from its obligation to provide reimbursement and contribution to Goldman Sachs. If any person is entitled to indemnification under this Annex (the "Indemnified Person") with respect to any action or proceeding brought by a third party that is also brought against the Company, the Company shall be entitled to assume the defense of any such action or proceeding with counsel reasonably satisfactory to the Indemnified Person. Upon assumption by the Company of the defense of any such action or proceeding, the Indemnified Person shall have the right to participate in such action or proceeding and to retain its own counsel but the Company shall not be liable for any legal expenses of other counsel subsequently incurred by such Indemnified Person in connection with the defense thereof unless (i) the Company has agreed to pay such fees and expenses, (ii) the Company shall have failed to employ counsel reasonably satisfactory to the Indemnified Person in a timely manner, or (iii) the Indemnified Person shall have been advised by counsel that there are actual or potential conflicting interests between the Company and the Indemnified Person, including situations in which there are one or more legal defenses available to the Indemnified Person that are different from or additional to those available to the Company , provided, however, that the Company shall not, in connection with any one such action or proceeding or separate but substantially similar actions or proceedings arising out of the same general allegations, be liable for the fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Persons, including Goldman Sachs, except to the extent that local counsel, in addition to its regular counsel, is required in order to effectively defend against such action or proceeding. The Company shall not consent to the terms of any compromise or settlement of any action defended by the Company in accordance with the foregoing without the prior consent of the Indemnified Person.

The Company shall not be required to indemnify Goldman Sachs for any amount paid or payable by Goldman Sachs in the settlement of any action, proceeding or investigation without the written consent of the Company, which consent shall not be unreasonably withheld.

Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of either our engagement or any matter referred to in this letter is hereby waived by the parties hereto. The provisions of this Annex A shall survive any termination or completion of the engagement provided by this letter agreement, and this letter agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

Goldman, Sachs & Co. | 2765 Sand Hill Road | Menlo Park, California 94025
Tel: 650-234-3300

**Goldman
Sachs**

---

**PERSONAL AND CONFIDENTIAL**

March 31, 2000

Ellen Chamberlain
Chief Financial Officer
Dragon Systems, Inc.
320 Nevada Street
Newton, MA  02460

Janet M. Baker, Ph.D.
Dragon Systems, Inc.
320 Nevada Street
Newton, MA  02460

Donald L. Waite
Executive Vice President and Chief Administrative Officer
Seagate Technology, Inc.
920 Disc Drive
P.O. Box 66360
Scotts Valley, CA  95067-0360

Ladies and Gentleman:

Reference is made to the engagement letter dated December 2, 1999 between Goldman, Sachs & Co. ("Goldman Sachs") and Dragon Systems, Inc. (the "Company") as financial advisor in connection with the possible sale of all or a portion of the Company (the "Engagement Letter").

With regard to a sale of all or a portion of the Company to Lernout & Hauspie Speech Products, N.V., ("Light" as defined in the Engagement Letter) the fee arrangements set forth in the Engagement Letter pertaining to a sale to Light shall be amended as follows:

"In connection with the sale of all or a portion of the Company to Lernout & Hauspie Speech Products, N.V., the Company shall pay Goldman Sachs a transaction fee of $5 million.  The transaction fee shall be paid to us in cash upon consummation of the transaction, and the quarterly fee of $150,000, to the extent paid, shall be credited against such transaction fee ."

BAKE 028137

Dragon Systems, Inc.
Seagate Technology
March 31, 2000
Page Two

The foregoing sentence shall be inserted after the third paragraph of the Engagement Letter and shall supercede all other fee arrangements with regard to a sale to Light. With regard to a sale of all or a portion of the Company to any Buyer (as defined in the Engagement Letter) other than Light, the fee provisions set forth in the third, fourth, fifth, sixth, seventh, eighth and ninth paragraphs of the Engagement Letter remain in full force and effect.

All other provisions of the letter, including the provisions of Annex A shall remain in full force and effect.

Very truly yours,                                    Confirmed:

_Goldman Sachs & Co._

(GOLDMAN, SACHS & CO.)                               DRAGON SYSTEMS, INC.

