# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————— :
                                      :
JANET BAKER and JAMES BAKER,          :
                                      :
              Plaintiffs              :     **JURY TRIAL DEMANDED**
                                      :
       v.                             :     Civil Action No. 09-10053-PBS
                                      :
GOLDMAN SACHS & CO.,                  :
GOLDMAN SACHS GROUP, INC., and        :
GOLDMAN SACHS & CO., LLC              :
                                      :
              Defendants.             :
———————————————————— :


## PLAINTIFFS' BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

Alan K. Cotler, Esq.               Terence K. Ankner, Esq.
Joan A. Yue, Esq.                  PARTRIDGE ANKNER & HORSTMANN LLP
Steven T. Voigt, Esq.              200 Berkeley Street
REED SMITH LLP                     16th Floor
2500 One Liberty Place             Boston, MA  02116
1650 Market Street                 (617) 859-9999
Philadelphia, PA  19103
(215) 851-8100

                                   Attorneys for Plaintiffs
                                   Janet Baker and James Baker

# CASES

*Ackerman v. Price Waterhouse,*
  216 A.D.2d 123 (N.Y. App. Div. 1995) ........................................................... 18

*AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.,*
  11 N.Y.3d 146, 896 N.E.2d 61 (2008) .............................................................. 14

*AJW Partners, LLC v. Cyberlux Corp.,*
  2008 WL 4514171 (N.Y. Sup. Ct. Sept. 19, 2008) ........................................... 14

*Altman v. Aronson,*
  231 Mass. 588, 121 N.E. 505 (1919) ............................................................... 25

*Alusit Ltd. v. Aluglas of Pa.,*
  1990 WL 209422 (S.D.N.Y. Dec. 4, 1990) .................................................. 21-22

*Bernstein v. Kelso & Co.,*
  231 A.D.2d 314 (N.Y. App. Div. 1997) ........................................................... 33

*Berwind Prop. Group, Inc. v. Envtl. Mgmt. Group, Inc.,*
  2007 WL 4707647 (D. Mass. Feb. 5, 2007) ..................................................... 23

*Branch v. Ernst & Young U.S.,*
  1995 WL 791941 (D. Mass. Dec. 22, 1995) ................................................. 30-31

*Cash Energy, Inc. v. Weiner,*
  768 F. Supp. 892, 893 (D. Mass. 1991) ........................................................... 30

*Cede & Co. v. Technicolor, Inc.,*
  542 A.2d 1182 (Del. 1988) ............................................................................... 33

*Chace v. Curran,*
  71 Mass. App. Ct. 258, 881 N.E.2d 792 (2008) .............................................. 26

*Chaikovska v. Ernst & Young LLP,*
  21 A.D.3d 1324 (N.Y. App. Div. 2005) ........................................................... 26

*Chiacchia v. Lycott Envtl. Research, Inc.,*
  4 Mass. L. Rptr. 399, 1995 WL 1146824 (Mass. Super. Ct. Sept. 15, 1995) .................. 25

*Christopher v. Father's Huddle Café, Inc.,*
  57 Mass. App. Ct. 217, 782 N.E.2d 517 (2003) .............................................. 25

*Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.,*
    81 N.Y.2d 821, 611 N.E.2d 282 (1993)..................................................................... 25

*County of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assoc., LP,*
    2007 WL 838975 (N.D.N.Y. Mar. 19, 2007) .................................................. 33

*Craig v. Everett M. Brooks Co.,*
    351 Mass. 497, 222 N.E.2d 752 (1967) ........................................................... 24

*Daisy Systems Corp. v. Bear Stearns and Co., Inc.,*
    97 F.3d 1171 (9th Cir. 1996) ............................................................................ 15

*DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.,*
    2003 WL 22283836 (S.D.N.Y. Oct. 2, 2003) .................................................. 20

*Dowling v. Narragansett Capital Corp.,*
    735 F. Supp. 1105 (D.R.I. 1990).........................................................24-25, 28, 31-32

*EBC I, Inc. v. Goldman Sachs & Co.,*
    5 N.Y.3d 11, 832 N.E.2d 26 (2005)........................................................... 15-16

*Echomail, Inc. v. Am. Express Co.,*
    529 F. Supp. 2d 140 (D. Mass. 2007) .............................................................. 23

*Edward B. Fitzpatrick, Jr. Construction Corp. v. County of Suffolk,*
    138 A.D.2d 446 (N.Y. App. Div. 1988) ....................................................... 21-22

*Ernest Lawrence Group v. Marketing the Ams., Inc.,*
    2005 WL 2811781 (S.D.N.Y. Oct. 27, 2005) .................................................. 28

*European Am. Bank & Trust Co. v. Strauhs & Kaye,*
    65 N.Y.2d 536, 483 N.E.2d 110 (1985)............................................... 22, 24, 26

*Farragut Mortgage Co. v. Arthur Andersen LLP,*
    1999 WL 823656 (Mass. Super. Ct. Aug. 5, 1999) .................................. 20, 22

*Feldman v. Cutaia,*
    951 A.2d 727 (Del. 2008) ................................................................................. 31

*Four Winds of Saratoga, Inc. v. Blue Cross and Blue Shield of Cent. N.Y., Inc.,*
    241 A.D.2d 906 (N.Y. App. Div. 1997) .......................................................... 22

*Friedman v. Mohasco Corp.,*
    929 F.2d 77 (2d Cir. 1991)................................................................................ 28

*Frydman & Co. v. Credit Suisse First Boston Corp.,*
    272 A.D.2d 236 (N.Y. App. Div. 2000) ................................................................ 16

*Gerber v. Bowditch,*
    2006 WL 1284232 (D. Mass. May 8, 2006) ........................................................ 28

*Golber v. Baybank Valley Trust Co.,*
    46 Mass. App. Ct. 256, 704 N.E.2d 1191 (1999) ........................................... 26

*Greenfield v. Shuck,*
    867 F. Supp. 62 (D. Mass. 1994) ........................................................................ 31

*Gupta v. Nat'l Life Ins. Co.,*
    2006 WL 2000118 (W.D.N.Y. July 17, 2006) ................................................. 21

*HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC,*
    517 F.3d 454 (7th Cir. 2008) ................................................................... 16, 24

*Helmsley v. Cohen,*
    56 A.D.2d 519 (N.Y. App. Div. 1977) ............................................................... 33

*Higgins v. New York Stock Exch., Inc.,*
    806 N.Y.S.2d 339 (N.Y. Sup. Ct. 2005) ................................................... 30, 31

*Hirshberg v. Appel,*
    266 Mass. 98, 164 N.E. 915 (1929) ................................................................... 31

*Hurley v. Fed. Deposit Ins. Corp.,*
    719 F. Supp. 27 (D. Mass. 1989) .......................................................... 30-31, 32

*In re Fidelity/Apple Sec. Litig.,*
    986 F. Supp. 42 (D. Mass. 1997) ........................................................................ 28

*In re Sonus Networks, Inc.,*
    499 F.3d 47 (1st Cir. 2007) .................................................................................. 31

*In re Trump Hotels Shareholder Derivative Litig.,*
    2000 WL 1371317 (S.D.N.Y. Sept. 21, 2000) ................................................. 14

*Int'l Floor Crafts, Inc. v. Adams,*
    477 F. Supp. 2d 336 (D. Mass. 2007) ............................................................... 27

*Joseph v. Shell Oil Co.,*
    482 A.2d 335 (Del. Ch. 1984) ............................................................................. 15

*Joyce v. Morgan Stanley & Co., Inc.,*
    2007 WL 967933 (N.D. Ill. Mar. 29, 2007).............................................................. 16, 17

*Joyce v. Morgan Stanley & Co., Inc.,*
    538 F.3d 797 (7th Cir. 2008) ............................................................................. 16

*Kitchens of the Oceans, Inc. v. McGladrey & Pullen, LLP,*
    832 So. 2d 270 (Fla. Dist. Ct. App. 2002) ........................................................ 32

*Kolodziej v. Gosciak,*
    2008 WL 2260601 (W.D.N.Y. May 30, 2008) .............................................. 21

*Kramer v. Western Pacific Industries,*
    546 A.2d 348 (Del. 1988) .................................................................................. 31

*Levine v. Yokell,*
    258 A.D.2d 296 (N.Y. App. Div. 1999) ........................................................ 22

*Lewis v. Rosenfeld,*
    138 F. Supp. 2d 466 (S.D.N.Y. 2001).............................................................. 26

*Liberty Mut. Ins. Co. v. First Brighton Transp. Mgmt., Inc.,*
    2008 WL 1787684 (E.D.N.Y. Apr. 17, 2008) .............................................22-23

*Linkage Corp. v. Tr. of Boston Univ.,*
    425 Mass. 1, 679 N.E.2d 191 (1997) .............................................................. 29

*Locator Servs. Group., Ltd. v. Treas. & Receiver Gen.,*
    443 Mass. 837, 825 N.E.2d 78 (2005) ............................................................ 14

*Lubin v. Lindenmere Prop., Inc.,*
    110 A.D.2d 514 (N.Y. App. Div. 1985) ........................................................ 33

*M. Paladino Inc. v. J. Lucchese & Son Contracting Corp.,*
    247 A.D.2d 515 (N.Y. App. Div. 1998) ........................................................ 18

*Manhattan Tops USA, Inc. v. Kenneth Leventhal & Co.,*
    4 Mass. L. Rptr. 700, 1995 Mass. Super. LEXIS 50 (Super. Ct. Dec. 1995) .................. 30

*Marram v. Kobrick Offshore Fund, Ltd.,*
    442 Mass. 43, 809 N.E.2d 1017 (2004) .......................................................... 26

*Massey v. Merrill Lynch & Co., Inc.,*
    464 F.3d 642 (7th Cir. 2006) ...................................................... 16, 27-28, 31

*McEneaney v. Chestnut Hill Realty Corp.,*
    38 Mass. App. Ct. 573, 650 N.E.2d 93 (1995) .......................................................... 27, 28

*McLean v. Triboro Coach Corp.,*
    302 N.Y. 49, 96 N.E.2d 83 (1950)............................................................................ 25

*Meyer v. Goldman Sachs & Co.,*
    234 A.D.2d 129 (N.Y. App. Div. 1996) ................................................................... 23-24

*Meyer v. Park S. Assoc.,*
    159 A.D.2d 337 (N.Y. App. Div. 1990) .................................................................... 33

*Milliken Co. v. Duro Textiles, LLC,*
    451 Mass. 547, 887 N.E.2d 244 (2008) .................................................................... 30

*Nanfelt v. Asher,*
    16 Mass. L. Rptr. 493, 2003 WL 21961421 (Mass. Super. Ct. June 11, 2003)............... 29

*Nat'l Bank of Canada v. Hale & Dorr, LLP,*
    17 Mass. L. Rptr. 681, 2004 WL 1049072 (Mass. Super. Ct. Apr. 28, 2004).................. 21

*Natural Stone Warehouse, Inc. v. AKG Yahtim Ve Insaat Malzemeiri Sanayi Ve Ticaret A.S.,*
    2008 WL 4193247 (N.Y. Sup. Ct. Sept. 15, 2008).......................................................... 18

*New Castle Siding Co. v. Wolfson,*
    97 A.D.2d 501 (N.Y. App. Div. 1983), *aff'd,* 63 N.Y.2d 782, 470 N.E.2d 868 (1984) ... 31

*Nycal v. KPMG Peat Marwick LLP,*
    426 Mass. 491, 688 N.E.2d 1368 (1998) .................................................................... 23

*O'Connor v. Merrimack Mutual Fire Ins. Co.,*
    73 Mass. App. Ct. 205, 897 N.E.2d 593 (2008) ............................................................ 27

*Ormond v. Anthem, Inc.,*
    2008 WL 906157 (S.D. Ind. Mar. 31, 2008)................................................................. 24

*Penato v. George,*
    52 A.D.2d 939 (N.Y. App. Div. 1976) ...................................................................... 14

*Peregrine Fixed Income Ltd. v. JP Morgan Chase Bank,*
    2006 WL 196967 (S.D.N.Y. Jan. 26, 2006) ............................................................... 20