                                                     By: _____
                                                         Ellen Chamberlain
                                                         Chief Financial Officer

                                                     Date: _____

                                                     SEAGATE TECHNOLOGY, INC., STOCKHOLDER

                                                     AGREEING ONLY AS TO THE FIFTH SENTENCE
                                                     OF ANNEX A

                                                     By: _____
                                                         Donald L. Waite
                                                         Executive Vice President and
                                                         Chief Administrative Officer

                                                     Date: _____

BAKE 028138

Dragon Systems, Inc.
Seagate Technology
March 31, 2000
Page Three

JANET M. BAKER, Ph.D., STOCKHOLDER

AGREEING ONLY AS TO THE FIFTH SENTENCE
OF ANNEX A.

By:     _____
        Janet M. Baker, Ph.D., Stockholder

Date:   _____

BAKE 028139

FOR DEPOSIT ONLY
MIDLSX SPR/COURT
# 01600532
1819A11/18 OODCHECK 275.00

FOR
BANK USE
ONLY

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE



//THIS DOCUMENT CONTAINS SECURITY FEATURES. SEE BACK FOR DETAILS.//

**ReedSmith** LLP

No. 999282

on Bank, N.A.
burgh, Pennsylvania

P.O. Box 2009
Pittsburgh, PA 15230

8-26/430

11/17/2008

$********515.00

Y   *Five Hundred Fifteen & no/100 Dollars*

THE ORDER OF

08-4306

MASSACHUSETTS SUPERIOR COURT

⑈999282⑈ ⑆043301601⑆ ⑈118⑈6695⑈

OF- 4306
$ 240

Validate

check for #515 only validated
for one plaintiff

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS SUPERIOR COURT DEPARTMENT COUNTY: __MIDDLESEX__ | DOCKET NO. 08-3906 |
|---|---|---|

| PLAINTIFF(S) Janet Baker and James Baker | DEFENDANT(S) Goldman Sachs & Co., Goldman Sachs Group, Inc., & Goldman Sachs & Co., LLC |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Terence K. Ankner, Esq., Partridge, Ankner & Horstmann, LLP 200 Berkeley Street, 16th Floor, Boston, MA  02116 (617) 859-9999 | ATTORNEY (IF KNOWN) |
| BBO#         552469 | |

**Origin code and track designation**

Place an x in one box only:
[ X ] 1. F01 Original Complaint
[  ] 2. F02 Removal to Sup.Ct. C.231,s.104
  (Before trial)     (F)
[  ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

[  ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[  ] 5. F05 Reactivated after rescript;relief from judgment/
  Order (Mass.R.Civ.P. 60)     (X)
[  ] 6.  E10 Summary Process Appeal     (X)

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| A01 | Services (Investment Banking) | (F) | |
| B99 | Other (See Below) | (F) | **Yes/No**  YES |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages.  For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(Attach additional sheets as necessary)

A.  Documented medical expenses to date:
  1.  Total hospital expenses               $_____
  2.  Total Doctor expenses                $_____
  3.  Total chiropractic expenses             $_____
  4.  Total physical therapy expenses          $_____
  5.  Total other expenses (describe)          $_____
                     Subtotal $_____

B.  Documented lost wages and compensation to date    $_____
C.  Documented property damages to date       $_____
D.  Reasonably anticipated future medical and hospital expenses $_____
E.  Reasonably anticipated lost wages        $_____
F.  Other documented items of damages (describe)    $_____

G.  Brief description of plaintiff's injury, including nature and extent of injury (describe)
  Plaintiffs seek damages in excess of $300 million for loss they sustained as a result of Defendants' negligence, gross negligence, negligent and intentional misrepresentation, breach of fiduciary duty, and violations of Chapter 93A of the General Laws as the investment banker exclusively engaged to provide comprehensive financial advice regarding the sale of their Company.
**Total** In excess of $300,000,000

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)
Provide a detailed description of claim(s):

  Plaintiffs seek damages in excess of $300 million for loss they sustained as a result of Defendants' breach of contract and breach of the implied covenant of good faith and fair dealing as the investment banker exclusively engaged to provide comprehensive financial advice regarding the sale of their Company.  **TOTAL** In excess of $300,000,000

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT  NONE

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____  Date:  November 18, 2008

A.O.S.C. 3-2007

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX
NOV 18 2008
CLERK

# Commonwealth of Massachusetts
## County of Middlesex
## The Superior Court

CIVIL DOCKET # **MICV2008-04306-J**
**Courtroom Civil J - Ct Rm 420 - 200 TradeCenter, Woburn**