*Peterson v. Richard,*
    2008 WL 2237562 (Mass. App. Ct. June 3, 2008) ....................................................... 14

*Premiere-N.Y., Inc. v. Travelers Prop. Cas. Corp.*,
    2008 WL 2676800 (N.Y. Sup. Ct. Jul. 8, 2008) ......................................................25-26

*Read v. Umphrey*,
    1995 WL 1146160 (Mass. Super. Ct. Oct. 10, 1995) ...................................................... 14

*Reder v. Travelers Plan Adm'rs of Conn., Inc.*,
    44 F. Supp. 2d 92 (D. Mass. 1999) .............................................................................. 23

*Reisman v. KPMG Peat Marwick LLP*,
    57 Mass. App. Ct. 100, 787 N.E.2d 1060 (2003), *review denied*,
    439 Mass. 1105, 787 N.E.2d 1059 (2003) ................................................. 23, 24, 26, 29-30

*Schneider v. Lazard Freres & Co.*,
    159 A.D.2d 291 (N.Y. App. Div. 1990) ........................................................................ 25

*SNS Bank, N.V. v. Citibank, N.A.*,
    7 A.D.3d 352 (N.Y. App. Div. 2004) ........................................................................... 26

*Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey, & Co.*,
    191 F. Supp. 2d 652 (E.D. Va. 2002) ....................................................................... 14, 23

*Stone v. Tavares*,
    1998 WL 90738 (Mass. Super. Ct. Feb. 25, 1998) ......................................................... 27

*Strougo v. Bassini*,
    282 F.3d 162 (2d Cir. 2002) ....................................................................................... 30

*Stuchen v. Duty Free Int'l., Inc.*,
    1996 WL 33167249 (Del. Super. Ct. Apr. 22, 1996) ...................................................... 24

*Szalla v. Locke*,
    421 Mass. 448, 657 N.E.2d 1267 (1995) ...................................................................... 29

*Tasseff v. Nussbaumer & Clarke, Inc.*,
    298 A.D.2d 877 (N.Y. App. Div. 2002) ....................................................................20-21

*The Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.*,
    2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ................................................................... 15

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ......................................................................................... 30

*Trustees of Boston Univ. v. ASM Communications, Inc.*,
    33 F. Supp. 2d 66 (D. Mass. 1998) .............................................................................. 29

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
    925 F.2d 566 (2d Cir. 1991)................................................................ 21

*Walker v. Chiauzzi*,
    57 A.D.3d 1353 (N.Y. App. Div. 2008) .......................................... 22

*Warsofsky v. Sherman*,
    326 Mass. 290, 93 N.E.2d 612 (1950) ............................................ 17

*Wilson Farm, Inc. v. Berkshire Life Ins. Co.*,
    15 Mass. L. Rptr. 423, 2002 WL 31440151 (Mass. Super. Ct. Oct. 31, 2002) ......... 15, 17

*Young v. Goldman Sachs & Co.*,
    2009 WL 247626 (Ill. Cir. Ct. Jan. 13, 2009)...................................... 14, 21-22

*Z Auction v. Salomon Smith Barney, Inc.*,
    2002 WL 1732526 (Cal. Ct. App. July 25, 2002)................................. 15, 25-26

## STATUTES

Fed. R. Civ. P. 8 .............................................................................28

Fed. R. Civ. P. 9 (b) .......................................................................28

Mass. Gen. Laws ch. 93A § 1(b) .................................................29

Mass. Gen. Laws ch. 93A § 11 ....................................................29

N.Y. Partnership Law § 26(a) ......................................................33

## OTHER AUTHORITY

Dan B. Dobbs, et al., *Prosser and Keenan on Torts* 760-61 (5th ed. 1984)..................................28

Restatement (Second) of Torts § 552........................................................................25, 26

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    THE FACTS STATED IN THE COMPLAINT.................................................2

    A.    The Bakers Had Substantial Distinct Interests At Stake In The Dragon
        Merger.......................................................................................................2

    B.    As Exclusive Financial Advisor For The Dragon Merger, Goldman Had
        Direct Obligations To The Bakers ...........................................................3

        1.    Goldman's Obligations Under The Engagement Agreement ......................4

        2.    Goldman's Direct Dealings With The Bakers .............................................6

        3.    Goldman's Fiduciary Relationship With The Bakers ..................................8

    C.    Goldman Fulfilled None Of Its Obligations To The Bakers As Exclusive
        Financial Advisor.....................................................................................9

        1.    Goldman Made Direct Misrepresentations To The Bakers .......................10

        2.    Goldman Did Nothing To Protect The Bakers' Interests...........................12

III.    ARGUMENT.......................................................................................................14

    A.    The Bakers' Complaint Pleads Contractual And Extra-Contractual Duties
        Owed By Goldman Directly To The Bakers And States Legally
        Cognizable Claims In Contract, In Tort, And Under Ch. 93A For Breach
        Of Those Duties .......................................................................................14

        1.    The Bakers' Claim Against Goldman For Breach Of Fiduciary
            Duty Is A Fact-Intensive Inquiry That Is Pled In The Complaint .............14

        2.    Goldman Had Direct Contractual Duties To The Bakers Under The
            Engagement Agreement.............................................................................18

        3.    Goldman's Persistent And Continual Direct Dealings With The
            Bakers Throughout The Course Of The Engagement Created
            Direct Obligations To The Bakers For Which Goldman Is Liable In
            Tort...........................................................................................................22

        4.    The Complaint Details Numerous Misrepresentations Goldman
            Made Directly To The Bakers....................................................................26

5.    Goldman's Dealings With The Bakers Were In A Commercial Business Relationship That Gives Rise To Liability Under Ch. 93A........29

B.    The Bakers Are Not Asserting Derivative Claims And Have Standing To Sue For Goldman's Breaches Of Its Direct Duties To Them ...............................30

C.    Goldman Sachs Group, Inc. And Goldman Sachs & Co., LLC Were General Partners Of Goldman Sachs & Co. During The Engagement And Are Properly Named As Defendants.....................................................................33

IV.    CONCLUSION...............................................................................................................34

## I.    INTRODUCTION

Janet and James Baker, the founders and majority owners of the $600 million company, Dragon Systems, have brought claims for (1) breach of fiduciary duty, (2) negligence and gross negligence, (3) negligent and intentional misrepresentation, (4) breach of contract and third party beneficiary rights, and (5) violation of the Massachusetts Unfair Trade Practices Statute. These claims arise from Goldman's failure to do virtually anything it promised to do and was legally obligated to do to protect the Bakers in investigating and evaluating proposed merger suitors for the Bakers' company, Dragon Systems, and implementing a merger with such a suitor.

Goldman had constant personal and direct communications and meetings with the Bakers assuring them Goldman was investigating areas of concern regarding Dragon's prospective merger partner, Lernout & Hauspie Speech Products, the Belgian technology company that acquired Dragon in an all-stock deal in June 2000. Goldman knew it was dealing directly with the Bakers whose approval was required for any merger. Goldman not only responded to the Bakers' questions, it affirmatively sought the Bakers' input on the issues.

For its $5 million fee, however, Goldman did nothing to investigate L&H or protect the Bakers. L&H turned out to be one of the largest frauds in history, with *inter alia*, phony revenues, phony customers, phony financials, and fictitious partner companies. A Wall Street Journal reporter uncovered with a couple of phone calls what Goldman with its global resources did not.

As a result, the Bakers (whom Goldman labels in its brief as mere "spectators," "not players," "bystanders" and "incidental recipients of the information") lost all of their $300 million 51% interest in Dragon and their lives' work of developing ground-breaking computer speech recognition technology. The Bakers relied directly on everything Goldman told them and everything Goldman was supposedly investigating and analyzing – and Goldman knew it. The Bakers' approval was necessary to the merger, and Goldman's fee. Goldman's factual

mischaracterizations of the Bakers as strangers to this transaction are as meritless as Goldman's motion to dismiss.

The Bakers' brief details why Goldman's motion should be denied. Suffice to say, Goldman's primary thrust is that the Bakers did not exist as individuals with their own rights as to Goldman and to whom Goldman owed duties. Goldman says its only legal obligations were to Dragon, the company. And now, because Dragon no longer exists (as a result of Goldman's misconduct), no one, according to Goldman, can sue Goldman. Goldman seeks virtual immunity, ignoring much of the facts alleged in the Complaint and mischaracterizing the rest.

For the most part, Goldman string cites over 50 cases – all inapposite. The law Goldman cites is either mischaracterized or has no relevance to the facts pled in the Complaint. The Complaint goes far beyond notice pleading and alleges facts supporting direct claims by the Bakers against Goldman. The factual allegations document Goldman's persistent and direct dealings with the Bakers in this small privately-held corporation. The law supports all causes of action alleged in the Complaint. Indeed, even L&H's investment banker, S.G. Cowen, had a cognizable duty to the Bakers. Goldman is in error when it argues that the Bakers' **own** investment banker does not. Goldman's motion to dismiss has no merit and should be denied.

## II.    THE FACTS STATED IN THE COMPLAINT

### A.    The Bakers Had Substantial Distinct Interests At Stake In The Dragon Merger

James and Janet Baker are recognized pioneers and innovators in the speech recognition industry. They are the husband and wife team who founded Dragon Systems, Inc., in 1982 and in the following 18 years developed Dragon into a worldwide leader in speech and language technology. ¶¶ 8-11.[1] In Dragon, they helped invent fundamental algorithms used in all speech

---

[1]    References herein to the allegations in the Complaint are cited as ¶ ___. The exhibits are cited as Exh. __.

recognition products today, and they commercialized speech recognition technology years before anyone else.  ¶¶ 8-9.

By the fall of 1999, when Dragon was approached by Visteon (a subsidiary of Ford) and L&H (a global speech technology company and an industry competitor) about merging, the Bakers and the Dragon Board valued Dragon at no less than $600 million.  ¶ 12.  The Bakers owned 51% of Dragon, valued at $300 million.  ¶¶ 2, 4.  They were Dragon's majority owners and controlling shareholders and their consent and approval was required for any sale of Dragon or its assets.  ¶¶ 3, 4, 15.[2]

Dragon had an extensive research and development pipeline for future products and opportunities – Dragon's "golden eggs."  ¶¶ 10-12.  These "golden eggs" of emerging technology had significant value for Dragon and the Bakers.  The opportunity to develop this technology with a viable and strong partner was the reason why the Bakers considered merging Dragon with a suitor. See ¶¶ 2, 9-12.

**B.     As Exclusive Financial Advisor For The Dragon Merger, Goldman Had Direct Obligations To The Bakers**

Goldman knew when it began pitching its services for the potential Dragon deal in November 1999 that Dragon was privately held, that the Bakers were Dragon's founders, majority owners and controlling shareholders, and that any deal would require the Bakers' approval.  ¶¶ 3-4, 14-15.  In its draft engagement agreement directed to Janet Baker and others at Dragon and in discussions leading up to its engagement, Goldman touted its experience, its international resources, and the "real value" it would add in "maximizing transaction value and negotiating definitive agreements."  ¶ 14.

---

[2]     James Baker served as Dragon's chairman and CEO for many years.  Janet Baker served as Dragon's president, succeeded her husband as Dragon's chairman and CEO, and was a member of Dragon's Board in late 1999 through the closing of the Dragon merger in June 2000.  ¶ 3.

The Bakers and Dragon believed that Goldman was well-qualified and highly competent to advise and protect them in any merger deal and selected Goldman with its superior expertise as the exclusive financial advisor for a Dragon merger. ¶¶ 16, 19, 21, 23.[3] The Bakers approved Goldman's engagement for a prospective sale of Dragon, and Janet Baker signed the Engagement Agreement on December 8, 1999. ¶ 16. Goldman's fee for the engagement was $5 million payable at the closing of a merger deal, with payment of $150,000 per quarter to be credited against the $5 million transaction fee. ¶¶ 17, 28, Exh. B.