RE:    **Baker et al v Goldman Sachs & Co. et al**
TO:

Terence K Ankner, Esquire
Partridge Ankner & Horstmann LLP
200 Berkeley Street
Boston, MA 02116

### SCHEDULING ORDER FOR  F  TRACK

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated, and case shall be resolved and judgment shall issue **09/09/2010**.

| STAGES OF LITIGATION | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | 02/16/2009 | 02/16/2009 | |
| Response to the complaint filed (also see MRCP 12) | | 03/18/2009 | |
| All motions under MRCP 12, 19, and 20 | 03/18/2009 | 04/17/2009 | 05/17/2009 |
| All motions under MRCP 15 | 03/18/2009 | 04/17/2009 | 05/17/2009 |
| All discovery requests and depositions served and non-expert depositions completed | 09/14/2009 | | |
| All motions under MRCP 56 | 10/14/2009 | 11/13/2009 | |
| Final pre-trial conference held and/or firm trial date set | | | 03/13/2010 |
| Case shall be resolved and judgment shall issue by **09/09/2010** | | | **09/09/2010** |

- **The final pre-trial deadline is not the scheduled date of the conference.**
- **You will be notified of that date at a later time.**
- **Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

Dated: 11/21/2008

Telephone: 781-939-2781

Michael A. Sullivan
Clerk of the Court

Commonwealth of Massachusetts
MIDDLESEX SUPERIOR COURT
Case Summary
Civil Docket

## MICV2008-04306
### Baker et al v Goldman Sachs & Co. et al

| | | | |
|---|---|---|---|
| **File Date** | 11/18/2008 | **Status** | Disposed: transferred to other court (dtrans) |
| **Status Date** | 01/22/2009 | **Session** | J - Civil J CtRm 420 (Woburn) |
| **Origin** | 1 - Complaint | **Case Type** | A01 - Services, labor, materials |
| **Track** | F - Fast track | **Lead Case** | |

**Jury Trial** Yes

### DEADLINES

| | Service | Answer | Rule12/19/20 | Rule 15 | Discovery | Rule 56 | Final PTC | Judgment |
|---|---|---|---|---|---|---|---|---|
| **Served By** | | | 03/18/2009 | 03/18/2009 | 09/14/2009 | 10/14/2009 | | |
| **Filed By** | 02/16/2009 | 03/18/2009 | 04/17/2009 | 04/17/2009 | | 11/13/2009 | | 09/09/2010 |
| **Heard By** | | | 05/17/2009 | 05/17/2009 | | | 03/13/2010 | |

### PARTIES

**Plaintiff**
Janet Baker
Maitland, FL
Active 11/18/2008

**Private Counsel 552469**
Terence K Ankner
Partridge Ankner & Horstmann LLP
200 Berkeley Street
Boston, MA 02116
Phone: 617-859-9999
Fax: 617-859-9998
Active 11/18/2008 Notify

**Plaintiff**
James Baker
Maitland, FL
Active 11/18/2008

*** See Attorney Information Above ***

**Defendant**
Goldman Sachs & Co.
53 State Street
Boston, MA
Service pending 11/18/2008

**Private Counsel 658789**
Annmarie A. Tenn
Ropes & Gray
1 International Place
Boston, MA 02110-2624
Phone: 617-951-7000
Fax: 617-951-7050
Active 01/22/2009 Notify

**Defendant**
Goldman Sachs Group, Inc.
Service pending 11/18/2008

*** See Attorney Information Above ***

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Civil Docket**

# MICV2008-04306
## Baker et al v Goldman Sachs & Co. et al

| Defendant | *** See Attorney Information Above *** |
|---|---|
| Goldman Sachs & Co., LLC<br>Service pending 11/18/2008 | |

| ENTRIES |
|---|

| Date | Paper | Text |
|---|---|---|
| 11/18/2008 | 1.0 | Complaint & civil action cover sheet filed |
| 11/18/2008 | | Origin 1, Type A01, Track F. |
| 01/22/2009 | 2.0 | Case REMOVED this date to US District Court of Massachusetts by defts GOLDMAN,SACHS & CO., THE GOLDMAN SACHS GROUP, INC., and THE GOLDMAN, SACHS & CO. L.L.C. |
| 01/22/2009 | | Findings: Above action this day removed to U S District Court. |

| EVENTS |
|---|