### 1.    Goldman's Obligations Under The Engagement Agreement

The Engagement Agreement, which Goldman drafted, does not require a fairness opinion. ¶ 17, Exh. B.[4] In this engagement, Goldman agreed to provide comprehensive financial advice and assistance in connection with the possible sale of all or a portion of Dragon throughout the term of its engagement as exclusive financial advisor. ¶ 17. Goldman's undertaking and the scope of its obligations included but were not limited to searching for an acceptable purchaser or investment partner for Dragon, assisting in negotiating the financial aspects of the transaction, coordinating site visits, and doing analyses of the value of any potential transaction to Dragon shareholders. *Id.*

Goldman addressed the Engagement Agreement to Janet Baker who with her husband, James Baker, owned 51% (and control) of Dragon.[5] Exh. B. The Engagement Agreement provided

---

[3]    Goldman was uniquely positioned to act as exclusive financial advisor for a Dragon merger in which one of Dragon's potential merger partners was a global technology company. Goldman was a leading investment banker in worldwide mergers and acquisitions. It had branches around the world (including Europe, South Korea, and Singapore, where L&H reported substantial business and revenues). And it had experience in the technology sector and M&A deals involving intellectual property assets. ¶ 22.

[4]    There was no need for a fairness opinion, as the price for any merger deal had already been set at $600 million, the value of the offers on the table from Visteon and L&H. See ¶¶ 12, 63. The need was for the services of an investment banker to take control of and drive the transaction process, ensure that the merger deal was properly structured, vet the prospective merger partners, and do the work and investigation necessary to protect the Bakers in any transaction. *E.g.,* ¶¶ 17-21, 24-25, 30, 32, 35.

[5]    The Engagement Agreement was also addressed to Donald Waite as representative of Seagate Technology, Inc., which owned approximately 35% of Dragon, and to Ellen Chamberlain, Dragon's CFO.

that Goldman's advice was for the exclusive information of Dragon's Board and senior management, and it permitted disclosure to third parties with Goldman's consent. *Id.* at p. 4. Goldman understood from the outset that the Bakers had final say over any sale of all or part of Dragon, and dealt directly with them throughout the engagement. See II.B.2-3 *infra*.

Goldman knew that a potential merger deal might involve the exchange of stock. ¶ 34, Exh. B at p. 3. Goldman therefore knew and understood the importance of evaluating the true worth of the buyer's enterprise and the strength of its operations. Goldman knew that the liquidity and stability of the value of the stock received was an important consideration for the shareholders in the acquired company and that in a stock deal for a high tech company like Dragon, the principals should have protective strategies for their intellectual property interests and for the value of the stock received. ¶¶ 25, 34, 39.

Goldman also knew from its earlier experience in a 1998 engagement for another client and from information in its analyst research reports that a potential merger with L&H involving stock would require extensive investigation and a diligent and experienced banking team. ¶¶ 41, 44, 113-115. Goldman knew that L&H had problems with transparency, that L&H's strategic partner relationships and related party revenues were matters of concern in 1998 and remained matters of concern at the time of the Dragon engagement. ¶¶ 77-80.[6] Goldman knew the importance of contacting customers and licensees to verify L&H's representations about its business relationships and revenue streams. ¶¶ 85-89. It made the calls in connection with its 1998 engagement for its

---

[6]    Goldman analysts were cautious about the L&H stock: (1) "L&H needs to demonstrate substantial organic earnings growth;" (2) concerns with transparency and changes in structure "reduce our [Goldman's] confidence in [L&H's earnings] estimate;" (3) there were concerns about "L&H's accounting policies" and about "the Dictation Consortium and Brussels Translation Group transactions where off-balance sheet activities funded R&D and were then re-acquired." These are issues that Goldman knew required thorough investigation, and are among the very issues that were behind L&H's collapse a few months after Dragon's merger with L&H closed. ¶¶ 35, 44-46, 113-116; see ¶¶ 127-146.

other client – and even recommended protective investment strategies for that client even though at that time there were no red flags like the growth in Asian revenue that surfaced as a significant concern in 2000 during the Dragon transaction.[7] ¶¶ 41, 91.

Goldman touted as its number one business principle that its "client's interests always come first." ¶ 23. Goldman knew, going into the engagement and throughout its course, that the Bakers were looking to Goldman and relying on Goldman's superior investment banking experience and expertise in M&A transactions to do all the work and investigation necessary to protect their interests in Dragon in any merger transaction. ¶ 24.[8] Had Goldman done the thorough and careful investigation, research, review, and analysis it knew were required for the Dragon/L&H all-stock deal, the numerous red flags that Goldman knew about from the outset of the engagement would have led to the conclusion that the Bakers' $300 million investment and the future development of Dragon's "golden eggs" were better off with Visteon or remaining in Dragon. ¶¶ 26, 62-119.

### 2. Goldman's Direct Dealings With The Bakers

The Bakers were not anonymous strangers to Goldman in the Dragon merger engagement, nor were they spectating "bystanders" who were merely "present on the scene." See Goldman Mem. at 2, 13. For 18 years leading up to the Dragon merger, the Bakers were the force behind Dragon's technological breakthrough and commercial advancement. ¶¶ 3-4, 8-9. They were Dragon's majority owners and controlling shareholders and their approval was necessary for any

---

[7]    This other client was a sophisticated institutional investor that was considering investing $25 million (or less) in L&H, a fraction of the Bakers' personal $300 million investment in L&H as a consequence of the Dragon merger. ¶ 91.

[8]    Given its experience and current information about L&H, Goldman knew the scope of its task as exclusive financial advisor for a potential Dragon merger with L&H. Even before it was formally engaged, Goldman began compiling a list of areas of L&H's business that it would need to investigate in connection with a potential deal, including L&H's geographic business, sources of revenue, major customers and customer contracts, new products in development, key license agreements and royalty arrangements, partnerships and investors, partner relationships (investor, customer, etc.), historical financials, 1999 and 2000 quarterly forecasts and assumptions, percentage of revenue for the top five customers and the top customers by quarter, off-balance sheet assets and liabilities, and revenue recognition and accounting policies. ¶ 44.

sale of all or part of Dragon or its assets.  ¶¶ 4, 15.  They were not merely players, they were **the central players** – and Goldman knew it.  ¶¶ 2-4, 8-9, 14-15, 31.

Goldman met with, spoke with, and directed communications to the Bakers throughout the course of the engagement.  These communications are detailed in the Complaint.  Examples include:

- On December 14, 1999, less than a week after the execution of the Engagement Agreement, Goldman circulated its list of L&H issues for inquiry and analysis to the key Dragon players, including Janet Baker and James Baker.  ¶ 45.[9]

- Goldman prepared a memorandum on December 16, 1999, comparing and contrasting L&H and Visteon as potential Dragon merger partners and submitted it to the Dragon Board – and to Janet and James Baker.  ¶¶ 46-47.

- On December 17, 1999, Goldman sent Janet Baker a memorandum titled "Discussion Materials for the Board of Directors" which was written for Janet Baker, James Baker, and the Dragon Board and addressed many of the same issues in the December 16, 1999 memorandum.  ¶ 52.

- Goldman had teleconferences with the Dragon Board on December 17, 1999 and December 20, 1999, during which Goldman presented financial information about L&H and forecasts in the event of a merger with L&H and discussed other issues related to L&H.  Janet and James Baker participated in these meetings.  ¶¶ 109-110.

- At Janet Baker's request, Goldman arranged for a teleconference between Janet Baker and Goldman's research analysts so the Bakers could personally confirm Goldman's advice about L&H stock contained in its January 20, 2000 memorandum.  ¶¶ 53, 116.

- Goldman sent Janet and James Baker a list of due diligence questions in March 2000, soliciting their input before a due diligence meeting with L&H.  ¶ 59.

- And of course, Janet and James Baker were at the Board meeting on March 27, 2000, when Goldman gave its favorable advice about the merger, and Janet Baker, James Baker, and the Board approved the Merger Agreement with L&H.  ¶ 111.

Goldman had numerous other meetings and communications with the Bakers outside of Board meetings before and after March 27, 2000, keeping the Bakers directly and personally

---

[9]     This paragraph of the Complaint contains a typo.  The date of the "list" is December 14, 1999, not December 14, 2000.

apprised of the status of its investigation of L&H and seeking their "input" on issues.  ¶ 44 (December 1, 1999 memorandum to Janet Baker); ¶ 55 (February 21, 2000 email to James and Janet Baker); ¶ 56 (February 23, 2000 facsimile to Janet Baker); ¶ 57 (February 29, 2000 memorandum to the Bakers and Dragon); ¶ 112 (numerous other communications with James and Janet Baker).

Goldman's many direct personal dealings with the Bakers led the Bakers to believe that Goldman was conducting the thorough investigation, research, review, and analysis of L&H necessary to the advice it was giving and the representations it was making, and was fulfilling all of the obligations it undertook as exclusive financial advisor in the Dragon merger.  ¶¶ 63, 68, 118. When the Dragon merger with L&H closed on June 7, 2000, the Bakers believed that Goldman had done its job.  ¶¶ 117-118.  They believed that the value of their ownership interest in Dragon was fairly compensated in the L&H stock they received in exchange and that their interests in the future development of Dragon's "golden eggs" were fully protected and would be realized in the merged company.  But for Goldman's assurances, the Bakers would have never agreed to merge Dragon with L&H in an all-stock deal.  ¶¶ 43, 59, 61, 63, 68, 70, 83, 91, 95, 98, 104, 117-118.

### 3.    Goldman's Fiduciary Relationship With The Bakers

The Bakers had a $300 million investment in Dragon and Dragon's technology pipeline but they had no experience or expertise in mergers.  ¶¶ 4, 24, 40.  So they turned to Goldman Sachs, one of the largest and most reputable investment banking firms in the world, to ensure that Dragon's merger partner was financially healthy and viable and that their financial and property interests in Dragon were fully protected in any deal.  ¶¶ 21-22, 32.

Goldman touted its extensive investment banking and M&A experience and invited – and accepted – the Bakers' trust and confidence in its superior expertise.  ¶¶ 14, 18-23.  Goldman knew when it accepted the engagement that it had been engaged because of its superior expertise in mergers and acquisitions.  ¶ 24.  Goldman also knew that neither the Bakers nor Dragon nor

Dragon's other advisors had Goldman's specialized expertise, resources, and capabilities.  ¶¶ 24, 58.  Goldman knew that the Bakers and Dragon were relying on Goldman – and Goldman's superior knowledge and expertise in international merger deals and deals involving technology companies with substantial IP assets – to drive the analysis of the L&H deal and give them comprehensive, complete, and competent advice and assistance in negotiating and consummating Dragon's merger with L&H.[10]  ¶ 20.  Throughout the course of the representation in the deal with L&H and through the closing on June 7, 2000, the Bakers believed their trust and confidence in Goldman was well-placed and that their interests in the deal were fully protected.  ¶¶ 63, 117-118.

C.    **Goldman Fulfilled None Of Its Obligations To The Bakers As Exclusive Financial Advisor**

The $600 million consideration for the proposed merger deal with L&H included a stock component from the very beginning.  ¶¶ 36, 61.  The merger consideration changed to an all-stock deal in early March 2000, as a consequence of L&H's acquisition of Dictaphone.  ¶¶ 36-38.

Goldman knew from its experience with L&H that an all-stock merger with L&H was a high-risk transaction and that L&H had serious red flags that needed to be investigated and satisfactorily resolved prior to a merger.  ¶¶ 38-39.  Goldman knew, from its experience in stock transactions, that valuation of L&H's stock, verification of "the true state of [L&H's] assets and operations," and evaluation of L&H's business and the strength and weaknesses of its operations (including its suppliers, customers, and partners) – all of which Goldman had listed as issues at the outset of its engagement – became even more important when the L&H merger deal became a stock-for-stock exchange.  ¶¶ 25, 34-39.

---

[10]    Goldman told L&H's banker (S.G. Cowen) that they should communicate information only through Goldman, not directly to the Bakers.  ¶ 31.

Goldman did nothing to protect the Bakers against the known risks of the all-stock transaction with L&H. ¶¶ 26, 40. Goldman made false representations about L&H's financial and business health. See II.C.1 *infra*. Goldman did virtually no investigation of the problems, questions, and issues Goldman itself identified as critical concerns for a transaction with L&H while misleading the Bakers into believing it did. ¶¶ 55-63, 112. Goldman reassured the Bakers about the positives of the merger while Goldman itself remained concerned about L&H's red flags and cautious about L&H's stock. ¶ 116. Goldman endorsed the Dragon merger with L&H with no advice whatsoever about protective strategies for the Bakers in the event their financial and business expectations were not met. ¶ 118.

### 1. Goldman Made Direct Misrepresentations To The Bakers

The Complaint details Goldman's direct misrepresentations to the Bakers during the course of the engagement. ¶¶ 46-53, 74-81, 90, 108-116. Among them are the representations in Goldman's December 16, 1999 memorandum comparing and contrasting a potential Dragon merger with L&H and with Visteon. In this memorandum, Goldman told the Bakers (and Dragon's Board):

- L&H is assembling the *broadest array of language pairs* for its translation service business that may be unmatched by any of its competitors. Its linguistic services group can *translate 70 languages* overall, while machine translation now boasts translation services for 15 language pairs;

- New OEM *licensees* of core technologies that build *pipeline of recurring revenue*; and

- Reported disappointing 3Q 1999 results with slower than expected organic sales and growing receivables. ¶ 47.

Goldman did nothing to investigate the facts it was representing or confirm their accuracy, either in connection with its December 16, 1999 memorandum or at any time during the engagement, and had no basis for these representations about L&H's translation capabilities, new licensees, or revenue pipeline. ¶¶ 48-49. Goldman did not contact any of L&H's "strategic partners" – the "Language Development Companies" and "Cross Language Development

Companies" that were supposedly developing translation capabilities in numerous languages – or any of L&H's customers or licensees in Asia where L&H reported significant growth in business and revenues during the last quarter of 1999 and the first quarter of 2000.  ¶¶ 64-71.[11]  Had Goldman done even a modicum of investigation – such as contacting L&H's customers as a Wall Street Journal reporter did a few months after the Dragon/L&H deal closed – it would have learned the true facts:  L&H had not developed the translation capabilities it claimed, its licensees were a sham, and its pipeline of revenue was fictitious.  ¶¶ 126-146.[12]

Goldman's December 17, 1999 "Merger Analysis" gave the Bakers Goldman's value estimates for the L&H/Dragon combined company on the bases of an all-cash deal, an all-stock deal, and a 50/50 cash/stock deal.  ¶ 52.  Goldman presented its favorable analyses without any investigation or research.  *Id.*  Had it done so, it would have known that its calculations could not be supported because the underlying figures carried red flags.  ¶¶ 60, 62, 126-146.

Goldman allayed the Bakers' concerns about L&H's stock in a January 20, 2000 memorandum to Janet Baker.  ¶ 53.  Goldman reported that its research analyst in Europe, who followed L&H stock and authored analyst reports on L&H, advised that movement in L&H stock was a result of overall market movements.  *Id.*  Goldman's European analyst reconfirmed this representation a few days later during a teleconference with Janet Baker, which Goldman set up at her request.  ¶ 116.  Neither Goldman nor Goldman's research analyst told the Bakers of their concerns about L&H and L&H's stock value identified in their research reports.  ¶¶ 77-80, 113-116. Goldman and its research analysts also did not tell the Bakers that they viewed these concerns as

---

[11]    Since Goldman flagged "slower than expected organic growth" as an issue of concern in Q3 1999, the subsequent explosive growth in Asia was a red flag that required thorough investigation and research.  ¶¶ 50, 131-135.  In the December 16, 1999 memorandum, Goldman also provided specific figures for L&H's earnings per share, revenue, income, and cash and cash equivalents, presenting these calculations as Goldman's own without disclaiming that they were taken from a third party source or verifying the numbers from the underlying source.  ¶ 51.

[12]    Goldman certainly knew the importance of verifying customer and licensee relationships.  ¶¶ 86, 89.  It did so for an earlier client with respect to L&H.  ¶ 91.

significant red flags or that they were cautious about L&H stock.  ¶¶ 113-116.  Instead of warning

the Bakers about their concerns and cautioning against a stock-for-stock merger with L&H or

proposing protective strategies (as Goldman did earlier for its sophisticated institutional investor

client), Goldman told the Bakers that L&H's stock value was not an open issue or a concern.  ¶¶ 40-

42, 61, 78-82, 98, 117-118.

The Bakers relied on these and other representations by Goldman related in the Complaint in

approving the Merger Agreement on March 27, 2000 and in proceeding with the merger on June 7,

2000.  ¶¶ 150-152, 158-160, 180-182, 186-188, 196-197, 201-206.

### 2.    Goldman Did Nothing To Protect The Bakers' Interests

When Goldman advised the Bakers that it had no concerns about the value of L&H's stock

and endorsed the deal with L&H, the Bakers believed that all of the areas of concern about L&H's

business and financial health had been thoroughly investigated, reviewed, analyzed, and addressed.

¶¶ 63, 68, 117-118.  The Bakers relied on Goldman and believed that Goldman was satisfied that

the L&H stock represented the agreed value for the sale of Dragon and that the structure of the deal

protected their substantial financial and property interests in Dragon.  ¶¶ 63, 118.

In fact, Goldman did virtually nothing:

- Despite its global resources and having offices in Singapore and South Korea (where L&H was reporting substantial revenue growth), Goldman did nothing to verify L&H's Asian revenue or its customer base.  Consequently, Goldman failed to learn what a Wall Street Journal reporter discovered with a few phone calls to L&H's purported customers – that most of L&H's Asian business was a sham and much of the rest of L&H's business was based on phony revenue.  ¶¶ 22, 64-76, 85-91, 131-137.

- Goldman knew that L&H derived revenue from so-called "strategic partners" that were, in fact, related entities in the course of its earlier engagement for another client, and knew that L&H was reporting revenue in 1999 and 2000 from "strategic partners" that were supposedly developing translation capabilities, some under licensing agreements with L&H. Goldman did nothing to confirm that these strategic partners were capable of (or actually developing) the technology as L&H claimed, or that the strategic partners even existed.  In fact, most were paper entities created with "investments" from L&H-affiliated entities as a conduit for L&H's fictitious revenue.  ¶¶ 72-84.

- Goldman knew the names of some – and should have known the names of all – L&H "customers." Goldman did not demand a listing of all customers or contact them as it knew it should. ¶¶ 88-91.

- Goldman knew that L&H had proposed increasing the amount of stock consideration for the Dragon deal and that this was going to be discussed at a high level meeting between principals and advisors on March 8, 2000. Goldman did not attend this critical meeting because the Goldman team leader was going on vacation and other team members were not available. The deal consideration changed to a stock-for-stock exchange at this meeting. ¶¶ 36-38.

- Goldman failed to examine the effect on L&H's financial health of the L&H acquisition of Dictaphone shortly before the Dragon deal and never advised the Bakers that the change in the structure of the Dragon deal to all stock as a consequence of the L&H/Dictaphone deal was a red flag that L&H's stock was not worth its trading price. ¶¶ 42, 97-99.

- Goldman should have insisted on full access to L&H's business and financial information and advised the Bakers against proceeding with the merger deal without full access. ¶ 102.

- Goldman knew well before its engagement for the Dragon merger that a transaction with L&H involving the exchange of stock was a high risk transaction. Goldman should have but did not advise the Bakers about strategies to protect the value of their investment in L&H consequent to the merger and their interest in Dragon's "golden eggs" in the event their financial and business expectations in the merged company were not met. ¶¶ 26, 34, 39-41, 61, 104.

Throughout the engagement, Goldman gave the appearance of working diligently on the Bakers' behalf. ¶¶ 43, 59, 63. In fact, Goldman did not do for the Bakers what it had done for more sophisticated clients and should have done in the Dragon/L&H deal. ¶¶ 39-42, 77, 90-91. The Bakers agreed to the merger in reliance on Goldman's representations and its good faith performance of its obligations as exclusive financial advisor. ¶¶ 63, 68, 108, 117-118, 130, 134. Goldman got a $5 million fee when the Dragon/L&H deal closed for writing a few memos and attending a few meetings. ¶¶ 28, 58, 61, 82. The Bakers lost their entire stake in Dragon which they built from the ground up over 18 years, and their interest in the future development of Dragon's "golden eggs." ¶¶ 2-4, 8-10, 28, 70, 83, 91, 95, 98, 104, 117-119.

## III.    ARGUMENT

### A.    The Bakers' Complaint Pleads Contractual And Extra-Contractual Duties Owed By Goldman Directly To The Bakers And States Legally Cognizable Claims In Contract, In Tort, And Under Ch. 93A For Breach Of Those Duties

#### 1.    The Bakers' Claim Against Goldman For Breach Of Fiduciary Duty Is A Fact-Intensive Inquiry That Is Pled In The Complaint

"[A] fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Penato v. George*, 52 A.D.2d 939, 942 (N.Y. App. Div. 1976). "[T]he relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Id.* It is a fact-intensive inquiry improper on a motion to dismiss. *E.g.*, *Read v. Umphrey*, 1995 WL 1146160, at *1 (Mass. Super. Ct. Oct. 10, 1995); *see Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey, & Co.,* 191 F. Supp. 2d 652, 661-62 (E.D. Va. 2002) (whether plaintiffs meet standard for fiduciary relationship "ultimately will be borne out by the facts").

Goldman ignores all of the facts in the Complaint that plead the existence of the Bakers' fiduciary relationship with Goldman and Goldman's breach of its obligations that arose as a result of the relationship.[13] See ¶¶ 14, 15, 18-26, 30-125, 147-153. Goldman's contention on page 12 of its brief that a fiduciary relationship exists only if there is some sort of an explicit "bi-lateral[ ]

---

[13]    Most of the cases on which Goldman relies are inapplicable outright because the plaintiffs in those cases did not even plead the existence of any sort of a relationship that would give rise to a fiduciary relationship. *See In re Trump Hotels Shareholder Derivative Litig.*, 2000 WL 1371317, at *1 (S.D.N.Y. Sept. 21, 2000) (class action lawsuit by stockholders who merely alleged they had claim against a "third party"); *Young v. Goldman Sachs & Co.*, 2009 WL 247626, at *3 (Ill. Cir. Ct. Jan. 13, 2009) (ordinary stockholder had "no privity or relationship with Goldman Sachs"); *Locator Servs. Group., Ltd. v. Treas. & Receiver Gen.*, 443 Mass. 837, 854, 825 N.E.2d 78, 93 (2005) (eminent domain case where plaintiffs did not allege any relationship with Massachusetts Treasurer); *Peterson v. Richard*, 2008 WL 2237562, at *2 (Mass. App. Ct. June 3, 2008) (child abuse case against Reverend and church where plaintiffs pled "no allegations of any relationship that would lead them to believe they could trust in, or confide in" Reverend's employer); *AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.*, 11 N.Y.3d 146, 157, 896 N.E.2d 61, 67 (2008) (suit against indenture trustee that carried out "basic, non-discretionary, ministerial functions" related to loan notes, where plaintiffs merely alleged that "a fiduciary duty exists," but pled "nothing more."); *AJW Partners, LLC v. Cyberlux Corp.*, 2008 WL 4514171, at *3 (N.Y. Sup. Ct. Sept. 19, 2008) (suit by arms-length investors who did not allege any "fiduciary or other special relationship").

agree[ment]" misstates the requirements for this cause of action.[14]  A business relationship can be "transformed" into a relationship with fiduciary obligations "where one party reposes its confidence in" the "specialized knowledge" of another.  *Wilson Farm, Inc. v. Berkshire Life Ins. Co.*, 15 Mass. L. Rptr. 423, 2002 WL 31440151, at *8 (Mass. Super. Ct. Oct. 31, 2002); s*ee Z Auction v. Salomon Smith Barney, Inc.*, 2002 WL 1732526, at *16 (Cal. Ct. App. July 25, 2002) ("ongoing conduct between parties may give rise to a fiduciary relationship") (applying New York law).  That is certainly the case here.

Furthermore, fiduciary duty claims are extra-contractual causes of action that are not defined or constrained by written agreements.  For example, in *Daisy Systems Corp. v. Bear Stearns and Co., Inc.*, 97 F.3d 1171, 1175, 1180 (9th Cir. 1996), the circuit court rejected the assertion by the "exclusive financial advisor" for a company considering a potential merger that the advisor's engagement letter "establish[ed] the limits of [its] duties."  The court held that the company's CEO "may have relied on [the bank] to provide him with assistance on a broad range of issues" related to the merger and the bank had a fiduciary duty to provide "reliable information based upon diligent and thorough analysis."  *Id.* at 1176, 1180.

Similarly, the court in *The Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.*, 2002 WL 362794, at *1-2, 9 (S.D.N.Y. Mar. 6, 2002), ruled that a fiduciary relationship need not be formalized in writing but may arise out of ongoing conduct where one party places its trust and confidence in an exclusive financial advisor "with superior knowledge and in a superior position to exert unique influence."  *Id.*; *see also EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 20, 832 N.E.2d 26, 31 (2005) (denying Goldman's motion to dismiss fiduciary

---

[14]    Goldman provides no case citation to support this statement.  *Joseph v. Shell Oil Co.*, 482 A.2d 335, 341-42 (Del. Ch. 1984), says nothing about a "bi-lateral" agreement and is factually inapposite.  That case involved a breach of fiduciary duty by majority shareholders for failing to disclose information minority shareholders needed to assess a tender offer for their stock.  *Id.*

duty claim); *Frydman & Co. v. Credit Suisse First Boston Corp.*, 272 A.D.2d 236, 236-37 (N.Y. App. Div. 2000) (fiduciary duty need not be formalized in writing).[15]

Goldman's argument that it elicited Janet Baker's trust and confidence only in a particular "capacity as a corporate representative" not only ignores the facts alleged in the Complaint but requires a favorable inference for Goldman from a fact-based assertion that is not proper in this motion to dismiss. The Complaint alleges numerous direct communications to Janet Baker – as well as to James Baker – individually and outside of Board meetings.[16]  *E.g.,* ¶¶ 14, 20, 45-47, 52-57, 59, 112, 116, and 152.

Goldman's argument loses all credibility when it tries to pigeonhole the facts of *this* case into the cases it cites. Goldman stretches its argument beyond the breaking point when it dismisses the Bakers as "incidental recipients of . . . information," who were merely "present on the scene" as "spectators, not players." Goldman Mem. at 13. Goldman's factual mischaracterizations are belied by the facts alleged in the Complaint, and cannot be credited on a motion to dismiss. Goldman knew that the merger would only go forward with the Bakers' approval. ¶ 15. Goldman dealt directly with the Bakers, affirmatively and frequently solicited their input, and misled them into

---

[15]     The cases cited by Goldman stand in stark contrast to the facts alleged by the Bakers. *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642 (7th Cir. 2006), a case applying Indiana law, does not support Goldman's contentions. Unlike here, the plaintiffs in *Massey* did not allege that the investment bank "made any misrepresentations to them as individual[s]." *Id.* at 650. They relied on a fairness opinion and a single presentation made to the entire Board of Directors; they did not allege an ongoing relationship of trust and numerous direct, personal interactions as the Bakers have pled between them and Goldman. *Id.* at 643-51. *Joyce v. Morgan Stanley & Co., Inc.*, 538 F.3d 797 (7th Cir. 2008), is another situation where a class of shareholders sued an investment banker that provided a fairness opinion. The "complaint . . . makes no mention of any extra-contractual duty," there was no relationship between the bank and the plaintiffs, and the plaintiffs did not show that they "actively sought out Morgan Stanley" for advice. *Id.* at 800-02; *see also Joyce v. Morgan Stanley & Co.*, 2007 WL 967933, at *7 (N.D. Ill. Mar. 29, 2007). *HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*, 517 F.3d 454 (7th Cir. 2008), is also a factually inapposite fairness opinion case. In *HA2003*, the investment bank was not hired to conduct financial or business due diligence or investigate the other side of the transaction, and the plaintiff complained only that the banker should not have used the client's own financial projections for its fairness opinion. *Id.* at 455-56.

[16]     Goldman makes no mention in its brief of its direct communications to James Baker. Moreover, Goldman's factual contentions would appear to require the illogical scenario that Janet Baker would need to obtain the approval of Goldman before she could convey back to herself what Goldman had previously told her in a different "capacity." See Goldman Mem. at 12 ("its advice could not even be disclosed to any such third party without its permission").

believing that Goldman had conducted a thorough investigation of L&H and that the merger with L&H would be positive. ¶ 63.  It takes great temerity for Goldman to attempt to dismiss this case by calling the Bakers merely "incidental recipients," when Goldman knew it was working directly with the Bakers who pioneered the Dragon speech recognition technology upon which their entire livelihood was based – and for which they worked a majority of their lifetimes.

Although the circumstances that may create a fiduciary relationship are varied, the considerations courts look to include the "readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge," "defendant's knowledge of the plaintiff's reliance," and "the plaintiff's business capacity contrasted with that of the defendant." *Wilson Farm*, 15 Mass. L. Rptr. 423, 2002 WL 31440151, at *8; *see Warsofsky v. Sherman*, 326 Mass. 290, 292, 93 N.E.2d 612, 615 (1950).  All of these "considerations" are alleged in the Complaint, which extensively pleads the Bakers' dependence on Goldman's superior expertise, Goldman's knowledge of the Bakers' reliance, Goldman's direct dealings with the Bakers, and Goldman's breaches.  See II.B.2-3, C *supra*.

Finally, the Engagement Agreement does not preclude or "disclaim" a fiduciary obligation to the Bakers, as Goldman argues.  The Bakers' lawsuit, unlike the shareholder lawsuit in *Joyce v. Morgan Stanley & Co.*, *Inc.,* 2007 WL 967933 (N.D. Ill. Mar. 29, 2007), is not based on a banker's representations in a fairness opinion.  The banker's engagement agreement in *Joyce* expressly limited its duties "solely to 21st Century [the company]" and its fairness opinion cautioned that it "expresses no opinion or recommendation as to how the holders of the 21st Century Common Stock should vote . . . in connection with the Merger."  *Id*. at *5.  The Engagement Agreement in this case, in contrast, does not contain such language.  It was directed to and signed by Janet Baker, who with her husband, James Baker, was Dragon's controlling shareholder.  It provided that Goldman's advice was for the exclusive information of Dragon's Board and senior management, not "solely for

the company," and permitted disclosure with Goldman's consent. Goldman can hardly claim that the Bakers were not proper recipients of its advice when it conveyed information during Board meetings to both Janet Baker (who was a member of the Board) and James Baker (who was not a Board member but participated in Board meetings as one of Dragon's principal owners and controlling shareholders) and when Goldman dealt directly with and delivered information to both Janet and James Baker outside the Board meetings. See II.B.2, C.1 *supra*.

In sum, Goldman has moved to dismiss Count I with fact-laden arguments that would not even be proper in a motion for summary judgment. The Bakers have stated a breach of fiduciary duty claim.

### 2. Goldman Had Direct Contractual Duties To The Bakers Under The Engagement Agreement

The plain face of the Engagement Agreement, which Goldman drafted, evidences Goldman's direct contractual obligations to the Bakers. *See Ackerman v. Price Waterhouse,* 216 A.D.2d 123, 124 (N.Y. App. Div. 1995).[17] Goldman addressed the agreement to "Janet M. Baker, Ph.D.", without any reference to her position, and she signed the Engagement Letter.

The Engagement Agreement does not limit, much less "*negate*[,] all duties except as to Dragon." See Goldman Mem. at 7 (emphasis original). Goldman defines Dragon as "the Company" in the first sentence of the Engagement Agreement. But the next sentence – where Goldman defines its duties and obligations as exclusive financial advisor – refers not to "Dragon" or "the Company" but to "you." In this sentence, Goldman promises to "provide **you** with financial advice and assistance . . . which may include . . . searching for a purchaser acceptable to **you** . . .

---

[17]    The two cases that Goldman relies on to argue otherwise, *M. Paladino Inc. v. J. Lucchese & Son Contracting Corp.*, 247 A.D.2d 515 (N.Y. App. Div. 1998) and *Natural Stone Warehouse Inc. v. AKG Yahtim Ve Insaat Malzemeiri Sanayi Ve Ticaret A.S.*, 2008 WL 4193247 (N.Y. Sup. Ct. Sept. 15, 2008), are inapposite. *M. Paladino* contains no facts at all. *Natural Stone* was a dispute about a sales contract where the plaintiff was affiliated with the purchaser of stone products from the defendant but "conced[ed] that it was not a party to [the] contract." 2008 WL 4193247, at *4.

and assisting **you** in negotiating the financial aspects of the transaction." Exh. B at p. 1 (emphasis added). This use of the word "you" instead of "Company" and Goldman's conduct throughout the engagement evidences Goldman's undertaking – and understanding – of **direct** obligations not just to Dragon, the Company, but also to the majority shareholders and founders who controlled Dragon's destiny and the decision about any sale of all or a portion of the Company – Janet and James Baker. See ¶¶ 15, 20, 31, 43, Exh. B at p. 4 (providing that Goldman's advice was for the Board and management and permitting disclosure to third parties with Goldman's consent); II.B.2 *supra*.

Goldman knew from the outset that Janet Baker and James Baker were Dragon's majority owners and any sale would require their approval. ¶¶ 14-15. Janet and James Baker understood that Goldman's contractual undertaking extended to them. ¶¶ 107-118. And so did Goldman, as evidenced by its numerous direct dealings with the Bakers in and outside of Board meetings throughout the course of the engagement. ¶¶ 20, 31, 45-47, 52-57, 59, 106, 112, 116.[18]

Janet Baker's agreement to the fifth sentence of Annex A to the Engagement Agreement does not exculpate Goldman from direct liability to the Bakers either for breach of contract or for negligence. This sentence provides that:

> The Company, Seagate Technology and Janet M. Baker also agree that neither Goldman Sachs nor any of such affiliates, partners, directors, agents, employees or controlling persons shall have any liability to the Company, Seagate Technology, Inc., *Janet M. Baker or any person asserting claims on behalf of or in right of the Company* in connection with or as a result of either our engagement or any matter referred to in this letter except to the extent that any *losses, claims, damages*, liabilities or expenses *incurred by the Company* result from the gross negligence, willful misconduct or bad faith of Goldman Sachs in performing the services that are the subject of this letter.

---

[18]    Goldman also had direct dealings and communications with the Bakers prior to its engagement. ¶¶ 14, 44.

Exh. B at p. 7 (Annex A, p. 1) (emphasis added).  This sentence plainly refers **only** to derivative claims on behalf of Dragon, **not** the Bakers' direct claims alleged in this action.

This is clear both from the phrasing of the provision and its context.  First, the sentence applies only to claims asserted "on behalf of or in right of the Company . . . [for] losses, claims, damages, liabilities or expenses incurred by the Company" – *i.e.*, derivative claims.  Second, indemnification agreements, like Annex A, that provide for indemnity of a party for its own negligence typically have a complementary provision (like this fifth sentence) exculpating the indemnitee from liability on derivative claims for negligence for injury to the indemnitor.

This provision does not exculpate Goldman from the Bakers' direct claims, nor was it intended to.[19]  Moreover, Goldman concedes that the sentence does **not** apply to Janet Baker's claims for gross negligence, willful misconduct, and bad faith, as well as all of James Baker's claims.  Goldman Mem. at 3.

Alternatively, there can be no question that the Bakers were also intended beneficiaries of Goldman's performance.  Contrary to Goldman's argument (Goldman Mem. at 8) and "as a threshold matter," **nothing** in the Engagement Agreement **negates** an intent to benefit the Bakers.  Nor do any of the cases Goldman cites say otherwise.

"A beneficiary will be considered an intended beneficiary . . . *when the circumstances indicate* that the promise intends to give the beneficiary the benefit of the promised performance." *Tasseff  v. Nussbaumer & Clarke*, *Inc.*, 298 A.D.2d 877, 878 (N.Y. App. Div. 2002) (emphasis

---

[19]    The most Goldman might argue is that the language of the Engagement Agreement is ambiguous, which also defeats its motion.  *DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*, 2003 WL 22283836, at *4 (S.D.N.Y. Oct. 2, 2003); *see Peregrine Fixed Income Ltd. v. JP Morgan Chase Bank*, 2006 WL 196967, at *2 (S.D.N.Y. Jan. 26, 2006).  Goldman drafted the Engagement Agreement and, accordingly, is not entitled to favorable inferences from ambiguous language on this motion to dismiss, or otherwise.  *See Farragut Mortgage Co. v. Arthur Andersen LLP*, 1999 WL 823656, at *9 (Mass. Super. Ct. Aug. 5, 1999) (denying motion for summary judgment where "both parties construe the terms of the [engagement] agreement differently").

added); *see Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991) (obligation to the third party beneficiary need not be expressly stated in contract); *Nat'l Bank of Canada v. Hale & Dorr, LLP*, 17 Mass. L. Rptr. 681, 2004 WL 1049072, at *12 (Mass. Super. Ct. Apr. 28, 2004) (third party was intended beneficiary where law firm "intended that [its] Opinion Letter [would] influence the[ir] behavior").[20]  In this case:

- The Engagement Agreement was directed to and signed by Janet Baker who with her husband, James Baker, owned 51% (and control) of Dragon.

- The Engagement Agreement provided that Goldman's advice was for the information of Dragon's Board and senior management.

- Goldman knew that Janet and James Baker were not only Dragon's majority owners but also Dragon's controlling shareholders and that their approval was necessary to any merger (and Goldman's $5 million pay day).

- Goldman dealt directly with the Bakers throughout the course of the engagement – soliciting their input and giving them advice and information both within and outside of Board meetings.

See II.B *supra*.  To suggest the Bakers were not intended beneficiaries of Goldman's undertaking as exclusive financial advisor for a Dragon merger deal strains credulity.  The facts say otherwise.

Nor is Goldman's argument supported by either of the cases in its discussion, *Edward B. Fitzpatrick, Jr. Construction Corp. v. County of Suffolk*, 138 A.D.2d 446 (N.Y. App. Div. 1988), and *Young,* 2009 WL 247626, at 3.[21]  The engagement agreements in both *Fitzpatrick* and *Young*

---

[20]    Goldman argues New York law applies to all of the issues in this case.  The Bakers contend that Massachusetts law applies.  For most issues, New York and Massachusetts apply the same or similar standards.  When they differ, the Bakers address the sufficiency of their claims under the more stringent standard for purposes of this motion, but they do not concede that this is necessarily the applicable law under a choice of law analysis and, accordingly, reserve their rights on this issue.

[21]    Goldman's other cases on this issue are opinions where the plaintiffs alleged mere conclusory allegations and no surrounding circumstances evidencing an intent for them to be third party beneficiaries.  *See Kolodziej v. Gosciak*, 2008 WL 2260601, at *3 (W.D.N.Y. May 30, 2008) (allegations in plaintiffs' claim of undue influence in naming a beneficiary to an investment account amounted to a mere "hope[] to indirectly benefit from the accounts"); *Gupta v. Nat'l Life Ins. Co.*, 2006 WL 2000118, *3-4 (W.D.N.Y. July 17, 2006) (after discovery was completed, plaintiff had "no evidence" that he was an intended beneficiary of an insurance policy and claim was based only on his "bald assertion"); *Alusit Ltd. v. Aluglas of Pa.*, 1990 WL 209422, at *11 (S.D.N.Y. Dec. 4, 1990) (unlike the Bakers' Complaint, the
*Continued on following page*

are unlike Goldman's Engagement Agreement here because they "expressly *negate[d]* enforcement by third parties." *Fitzpatrick*, 138 A.D.2d at 449; *Young*, 2009 WL 247626, at 3 (emphasis added). And, contrary to Goldman's argument, there are other **significant principled distinctions** between *Young* and this case that make *Young* inapposite. Unlike this case, Y*oung* involved a fairness opinion which stated, *in at least two places*, that it "is not a recommendation as to how any holder of common stock . . . should vote with respect to the . . . merger." The putative class plaintiff in *Young* was an ordinary stockholder who had **no relationship** with Goldman Sachs. 2009 WL 247626, at 3. The facts here are in stark contrast to *Young*. The Bakers were Dragon's majority owners and controlling shareholders and had to approve any merger. Goldman had numerous direct personal dealings with the Bakers, and Goldman knew they were relying on its expertise, advice and assistance in making their decision to approve the merger. Unlike *Young*, the Bakers were – and are on the facts alleged in the Complaint – intended beneficiaries of Goldman's contractual undertaking.[22]

>    **3.    Goldman's Persistent And Continual Direct Dealings With The Bakers Throughout The Course Of The Engagement Created Direct Obligations To The Bakers For Which Goldman Is Liable In Tort**

Goldman concedes that a duty of care giving rise to tort liability exists with either "a privity-like relationship"[23] or "an intent by the defendant to provide information for the specific benefit or

---

*Continued from previous page*
*Alusit* complaint "fail[ed] to allege circumstances indicating that [an entity] intended to give [plaintiff] the benefit of the promised performance" in a confidentiality agreement).

[22]    In light of the foregoing, the Bakers also state a proper claim for breach of the covenants of good faith and fair dealing, which are "implied in every contract." *See Farragut*, 1999 WL 823656, at *10. *Levine v. Yokell,* 258 A.D.2d 296, (N.Y. App. Div. 1999), one of Goldman's two cases, is a two-paragraph opinion without any facts. In *Four Winds of Saratoga, Inc. v. Blue Cross and Blue Shield of Central New York, Inc.*, 241 A.D.2d 906, 907 (N.Y. App. Div. 1997), there was no underlying contract or third party beneficiary relationship between the parties.

[23]    *See, e.g., European Am. Bank & Trust Co. v. Strauhs & Kaye,* 65 N.Y.2d 536, 554, 483 N.E.2d 110, 120 (1985). In *Walker v. Chiauzzi,* 57 A.D.3d 1353, 1353 (N.Y. App. Div. 2008), one of the cases Goldman cites, real estate owners attempted to sue a land surveyor *who was hired by their neighbors* for professional negligence. In Goldman's other case, *Liberty Mutual Insurance Co. v. First Brighton Transportation Management, Inc.*, 2008 WL 1787684, at *5
*Continued on following page*

guidance of the plaintiff."[24]  But Goldman again ignores all of the facts in the Complaint that

underpin its duty to the Bakers and evidence Goldman's breach of that duty under both New York

and Massachusetts law.[25]

Goldman's central theme against the Bakers' tort claims – that an investment bank has no

direct duty and cannot have direct liability to a shareholder – is not supported by the law.[26]

Goldman's principal case, *Meyer v. Goldman Sachs & Co.*, 234 A.D.2d 129 (N.Y. App. Div. 1996),

is a two-paragraph opinion without any facts other than a statement that the plaintiffs, ordinary

shareholders, had failed to allege a "relationship" with the defendant investment bank.  *Id.* at 130.

The opinion does not state a "general rule" that a bank hired by a board is not in privity with

---

*Continued from previous page*

(E.D.N.Y. Apr. 17, 2008), an insurance company's negligent misrepresentation claims failed not because of the relationship between the parties, but because plaintiff's pleading *failed to allege* that defendant insurance brokers were responsible for or aware of the incorrect information included on insurance applications.

[24]    *See, e.g., Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 110, 787 N.E.2d 1060, 1067 (2003), *review denied*, 439 Mass. 1105, 787 N.E.2d 1059 (2003).  *Reisman* distinguished *Nycal v. KPMG Peat Marwick LLP*, 426 Mass. 491, 499, 688 N.E.2d 1368, 1373 (1998), cited by Goldman, on the facts.  The accountants in *Reisman* were active participants in the merger deal, like Goldman here, whereas the accountants in *Nycal* were not and were not aware that a deal was in the offing or that their reports would be shared with the plaintiffs.  In *Reder v. Travelers Plan Administrators of Connecticut, Inc.*, 44 F. Supp. 2d 92, 97 (D. Mass. 1999), the court concluded on summary judgment that there was "simply no factual evidence in the record that would indicate that [defendant insurance administrator] knew or intended that [plaintiff], or any limited group of which he was a member would rely upon [defendant's] advice."

[25]    In most instances where a contract provides for the law to be applied in disputes between parties, courts apply the provision only to contract claims.  *See, e.g., Echomail, Inc. v. Am. Express Co.*, 529 F. Supp. 2d 140, 146 (D. Mass. 2007).  Goldman's choice of law case, *Berwind Property Group, Inc. v. Environmental Management Group, Inc.*, 2007 WL 4707647, at *5 (D. Mass. Feb. 5, 2007), is an unpublished decision that did not involve a breach of fiduciary duty or negligent misrepresentation.  The tort claims in *Berwind* simply "duplicate[d] the breach of contract claim."  *Id.* at *5.

[26]    Nor is it supported by the language of the Engagement Agreement.  As discussed at 17-22 *supra*, nowhere in the Engagement Agreement does Goldman disclaim direct obligations to the Bakers.  Indeed, in limiting the exculpatory provision to only derivative claims by Janet Baker for negligence, the Engagement Agreement recognizes direct duties to the Bakers – both under the contract and extra-contractually by virtue of its relationship with the Bakers and the representations made to them – and, therefore, liability to them in tort for negligence, gross negligence, willful misconduct, and bad faith.  *See Stone Castle Fin.*, 191 F. Supp. 2d at 661-62 (investment bank retained to provide advice for potential acquisition had "both a contractual duty  . . . as well as a separate duty arising from Defendants' role as the investment banking firm retained for the acquisition").

shareholders.  The *Meyer* ruling is unremarkable and does not support Goldman's "no duty" argument on the facts alleged in this case.[27]

Unlike the plaintiffs in *Meyer* and the other cases cited by Goldman, the Bakers have pled the requisite relationship with Goldman even under the somewhat more stringent New York test. Indeed, in *European American Bank & Trust Co.*, which was cited by the *Meyer* court (but not by Goldman), the New York Court of Appeals held that the "prerequisites for the cause of action in negligence, as well as in gross negligence, are fully satisfied" where (1) the plaintiff alleged reliance on an accounting partnership's representations and (2) the defendant accounting partnership "was well aware that a primary, if not the exclusive, *end and aim* of auditing its client . . . was to provide [the plaintiff] with the financial information it required."  65 N.Y.2d at 554 (emphasis original). Here, as in *European American Bank*, the Bakers allege that Goldman knew their identity, knew they would be relying on Goldman, knew that their approval was required for any sale of all or a part of Dragon, communicated directly with them "both orally and in writing," met together with them, and made repeated direct representations to them.  *Compare id. with* ¶¶ 15, 23-24, 31-32, 45-47, 52-57, 59, 61, 116, 117, 180-81, 185-86, 192, and 201-202.  The Bakers plead a direct duty owed by Goldman to them[28] and breach of duty.

---

[27]     Nor do other cases Goldman cites.  The class of shareholders in *Stuchen v. Duty Free International, Inc.*, 1996 WL 33167249, at *12 (Del. Super. Ct. Apr. 22, 1996), had no relationship with the investment bank that provided advice to a company related to an acquisition.  In *Ormond v. Anthem, Inc.*, 2008 WL 906157, at *28-29 (S.D. Ind. Mar. 31, 2008), the investment bank's obligation was only to provide a fairness opinion, which expressly stated it was only intended for the company's Board of Directors, and the investment bank had no relationship with the plaintiff class of individual policyholders.  *HA2003 Liquidating Trust* is distinguished *supra* at note 15.

[28]     In *Reisman*, a leading case in Massachusetts, the court reversed summary judgment for the defendant accountant in a lawsuit filed by former shareholders.  57 Mass. App. Ct. at 102, 787 N.E.2d at 1062.  The court held that there was an "inference of . . . awareness" by KPMG that its audit opinion and prepared financial statements were given to and relied on by the shareholders.  *Id.* at 125, 787 N.E.2d at 1077; s*ee also Craig v. Everett M. Brooks Co.*, 351 Mass 497, 501, 222 N.E.2d 752, 755 (1967) (upholding negligence claim where identity of plaintiff and extent of reliance were known to defendant).  The fact that Goldman is an investment bank does not change the analysis or the result.  In *Dowling v. Narragansett Capital Corp.*, the court denied the investment bank's motion to dismiss the shareholder's negligence claim, finding that the investment bank "was hired to assess the adequacy of the proposed purchase price" and the bank's "assessment was patently intended to guide shareholders in deciding whether to approve the sale."  735
*Continued on following page*

The standard of care that defines the duty Goldman owed the Bakers is the "degree of care that a reasonably prudent investment banker would have exercised under the same circumstances." *Schneider v. Lazard Freres & Co.*, 159 A.D.2d 291, 297 (N.Y. App. Div. 1990). Negligence under both New York and Massachusetts law is the failure, either by action or omission, to exercise that degree of care. *See, e.g., id.; Altman v. Aronson*, 231 Mass. 588, 591, 121 N.E. 505, 506 (1919); *Christopher v. Father's Huddle Café, Inc.*, 57 Mass. App. Ct. 217, 222, 230, 782 N.E.2d 517, 522, 529 (2003) (relying on *Altman* as "long standing Massachusetts authority"); *McLean v. Triboro Coach Corp.,* 302 N.Y. 49, 51, 96 N.E.2d 83, 83-84 (1950).

The test for gross negligence under Massachusetts law is more than ordinary negligence but does not require a showing of reckless disregard. *Altman*, 231 Mass. at 591, 121 N.E. at 506. New York requires conduct that evinces reckless indifference. *See Z Auction,* 2002 WL 1732526, at *11-12 (quoting New York cases and analyzing facts under New York law). The Bakers' Complaint pleads negligent conduct, and also pleads "the kind of conduct that rises to the level of 'gross negligence,'" even under New York's "reckless indifference" standard. See II.C *supra*.

"Deficient" work in "multiple ways and at various times over the course of the engagement" and "completely ignor[ing] and never investigat[ing]" "red flags," as alleged here, constitute gross negligence under Massachusetts law. *Chiacchia v. Lycott Envtl. Research, Inc.*, 4 Mass. L. Rptr. 399, 1995 WL 1146824, at *11 (Mass. Super. Ct. Sept. 15, 1995). This kind of conduct more than meets New York's "reckless indifference" standard.[29] The allegations here bear similarity to those

---

*Continued from previous page*

F. Supp. 1105, 1124 (D.R.I. 1990) (applying Restatement (Second) of Torts § 552).

[29]    None of the three cases in Goldman's footnote 10 involved multiple acts and omissions over the course of an engagement, as alleged here. Nor did those claims rise to the level of Goldman's egregious conduct here. *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 824, 611 N.E.2d 282, 283 (1993), involved negligent installation of a burglar alarm system. *Premiere-N.Y., Inc. v. Travelers Property Casualty Corp.*, 2008 WL 2676800, at *1 (N.Y. Sup. Ct. Jul. 8, 2008), was a claim by a subcontractor against a surety in a construction dispute about delays in

*Continued on following page*

in *Z Auction,* 2002 WL 1732526, at *3, 4, 12. There, as here, the investment banker gave the

plaintiff advice with knowledge of a problem but without adequate due diligence. *Id.;* ¶¶ 24-26, 33-

44, 58-118. Applying New York's recklessness standard, which is more stringent than the

Massachusetts requirement for gross negligence, the court found that the plaintiff stated a claim for

gross negligence. *Z Auction*, 2002 WL 1732526, at *1. So too do the Bakers' allegations here.

### 4. The Complaint Details Numerous Misrepresentations Goldman Made Directly To The Bakers

The Complaint details multiple statements and omissions made by Goldman that constitute

intentional[30] and negligent misrepresentation.[31] Goldman made numerous specific factual

representations to the Bakers about L&H's business and financial performance without conducting

any investigation into whether the information contained in the statements was true and without

knowledge about the veracity of L&H's financial numbers and the legitimacy of L&H's customer

base and licensing arrangements. See II.C.1 *supra*. Goldman had negative information about L&H

from a prior representation of another client and from Goldman's research analysts that constituted

red flags and made them cautious about L&H stock. ¶¶ 41-42, 77-80, 103, 113-115. Goldman did

---

*Continued from previous page*

the construction schedule not adhered to. *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 354 (N.Y. App. Div. 2004),
was a dispute by an arms-length note holder about particular management decisions of its debtor.

[30]   Intentional misrepresentation requires "a false representation of a material fact with knowledge of its falsity for
the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted
upon it to [its] damage." *Reisman*, 57 Mass. App. Ct. at 108-09, 787 N.E.2d at 1066-67. A failure to disclose can also
be an intentional misrepresentation if the defendant has a duty to exercise reasonable care to disclose the matter in
question. *See Chace v. Curran*, 71 Mass. App. Ct. 258, 263-64, 881 N.E.2d 792, 796-97 (2008). The standard under
New York law is the same. *See, e.g., Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 477 (S.D.N.Y. 2001).

[31]   Negligent misrepresentation under Massachusetts law follows the Restatement (Second) of Torts § 552; liability
extends to the "limited group of persons for whose benefit and guidance [the defendant] intends to supply the
information." *Reisman*, 57 Mass. App. Ct. at 122 n.23, 787 N.E.2d at 1075 n. 23; s*ee, e.g., Marram v. Kobrick Offshore
Fund, Ltd.*, 442 Mass. 43, 60, 809 N.E.2d 1017, 1031 (2004); *Golber v. Baybank Valley Trust Co.*, 46 Mass. App. Ct.
256, 260, 704 N.E.2d 1191, 1194 (1999). New York requires that the parties have a "nexus between them sufficiently
approaching privity." *See, e.g., European Am. Bank*, 65 N.Y.2d at 554, 483 N.E.2d at 118; *Chaikovska v. Ernst &
Young LLP*, 21 A.D.3d 1324, 1325 (N.Y. App. Div. 2005). The Bakers meet the duty test under both Massachusetts
and New York. See III.A.3 *supra* at 22-24.

not share its caution with the Bakers.  Instead, Goldman told the Bakers there were no open issues or concerns about L&H's stock value.  ¶¶ 61, 111-118.

Goldman made numerous other misrepresentations throughout its relationship with the Bakers, without doing the investigation necessary to support them.  ¶¶ 46-53, 55-56, 59, 61, 90, 109-118.  *See Stone v. Tavares*, 1998 WL 90738, at *2 (Mass. Super. Ct. Feb. 25, 1998) (misrepresentations made were actionable where accurate facts could have been obtained through exercise of modicum of diligence).  One of the more egregious is the representation in the Merger Analysis about L&H's "pipeline of revenue" from licensees of core technologies.  It would have taken only a "modicum of diligence" – phone calls to purported customers – to learn the truth of these "facts," namely, that the customers did not exist, most of the licensees existed only on paper, and the revenue pipeline was a sham.[32]   See II.C.1 *supra*.

Goldman also misrepresented its work and caused the Bakers to obtain comfort about areas of concern with the L&H merger through their belief that Goldman was conducting comprehensive due diligence into all aspects of L&H's business.  ¶¶ 30-35, 43-63, 65, 69, 72, 82, 90, 93, 98, 100, 103, 106-112, 116-118.  Goldman knew that the merger would not occur without the Bakers' approval, and made all of these representations with the specific intent that the Bakers would rely.[33]

---

[32]    Goldman's argument that the Bakers have not pled actionable misrepresentations relies on inapposite cases.  *International Floor Crafts, Inc. v. Adams*, 477 F. Supp. 2d 336, 341 (D. Mass. 2007), was a *failure to plead detrimental reliance* upon the misrepresentations.  *O'Connor v. Merrimack Mutual Fire Insurance Co.*, 73 Mass. App. Ct. 205, 213, 897 N.E.2d 593, 600 (2008), was *after* trial in which the plaintiff failed to present evidence that the information defendant provided was false.  Goldman's argument that there is no allegation that its statements were false ignores paragraphs 126 through 146 of the Complaint, which extensively detail the L&H sham.  Moreover, the Court may reasonably infer on a motion to dismiss that the alleged representations were false.  *See McEneaney v. Chestnut Hill Realty Corp.*, 38 Mass. App. Ct. 573, 576, 650 N.E.2d 93, 96 (1995).

[33]    Goldman relies on *Massey*, 464 F.3d at 650, for its factual assertion that Goldman only made representations to Janet Baker as a Board member, and therefore only the now non-existent Dragon can sue Goldman for Goldman's causing Dragon to no longer exist.  First, Goldman's argument requires a factual mischaracterization favorable to Goldman which Goldman cannot make on a motion to dismiss.  Janet Baker was individually relying on everything Goldman was telling her directly on a constant basis.  Goldman knew that Janet Baker (and her husband) were putting their lives' work in Goldman's hands.  By claiming it was only talking to Dragon (and not another human being), Goldman seeks virtual immunity for its misconduct.  According to Goldman only Dragon can sue it, but Dragon does

*Continued on following page*

- 27 -

The Bakers' detailed 66-page Complaint sufficiently and properly pleads the dates on which

Goldman made its representations, the substance of the misrepresentations, and the method by

which Goldman communicated – *i.e.,* the who, what, when, and how required for both Rule 8 and

Rule 9(b) pleading.[34]  See II.B.2, C.1 *supra.*

Goldman's misrepresentations are not insulated from liability as statements of "opinion."

An opinion constitutes a statement of fact where it implies that there are either facts to justify it or

no facts incompatible with it.  *McEneaney*, 38 Mass. App. Ct. at 575, 650 N.E.2d at 96.  "This is

particularly true where the maker is understood to have special knowledge of facts unknown to the

recipient."  *Id.; see also Dowling*, 735 F. Supp. at 1124 (reliance on opinion was reasonable when

the speaker "held itself out as an expert"); Dan B. Dobbs, et al., *Prosser and Keenan on Torts* 760-

61 (5th ed. 1984) ("where the parties stand in a relation of trust and confidence," reliance on an

opinion is justified).[35]

Goldman's statements, to the extent they were opinions, likewise implied that there were

facts justifying the statements or no incompatible facts.[36]  The Bakers relied on Goldman to do what

---

*Continued from previous page*

not exist because of Goldman's misconduct.  Second, *Massey* was a "fairness opinion" case in which the shareholder plaintiffs did not even allege that the investment banker defendant "made any misrepresentations to them as individual shareholders."  *Id.*

[34]    The Bakers' negligent misrepresentation claim is not subject to a Rule 9(b) heightened pleading standard, s*ee Gerber v. Bowditch,* 2006 WL 1284232, at *13, n.16 (D. Mass. May 8, 2006); however, it is pled with specificity and withstands scrutiny under Rule 9(b).

[35]    In contrast, the cases on which Goldman relies were either clearly identified as mere "opinions" or failed to plead the elements of misrepresentation.  *See Friedman v. Mohasco Corp.*, 929 F.2d 77, 78 (2d Cir. 1991) (finding advisor's statement of future market value of company's debentures was opinion because it clearly stated figure was "joint opinion" of financial advisors); *Ernest Lawrence Group v. Marketing the Ams., Inc.*, 2005 WL 2811781, at *13 (S.D.N.Y. Oct. 27, 2005) (summary judgment granted when there were no substantive communications between plaintiff and defendant); *In re Fidelity/Apple Sec. Litig.*, 986 F. Supp. 42, 45 (D. Mass. 1997) (plaintiff failed to plead reliance and falsity).

[36]    *E.g.,* ¶ 48 (L&H could translate 70 languages overall); ¶ 49 (L&H had a pipeline of recurring revenue); ¶ 52 (implying calculations for analyses of value of combined company were based on accurate and verified data).

it said it was doing.  The Bakers trusted that Goldman was conducting due diligence and a thorough investigation of L&H's business and that Goldman's representations and assurances about L&H were supported by this work.  Goldman's misrepresentations are actionable.

**5.      Goldman's Dealings With The Bakers Were In A Commercial Business Relationship That Gives Rise To Liability Under Ch. 93A**

A claim under Mass. Gen. Laws ch. 93A § 11 requires that (1) interaction between the parties be commercial in nature and (2) both parties act in a "business context" by engaging in trade or commerce.  *Trustees of Boston Univ. v. ASM Communications, Inc.*, 33 F. Supp. 2d 66, 76 (D. Mass. 1998) (citing *Linkage Corp. v. Tr. of Boston Univ.*, 425 Mass. 1, 679 N.E.2d 191 (1997)).  An interaction is commercial in nature if it is between two separate individuals or entities as opposed to "intra-enterprise" or "within a single company."  *Linkage*, 425 Mass. at 23, 679 N.E.2d at 207; *Szalla v. Locke*, 421 Mass. 448, 452, 657 N.E.2d 1267, 1270 (1995).  "Trade" and "commerce" include "the sale . . . of . . . any property," *see* Mass. Gen. Laws ch. 93A § 1(b), and stock transactions meet this test.  *See Nanfelt v. Asher*, 16 Mass. L. Rptr. 493, 2003 WL 21961421, at *9 (Mass. Super. Ct. June 11, 2003).

Goldman's argument that the Bakers fail to plead "a direct commercial business transaction" mirrors the defendant's argument that was rejected in *Reisman*, 57 Mass. App. Ct. at 125, 787 N.E.2d at 1078.  There, the Massachusetts Court of Appeals reversed the trial court's ruling that shareholders in a transaction "did not have a significant business relationship" with KPMG.  The appellate court held that the relationship between KPMG and the shareholders was "more than trivial."  The accountants were "in direct contact" with the shareholders during the stock-for-stock merger negotiations, assigned a partner to advise the shareholders, were "responsible for the structure of the transaction and reviewed all documents relating to it."  *Id.*, 787 N.E.2d at 1078.  As in *Reisman*, this case involved a stock-for-stock merger where Goldman "sat on the [Bakers'] side

of the negotiating table," had direct communications with the Bakers throughout the transaction, was responsible for advice on the structure of the transaction, and knew that the Bakers would rely on its representations.[37]  *See also Manhattan Tops USA, Inc. v. Kenneth Leventhal & Co.*, 4 Mass. L. Rptr. 700, 1995 Mass. Super. LEXIS 50, at *10 (Mass. Super. Ct. Dec. 1995) ("business relationship" could be found where "professional advisors" "intended potential investors, such as the plaintiffs . . . to rely on their bottom line valuation").  The Bakers meet the requirements for this cause of action.

### B.    The Bakers Are Not Asserting Derivative Claims And Have Standing To Sue For Goldman's Breaches Of Its Direct Duties To Them

The Court should reject Goldman's argument that the Bakers have no standing.  First, where, as here, the complaint alleges **direct** contractual and extracontractual duties, the claims for breach of those duties are direct, not derivative.  See III.A *supra*.  Second, courts have rejected Goldman's contention that a claim is derivative if it affects all stockholders equally or unless there is "individualized harm."  *See, e.g., Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) ("we expressly disapprove . . . the concept that a claim is necessarily derivative if it affects all stockholders equally"); *Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002) (direct suit does not require injury distinct from other shareholders).

Whether a claim is direct or derivative turns on the "nature of the wrong and to whom the relief should be granted."  *Tooley*, 845 A.2d at 1039; *see, e.g., Branch v. Ernst & Young U.S.*, 1995 WL 791941, at *4 (D. Mass. Dec. 22, 1995); *Higgins v. New York Stock Exch., Inc.*, 806 N.Y.S.2d 339, 351 (N.Y. Sup. Ct. 2005); *see also Hurley v. Fed. Deposit Ins. Corp.*, 719 F. Supp. 27, 30 (D.

---

[37]    The relationship deemed insufficient in *Milliken Co. v. Duro Textiles, LLC*, consisted only of failed debt restructuring discussions and subsequent bankruptcy and litigation proceedings.  451 Mass. 547, 565, 887 N.E.2d 244, 260 (2008).  There was no direct business or commercial relationship at all in *Cash Energy, Inc. v. Weiner;* the parties' "only relationship ar[ose] from their ownership and use of neighboring properties."  768 F. Supp. 892, 893 (D. Mass. 1991).

Mass. 1989) ("where the shareholders themselves have been defrauded . . . they [can] sue the wrongdoer").[38]  In both *Higgins* and *Branch*, the courts held there was a distinction between an injury to the corporation's assets (for which a shareholder has only a derivative claim) and an injury that affects the shareholder's "equity" or ownership interest in the corporation (which is a direct injury for which the shareholder has a direct claim).  *See Branch*, 1995 WL 791941, at *4 n.5; *Higgins*, 806 N.Y.S.2d at 354.  This case is not about a mere diminution in share value as a result of an injury to a corporate asset.  As in *Higgins* and *Branch*, the wrong that caused the Bakers' irreplaceable loss is Goldman's breach of its direct duties to the Bakers.  The harm to the Bakers is the loss of their entire equity interest in and ownership of Dragon, which was their lives' work for more than 18 years.  This is not an "asset" owned by Dragon for which Dragon has a right to sue.[39]

Moreover, neither the Bakers' claim nor their injury is shared by other shareholders.  **The Bakers personally relied on Goldman's direct representations to them.**  In addition, and unlike other Dragon shareholders, the Bakers' shares of the merged company were subject to lock-up agreements.  ¶ 4.[40]  *See Dowling*, 735 F. Supp. at 1113 (claim is direct where loss is not born

---

[38]    *In re Sonus Networks, Inc.*, 499 F.3d 47, 63-64 (1st Cir. 2007), does not state that the law of the state of incorporation applies to the threshold determination whether a claim is direct or derivative.  Massachusetts courts have not consistently applied a particular choice of law rule to distinguish direct from derivative claims.  *See Greenfield v. Shuck*, 867 F. Supp. 62, 66 n.7 (D. Mass. 1994).  Whether Massachusetts, New York or Delaware law ultimately guides the analysis, the result is the same – the Bakers have standing to assert direct claims against Goldman.

[39]    In contrast, the principal cases cited by Goldman – *Feldman v. Cutaia*, 951 A.2d 727, 732 (Del. 2008), *Kramer v. Western Pacific Industries*, 546 A.2d 348, 353 (Del. 1988), and *Hirshberg v. Appel*, 266 Mass. 98, 100, 164 N.E. 915, 915-16 (1929) – were found to be derivative suits because they were "claim[s] of mismanagement resulting in corporate waste."  *Massey*, 464 F.3d at 650, is inapplicable because it contains no allegation that the defendant "made any misrepresentations to [plaintiffs] as individual[s]."  Moreover, the appellate division in *New Castle Siding Co. v. Wolfson*, acknowledged that "[w]here…the injury to a shareholder resulted from the violation of duty owing to the shareholder from the wrongdoer…an individual cause of action may exist." 97 A.D.2d 501, 502 (N.Y. App. Div. 1983), *aff'd*, 63 N.Y.2d 782, 470 N.E.2d 868 (1984).

[40]    James Baker also had a non-compete that ran from the date of the merger through December 31, 2000 and a three-year non-solicitation agreement.  After the merger, Janet Baker remained with the Dragon Division of L&H to oversee the development of Dragon's "golden eggs."  She had a three-year non-compete, non-solicitation agreement from the date of termination of employment from L&H.  The Bakers never imagined that the individualized nature of their injury and damages resulting from Goldman's breaches of its direct obligations to them would be at issue in this case so these

*Continued on following page*

equally by all shareholders).  The Bakers had an interest in Dragon unique from all other shareholders.  Dragon was their lives' work, and they retained their majority ownership and the right to the final say over Dragon's destiny from Dragon's very beginning up to the merger.  See II.A & B.2 *supra*.  The Bakers agreed to the merger because they understood from Goldman's direct representations to them that the merger would enable them, through the Dragon Division of the merged L&H company, to develop Dragon's advancements in the speech technology that they had spent their lives researching and developing.  See II.A, B.2-3.  They lost Dragon and their interest in seeing Dragon's "golden eggs" to fruition as a result of their reliance on Goldman in approving Dragon's merger with L&H and Goldman's complete and utter failure to fulfill its contractual and legal obligations as financial advisor for the deal.

Finally, shareholders **have direct standing** to sue even for typically derivative claims like corporate waste if there are material misrepresentations or omissions.  *Hurley*, 719 F. Supp. at 30; *see also Kitchens of the Oceans, Inc. v. McGladrey & Pullen, LLP*, 832 So. 2d 270, 273 (Fla. Dist. Ct. App. 2002) (company's president "stated a cause of action on his own behalf" where he "alleged that auditors knew or should have known that he was one of the limited group of persons for whose benefit and guidance the audit conclusion would be used" and in reliance on audit "suffered a total loss in value of his stock").  And it is indisputable that a merger does not affect standing to sue for a direct injury.  "Where a corporation is dissolved or sold in a transaction marred by breaches of fiduciary duty, the wronged shareholders of the former corporation are not left without a remedy . . . No one would assert that a former owner suing for loss of property through deception or fraud has lost standing to right the wrong that arguably caused the owner to relinquish ownership or

---

*Continued from previous page*
specific allegations are not pled in the Complaint but can be readily added by amendment if the Court deems it necessary.

possession of the property." *Bernstein v. Kelso & Co.*, 231 A.D.2d 314, 322-23 (N.Y. App. Div. 1997) (quoting *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1188 (Del. 1988)).  The Bakers' claims are direct, their injuries are direct, and they have standing to sue Goldman.

> **C.    Goldman Sachs Group, Inc. And Goldman Sachs & Co., LLC Were General Partners Of Goldman Sachs & Co. During The Engagement And Are Properly Named As Defendants**

It is well-settled that general partners are personally and individually liable for the obligations of the partnership and are proper defendants in a suit against the limited partnership. *County of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assoc., LP*, 2007 WL 838975, at *1 (N.D.N.Y. Mar. 19, 2007) (citing N.Y. Partnership Law § 26(a)(2)).[41]  During the relevant time Goldman solicited and was engaged as exclusive financial advisor for the Dragon merger, Goldman Sachs Group, Inc. and Goldman Sachs & Co., LLC were the two general partners of the limited partnership Goldman Sachs & Co.  As such, they are liable for the debts and liabilities of Goldman Sachs & Co. for wrongs committed during the engagement.[42]  A partner's subsequent withdrawal[43] from the partnership does not relieve it of partnership obligations assumed or liabilities incurred during the time it was a general partner.  *Id.* at *4 (denying general partner's motion to dismiss); *Lubin v. Lindenmere Prop., Inc.*, 110 A.D.2d 514, 514 (N.Y. App. Div. 1985) (holding that case was "properly maintainable" against former general partner).  Accordingly, all of the named Goldman entities are proper defendants in this case.

---

[41]    The cases Goldman cites relate to real estate leases and are *sui generis*.  *See Meyer v. Park S. Assoc.*, 159 A.D.2d 337, 338 (N.Y. App. Div. 1990); *Helmsley v. Cohen*, 56 A.D.2d 519, 519 (N.Y. App. Div. 1977).  As *Meyer* makes clear, "[a]n individual partner is liable for tortious action committed by the partnership," such as the acts the Bakers allege in their Complaint.  *See* 159 A.D.2d at 339.

[42]    The parties entered into a Tolling and Document Preservation Agreement on July 31, 2002.  Complaint, Exh. A.

[43]    Goldman Sachs Group, Inc. withdrew as a general partner and became a limited partner of Goldman Sachs & Co. on August 8, 2008.

IV.    **CONCLUSION**

For the foregoing reasons, the Bakers respectfully request that this Court deny Goldman's

Motion to Dismiss.

Respectfully submitted

Dated: April 8, 2009

/s/ Terence K. Ankner
Terence K. Ankner, Esq. (BBO #552469)
Partridge Ankner & Horstmann LLP
200 Berkeley Street, 16th Floor
Boston, MA  02116
(617) 859-9999

and

/s/ Alan K. Cotler
Alan K. Cotler, Esq.
Joan A. Yue, Esq. (BBO #538220)
Steven T. Voigt, Esq.
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103
(215) 851-8100

Attorneys for Plaintiffs
Janet Baker and James Baker

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 8, 2009.

/s/ Joan A. Yue
Joan A. Yue

- 34 -