# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————— :
                                              :
JANET BAKER and JAMES BAKER,    :
                                              :
             Plaintiffs          :    **JURY TRIAL DEMANDED**
                                              :
       v.                        :    Civil Action No. 09-10053-PBS
                                              :
GOLDMAN SACHS & CO.,             :
GOLDMAN SACHS GROUP, INC., and   :
GOLDMAN SACHS & CO., LLC         :
                                              :
             Defendants.         :
———————————————————— :


## PLAINTIFFS' SUR REPLY BRIEF OPPOSING
## DEFENDANTS' MOTION TO DISMISS


Alan K. Cotler, Esq.                 Terence K. Ankner, Esq.
Joan A. Yue, Esq.                    PARTRIDGE ANKNER & HORSTMANN LLP
Steven T. Voigt, Esq.                200 Berkeley Street
REED SMITH LLP                       16th Floor
2500 One Liberty Place               Boston, MA  02116
1650 Market Street                   (617) 859-9999
Philadelphia, PA  19103
(215) 851-8100


                                     Attorneys for Plaintiffs
                                     Janet Baker and James Baker

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... i

I.    INTRODUCTION .................................................................................................1

II.   ARGUMENT .........................................................................................................1

    A.    The Bakers State A Claim For Breach Of Fiduciary Duty .......................1

    B.    Goldman Had Direct Contractual Duties To The Bakers .........................5

    C.    Goldman Owed A Duty Of Care To The Bakers.....................................10

    D.    The Bakers Plead Actionable Factual Misrepresentations......................14

    E.    The Bakers State A Claim For Violation Of Chapter 93A .....................16

    F.    The Bakers' Claims Against Goldman Are Direct Claims .....................18

    G.    Goldman Sachs Group, Inc. And Goldman, Sachs & Co., LLC Are
           Properly Named As Defendants In This Action .....................................19

III.  CONCLUSION......................................................................................................20

## TABLE OF AUTHORITIES

*67 Wall St. Co. v. Franklin Nat'l Bank*,
    37 N.Y.2d 245, 333 N.E.2d 184 (1975) ................................................ 8

*Ackerman v. Price Waterhouse*,
    216 A.D.2d 123 (N.Y. App. Div. 1995) ............................................ 5-6

*Alford v. Frontier Enterprises, Inc.*,
    599 F.2d 483 (1st Cir. 1979) .......................................................... 14

*Bear Stearns and Co., Inc., v. Daisy Systems Corp.*,
    97 F.3d 1171 (9th Cir. 1996) ........................................................... 3

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007) ............................................. 16

*Branch v. Ernst & Young U.S.*,
    1995 WL 791941 (D. Mass. Dec. 22, 1995) .................................18-19

*Brooklyn Life Ins. Co. v. Dutcher*,
    95 U.S. 269 (1877) ......................................................................... 7

*Brooks v. Key Trust Co. Nat'l Ass'n*,
    26 A.D.3d 628 (N.Y. App. Div. 2006)............................................1-2

*CBIC Bank & Trust Co. (Cayman) Ltd. v. Credit Lyonnais*,
    270 A.D.2d 138 (N.Y. App. Div. 2000)............................................ 4

*Credit Alliance Corp. v. Arthur Andersen & Co.*,
    65 N.Y.2d 536, 483 N.E.2d 110 (1985) .......................................... 11

*Dowling v. Narragansett Capital Corp.*,
    735 F. Supp. 1105 (D.R.I. 1990) .............................................. 12, 18

*EBC I, Inc. v. Goldman Sachs & Co.*,
    5 N.Y.3d 11, 832 N.E.2d 26 (2005) ................................................ 2

*Edward B. Fitzpatrick, Jr. Construction Corp. v. County of Suffolk*,
    138 A.D.2d 446 (N.Y. App. Div. 1988)........................................12-13

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*,
    375 F.3d 168 (2d Cir. 2004) ........................................................... 8

*European Am. Bank & Trust Co. v. Strauhs & Kaye*,
  65 N.Y.2d 536, 483 N.E.2d 110 (1985) .............................................................. 11

*Fed. Ins. Co. v. Americas Ins. Co.*,
  258 A.D.2d 39 (N.Y. App. Div. 1999).............................................................. 7, 8

*Feldman v. Cutaia*,
  951 A.2d 727 (Del. 2008)..................................................................................... 19

*Fidelis Corp. v. Litton Indus., Inc.*,
  293 F. Supp. 164 (S.D.N.Y. 1968) ...................................................................... 19

*Frydman & Co. v. Credit Suisse First Boston Corp.*,
  272 A.D.2d 236 (N.Y. App. Div. 2000) ................................................................ 5

*Gerber v. Bowditch*,
  2006 WL 1284232 (D. Mass. May 8, 2006) ........................................................ 16

*Gupta v. Nat'l Life Ins. Co.*,
  2006 WL 2000118 (W.D.N.Y. July 17, 2006) ....................................................... 9

*HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*,
  517 F.3d 454 (7th Cir. 2008)........................................................................... 2, 13

*Helmsley v. Cohen*,
  56 A.D.2d 519 (N.Y. App. Div. 1977).................................................................. 20

*Herrington v. Verrilli*,
  151 F. Supp. 2d 449 (S.D.N.Y. 2001) .................................................................. 12

*Higgins v. N. Y. Stock Exch., Inc.*,
  806 N.Y.S.2d 339 (N.Y. Sup. Ct. 2005) ............................................................... 18

*Hirshberg v. Appel*,
  266 Mass. 98, 164 N.E. 915 (1929) ..................................................................... 13

*Hurley v. Fed. Deposit Ins. Corp.*,
  719 F. Supp. 27 (D. Mass. 1989) ......................................................................... 19

*Iannacchino v. Ford Motor Co.*,
  451 Mass. 623, 888 N.E.2d 879 (2008) ............................................................... 16

*IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*,
  26 F.3d 370 (2d Cir. 1994).................................................................................... 7

*In re Tyco Int'l, Ltd.*,
  2007 WL 1687775 (D.N.H. June 11, 2007).......................................................... 16

*Joyce v. Morgan Stanley & Co., Inc.*,
  538 F.3d 797 (7th Cir. 2008)................................................................... 4, 11, 13

*Keeney v. Kemper Nat'l Ins. Co.*,
  1998 WL 29815 (2d Cir. Jan. 27, 1998)................................................................ 8

*Kitchens of the Oceans, Inc. v. McGladrey & Pullen, LLP*,
  832 So. 2d 270 (Fla. Dist. Ct. App. 2002)........................................................... 19

*Kolodziej v. Gosciak*,
  2008 WL 2260601 (W.D.N.Y. May 30, 2008) ........................................................ 9

*Kottler v. Deutsche Bank AG*,
  2009 WL 55885 (S.D.N.Y. Jan. 9, 2009)........................................................... 3-4

*M. Paladino, Inc. v. J. Lucchese & Son Contracting Corp.*,
  247 A.D.2d 515 (N.Y. App. Div. 1998)............................................................... 6

*Mandarin Trading Ltd. v. Wildenstein*,
  851 N.Y.S.2d 71, 2007 WL 3101235 (N.Y. Sup. Ct. 2007) ................................. 15

*Manhattan Tops, USA, Inc. v. Kenneth Leventhal & Co.*,
  4 Mass. L. Rptr. 700, 1995 Mass. Super. LEXIS 50
  (Mass. Super. Ct. Dec. 1995) ......................................................................... 17

*Massey v. Merrill Lynch & Co., Inc.*,
  464 F.3d 642 (7th Cir. 2006)................................................................ 11, 12-13

*McEneaney v. Chestnut Hill Realty*,
  38 Mass. App. Ct. 573, 650 N.E.2d 93 (1995)................................................... 16

*McIntyre v. Okurowski*,
  717 F. Supp. 10 (D. Mass. 1989) ....................................................................... 4

*Meyer v. Goldman Sachs & Co.*,
  234 A.D.2d 129 (N.Y. App. Div. 1996).............................................................. 11

*Meyer v. Park S. Assoc.*,
  159 A.D.2d 337 (N.Y. App. Div. 1990).............................................................. 20

*Milliken Co. v. Duro Textiles, LLC*,
  451 Mass. 547, 887 N.E.2d 244 (2008) ............................................................ 17

*Nanfelt v. Asher,*
    16 Mass. L. Rptr. 493, 2003 WL 21961421 (Mass. Super. Ct. June 11, 2003) .... 16

*Nat'l Bank of Canada v. Hale & Dorr, LLP,*
    17 Mass. L. Rptr. 681, 2004 WL 1049072 (Mass. Super. Ct. Apr. 28, 2004) ........ 9

*New Castle Siding Co. v. Wolfson,*
    97 A.D.2d 501 (N.Y. App. Div. 1983) ............................................................. 6, 13

*Post & Co. v. Sidney Bitterman, Inc.,*
    219 A.D.2d 214 (N.Y. App. Div. 1996) ................................................................. 19

*Onanuga v. Pfizer, Inc.,*
    2003 WL 22670842 (S.D.N.Y. Nov. 7, 2003) ........................................................ 9

*Ormond v. Anthem, Inc.,*
    2008 WL 906157 (S.D. Ind. Mar. 31, 2008) ........................................................ 12

*Read v. Umphrey,*
    1995 WL 1146160 (Mass. Super. Ct. Oct. 10, 1995) ............................................. 3

*Reder v. Travelers Plan Administrators of Conn., Inc.,*
    44 F. Supp. 2d 92 (D. Mass. 1999) ...................................................................... 11

*Reisman v. KPMG Peat Marwick LLP,*
    57 Mass. App. Ct. 100, 787 N.E.2d 1060 (2003) ...................................... 11-12, 17

*Riverside S. Planning Corp. v. CRP/Extell Riverside, LP,*
    869 N.Y.S.2d 511 (N.Y. App. Div. 2008) .............................................................. 8

*Rohtstein Corp. v. KPMG, LLP,*
    2007 WL 4416840 (Mass. Super. Ct. Dec. 10, 2007) .......................................... 14

*Schneider v. Lazard Freres & Co.,*
    159 A.D.2d 291 (N.Y. App. Div. 1990) ............................................................... 12

*Stone v. Tavares,*
    8 Mass. L. Rptr. 192, 1998 WL 90738 (Mass. Super. Ct. Feb. 25, 1998) ............ 15

*Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co.,*
    191 F. Supp. 2d 652 (E.D. Va. 2002) ................................................................. 2, 3

*Strougo v. Bassini,*
    282 F.3d 162 (2d Cir. 2002) ............................................................................... 18

*Tasseff v. Nussbaumer & Clark, Inc.,*
  298 A.D.2d 877 (N.Y. App. Div. 2002)................................................................. 9

*The Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette*
  *Securities Corp.*, 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ............................... 3

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004).................................................................................. 18

*Turano v. Turano,*
  2009 WL 806790 (N.Y. Sup. Ct. Mar. 10, 2009).................................................... 6

*U.S. Borax & Chem. Corp. v. Szmokaluk,*
  1981 WL 404963 (Del. Super. Ct. June 23, 1981).................................................. 6

*U.S. Trust Co. of N.Y. v. Bamco 18,*
  183 A.D.2d 549 (N.Y. App. Div. 1992)................................................................. 20

*Wilson Farm, Inc. v. Berkshire Life Ins. Co.*,
  15 Mass. L. Rptr. 423, 2002 WL 31440151
  (Mass. Super. Ct. Oct. 31, 2002).......................................................................2-5

*Young v. Goldman Sachs & Co.,*
  2009 WL 247626 (Ill. Cir. Ct. Jan. 13, 2009) ...................................................... 12

*Z Auction v. Salomon Smith Barney, Inc.*,
  2002 WL 1732526 (Cal. Ct. App. July 25, 2002) ................................................... 3

*Zuckerman v. Antenucci,*
  478 N.Y.S.2d 578 (N.Y. Sup. Ct. 1984) ............................................................... 20

## STATUTES AND RULES

Fed. R. Civ. P. 9(b).................................................................................................. 16

Mass. Gen. Laws. ch. 93A § 1(b)............................................................................. 16

N.Y. Partnership Law § 26(a) ..............................................................................19-20

## OTHER AUTHORITY

1 William Meade Fletcher, et al.
  *Fletcher Cyclopedia of the Law of Private Corporations* § 29 (2006) .................. 6

Ted. J. Fiflis, *Responsibility of Investment Bankers to Shareholders,*
  70 Wash. U. L.Q. 497 (1992)................................................................................ 12

## I.    INTRODUCTION

Goldman's Reply is replete with pejorative terminology about the Bakers being "corporate insiders," the Bakers claiming "superior insider status," and the Bakers asserting a "self-proclaimed exalted status," as if the Bakers were self-absorbed "bystanders" filing a lawsuit they have no right to bring.  These lawyer-contrived labels do not stand up to the facts alleged in the Complaint and the law.  Goldman's banking team worked hand-in-hand over six months communicating with and advising the Bakers on the L&H merger.  There can be no question that the Bakers reasonably and properly put their trust and confidence in Goldman's abilities, expertise, advice, and recommendations.  The Bakers trusted that Goldman was taking all the necessary steps to protect their $300 million investment.  The law is clear that Goldman owed legal duties to the Bakers.  Nothing in the Engagement Agreement Goldman drafted or the cases Goldman cites prohibits the claims brought here.  Goldman did virtually nothing to protect the Bakers in return for its $5 million fee.  Indeed, a Wall Street Journal reporter was more competent than Goldman.  Goldman's motion to dismiss should be denied.

## II.    ARGUMENT

### A.    The Bakers State A Claim For Breach Of Fiduciary Duty

Goldman's Reply mischaracterizes the Bakers' fiduciary duty arguments, ignores the facts, misstates the law, and rehashes its infirm argument that it never "expressly undertook or voluntarily assumed any fiduciary duties . . . ."  Reply at 10.  Goldman's arguments to dismiss the fiduciary duty claim fail.

*Brooks v. Key Trust Co. National Ass'n*, 26 A.D.3d 628 (N.Y. App. Div. 2006), one of Goldman's new cases, does not state that a fiduciary duty claim requires an "express" undertaking of such a duty.  In *Brooks*, the defendant had a fiduciary duty under the contract so the separate

fiduciary duty claim was dismissed because it was duplicative of the contract claim.  *Id.* at 630.[1]

The Bakers assert, in contrast, that Goldman's extensive direct dealings with them and Goldman's

direct misrepresentations to them over the course of the engagement "created a relationship of

higher trust" that was in addition to and "apart from the terms of the contract."  *Id.* (citing *EBC I,*

*Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19-20, 832 N.E.2d 26, 31 (2005)).

Moreover, *Brooks* directly contradicts Goldman's argument that a fiduciary duty claim is

constrained and limited by the purported language of the contract.[2]  *Brooks* and *EBC I* make it clear

that a fiduciary relationship can arise — and is actionable — apart from and independent of the

duties specified in a contract.  *Id.*;[3] s*ee also Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey &*

*Co.*, 191 F. Supp. 2d 652, 661 (E.D. Va. 2002) ("Courts will recognize claims for both breach of

contract and breach of fiduciary duty . . . [where] two separate duties were breached by the same or

separate conduct — a duty arising out of the contract and a duty arising out of common law").

Goldman also argues that the Bakers' factual allegations and the Bakers' reliance on *Wilson*

*Farm, Inc. v. Berkshire Life Insurance Co.*, 15 Mass. L. Rptr. 423, 2002 WL 31440151, at *8

(Mass. Super. Ct. Oct. 31, 2002), do not support their fiduciary duty claim.  Goldman is wrong.

First, the Bakers cited *Wilson Farm* (and other cases) to demonstrate, in contradiction to

Goldman's contention, that a fiduciary duty claim is extra-contractual, does not require a writing,

---

[1]    Obviously, Goldman does not (and cannot) make this same argument here where it is contending that it had no contractual duties of any kind to the Bakers.

[2]    The case Goldman cites for this contention, *HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*, 517 F.3d 454 (7th Cir. 2008), did not even involve a claim for breach of fiduciary duty and nowhere states that a breach of fiduciary duty claim is "constrained" by a contract.  See Bakers' initial Brief at 16 n.15 (further distinguishing *HA2003*).

[3]    See Bakers' initial Brief at 15-16 (discussing *EBC I*).  Goldman does not mention *EBC I* in its Reply.  **This is not surprising because the court in *EBC I* denied Goldman's motion to dismiss the fiduciary duty claim.  The court found that "a relationship of higher trust" was created independent of an underwriting agreement because an internet retailer "was induced to and did repose confidence in Goldman Sachs' knowledge and expertise to advise it as to a fair IPO price and engage in honest dealings with [the retailers'] best interest in mind."**  5 N.Y.3d at 20, 832 N.E.2d at 31.

and is not constrained by or limited to the breaching party's contractual duties.[4]  Second, the Bakers did not argue in their initial Brief that their fiduciary duty claim rests in sum and substance solely on the "trust and confidence" they placed in Goldman.  Rather, they argued that *all of the considerations* listed in *Wilson Farm* support the existence of a fiduciary relationship in this case.  See Bakers' initial Brief at 17.  Third, as the *Wilson Farm* court recognized in denying summary judgment, "the circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition . . . ."  *Id.* at *7.[5]

Goldman nevertheless insists that it is "appropriate" to rule on a fiduciary duty claim at the motion to dismiss stage, but in fact, the majority of cases hold the opposite — that this is a fact-specific inquiry and should be resolved by the jury.  *See, e.g., Read v. Umphrey*, 1995 WL 1146160, at *1 (Mass. Super. Ct. Oct. 10, 1995) ("what constitutes a fiduciary relationship is fact intensive, and not proper for a motion to dismiss"); *Stone Castle Fin.*, 191 F. Supp. 2d at 662; *Z Auction*, 2002 WL 1732526, at *16.  All of the cases on which Goldman relies (Reply at 11) to assert that breach of fiduciary duty presents a question of law involved situations where there was no factual dispute that a fiduciary duty claim could exist.

In *Kottler v. Deutsche Bank AG*, plaintiffs pled "no connection" between themselves and the defendant advisory firm other than the firm mailing documents about tax strategy to one of the

---

[4]    See cases cited in Bakers' initial Brief at 15-16.  Goldman accuses the Bakers in footnote 9 of its Reply of "misrepresent[ing] the relevance" of *The Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.*, 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002), *Z Auction v. Salomon Smith Barney, Inc.*, 2002 WL 1732526 (Cal. Ct. App. July 25, 2002), *Bear Stearns & Co. v. Daisy Systems Corp.*, 97 F.3d 1171 (9th Cir. 1996), and *Stone Castle*, 191 F. Supp. 2d 652, because the issue in these cases was whether there was a fiduciary duty to the company.  See Reply at 10 n.9.  This factual distinction does not change the considerations that drive the analysis of fiduciary duty or undermine the relevance of the cases.  As set forth in the Bakers' initial Brief at Section III.B and in this Sur Reply at II.B-D *infra*, neither the contract nor the common law limits Goldman's obligations solely to the company.  Goldman had direct dealings with and made direct misrepresentations to the Bakers that give rise to direct duties under established law, including a fiduciary duty.  These cases support that contention.

[5]    The *Wilson Farm* court identified some of the considerations for whether such a fiduciary relationship exists. *Id.* at *8.  All of those considerations are alleged here (see Bakers' initial Brief at 17 and at II.B.2-3, C); none is addressed in Goldman's Reply.

plaintiffs on a single occasion. 2009 WL 55885, at *12 (S.D.N.Y. Jan. 9, 2009). This was plainly

insufficient for "a particularized relationship of trust." *Id.* *McIntyre v. Okurowski* involved a

couple's "blind reliance" on a stockbroker's decisions to put their money in particular investments.

717 F. Supp. 10, 11 (D. Mass. 1989). Unlike Goldman's relationship with the Bakers, the

stockbroker in *McIntyre* did not invite the plaintiffs' input, engage them in his process, or allay their

concerns about issues related to the investment decisions being made. *McIntyre* does not remotely

approach the facts alleged here. *CBIC Bank & Trust Company (Cayman) Limited v. Credit*

*Lyonnais* was a lawsuit between two banks. 270 A.D.2d 138 (N.Y. App. Div. 2000). Unlike here,

the contract in *CBIC* was between equally sophisticated parties and specifically stated that neither

party would be considered a "fiduciary," that each "is a sophisticated institutional investor," that

each "has acted in the capacity of an arms-length contractual counterparty," and that neither was

acting as the other's "financial advisor." *Id*. at 139. No such language is in Goldman's

Engagement Agreement. The complaint in *Joyce v. Morgan Stanley & Co., Inc.*, distinguished in

the Bakers' initial Brief at 16, "makes no mention of any extra-contractual duty." 538 F.3d 797,

800-02 (7th Cir. 2008). That is not the case here.

The extensive direct two-way dealings between Goldman and the Bakers detailed in the

Complaint show that Goldman invited, encouraged, and accepted the Bakers' trust and confidence

and, thereby, "undertook" and "voluntarily assumed" obligations to them.[6] All of the *Wilson Farm*

---

[6]      *E.g.*, ¶ 14 (Goldman pitched to serve as the "exclusive" investment banker, touting its experience and
expertise); ¶ 23 ("Goldman invited and expected that trust"); ¶ 24 ("Goldman knew or should have known that . . . the
Bakers were relying on Goldman"); ¶ 55 (Goldman emailed the Bakers and solicited their "input"); ¶57 ("Goldman sent
a memorandum . . . that purported to outline a plan of action for analysis of L&H"); ¶ 90 ("Goldman gave the
appearance of working diligently to protect Plaintiffs . . ."); ¶ 107 ("In its role as exclusive investment banker for
Dragon and the Bakers, Goldman demanded the lead on communications with L&H and L&H's bankers and took
control over the transfer of information to and from L&H and L&H's consultants.");¶ 108 ("Goldman invited and
encouraged Plaintiffs' trust . . . and reliance . . . providing advice . . . without conducting the . . . analysis it was legally
. . . obligated to do"); ¶ 116 ("Goldman actively took steps to allay concerns . . . by arranging for a teleconference with
Goldman's analysts"). References herein to the Complaint follow the same convention as in the Bakers' initial Brief
and are cited as ¶ __.

considerations are alleged in the Complaint and support the Bakers' fiduciary duty claim.  See Bakers' initial Brief at 17 and at II.B.2-3, C.  **And these considerations all implicate factual issues that preclude dismissal on Goldman's preliminary motion.**

Goldman does not deny it had direct dealings with the Bakers.  It argues, instead, that **all** of its direct dealings with the Bakers were merely in the Bakers' capacity as representatives of Dragon and, consequently, do not show Goldman's assumption of any obligations, fiduciary or otherwise, to them individually and directly.  **Goldman's argument hinges on factual issues and factual mischaracterizations** — *i.e.*, the capacity in which the parties dealt with each other — which contradict the allegations in the Complaint.  These factual issues cannot be decided on a motion to dismiss.  *See, e.g., Frydman & Co. v. Credit Suisse First Boston Corp.,* 272 A.D.2d 236, 237 (N.Y. App. Div. 2000).

The Goldman banking team knew its mission was to structure a deal that would protect Janet and James Baker's life work and $300 million investment of technological genius.  Goldman's effort to "wordsmith" its way out of liability on a motion to dismiss has no support in fact or law.

> **B.      Goldman Had Direct Contractual Duties To The Bakers**

There is nothing in the Engagement Agreement Goldman drafted that precludes its liability to the Bakers under contract.  Goldman points to no such language.  None exists.  Goldman stretches the meaning of the words it used.  Goldman urges an interpretation its words do not support and dismisses as irrelevant its subsequent conduct in the course of performance, which contradicts (and trumps) the purported "crystal clear" interpretation it argues.

First, no law exists anywhere that says an investment bank cannot have contractual obligations under a single contract to both a business entity and its owners.  *See Ackerman v. Price Waterhouse*, 216 A.D.2d 123, 123-24 (N.Y. App. Div. 1995) (affirming denial of motion to dismiss because "the defendant accounting firm owed a contractual duty to the limited partners, who were

members of a settled and particularized class, known to [the firm] to have a need to rely upon" the information the firm provided). The object of the Goldman engagement as exclusive financial advisor here was a sale of all or part of Dragon, which in turn depended on the Bakers' own investment decision. Throughout the six-month course of the engagement, Goldman directed information to the Bakers and involved them in the process of its review and analysis of Dragon's potential merger partners, knowing that they were Dragon's majority owners and controlling shareholders and had a "need to rely" on Goldman in deciding whether to proceed with a sale of Dragon.[7]

Second, Goldman argues that the Bakers' allegations of direct dealings are irrelevant in determining Goldman's contractual (and common law) obligations to the Bakers because Dragon, the company, was its "exclusive" client. Goldman misleadingly attaches significance to the use of the phrase "exclusively engaged" that is at odds with both its commonly understood meaning in the industry and Goldman's conduct in performing the engagement.[8] "Exclusively engaged" is typical

---

[7]     Goldman's cases and other authority (Reply at 3) do not rehabilitate its position. See Bakers' initial Brief at 18, 31 (distinguishing *M. Paladino, Inc. v. J. Lucchese & Son Contracting Corp.*, 247 A.D.2d 515, 515 (N.Y. App. Div. 1998) and *New Castle Siding Co. v. Wolfson*, 97 A.D.2d 501, 502 (N.Y. App. Div. 1983)). In *Turano v. Turano*, an administrator of an estate failed to establish a breach of contract in her own right under a contract made by her dead husband because her "complaint did not set forth any connection she had with the contract and the contract fails to make any mention of her." 2009 WL 806790, at *3 (N.Y. Sup. Ct. Mar. 10, 2009). *U.S. Borax & Chemical Corp. v. Szmokaluk* states that shareholders cannot sue on a corporate contract to which they are not parties *unless* they are third-party beneficiaries. 1981 WL 404963, at *5 (Del. Super. Ct. June 23, 1981). 1 William Meade Fletcher, et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 29 (2006), states that shareholders cannot sue on a corporate contract *unless* there is a duty to the shareholders. In this case, the Bakers allege (1) there is a duty owed directly to them under the contract, (2) that they are, in any event, third party beneficiaries of the contract, and (3) facts underpinning that duty.

[8]     Goldman's "exclusivity" argument is also at odds with its use of the word "you," which is deliberate and distinct from its use of the defined term, "the Company." Goldman scattered 26 references to "the Company" throughout the Agreement, but it inserted "you" infrequently, only in certain critical places. Crucially, Goldman used the word "you" instead of "the Company" three times in the sentence describing the scope of its own duties under the Engagement Agreement. Complaint, Ex. B at 1. No other sentence in the contract contains multiple uses of this word. If Goldman wanted to draft a contract that sought to limit its duties to Dragon, it would have consistently referenced "the Company" throughout the Agreement. Goldman would also have expressly stated this in the letter it drafted. It did not. Rather, the letter is addressed to Janet M. Baker, Ph.D. (and Chamberlain and Waite), and the "you" with respect to providing the services under the Agreement is likewise addressed to Janet Baker. In signing the Agreement, Janet Baker understood that Goldman was providing services to her as Dragon's owner and a controlling shareholder and that

*Continued on following page*

language in an M&A engagement agreement like that here; it means that Goldman is the exclusive, and only, investment banker acting as financial advisor on the Dragon side of any deal.[9]

    Third, Goldman's conduct in performing the engagement belies the limitation Goldman argues based on the words it used. Even if there were a disparity between the contractual language and the parties' conduct (which there is not), **the parties' course of performance is "the most persuasive evidence" of the meaning of the contract**. *E.g., Fed. Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999). "There is no surer way to find out what parties meant, than to see what they have done." *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) (quoting *Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877)). The course of performance here contradicts, and trumps, Goldman's spin.[10]

    This is not a case where the Bakers had mere "access" to Goldman's advice, as Goldman puts it. See Reply at 7. Goldman went out of its way to involve the Bakers in the engagement, communicating with them inside and outside of the boardroom, asking for their input, answering

---

*Continued from previous page*

she was exculpating Goldman **only** with respect to **derivative** claims for negligence per Annex A. It is axiomatic that all ambiguities are interpreted against the drafter, Goldman.

[9]    This is clear from the phrase itself, other provisions in the Agreement, and Goldman's conduct. Goldman's exclusivity is reinforced by the provision that assures Goldman's fee on closing even if its engagement were terminated so long as it listed the acquiring company as a "prospective buyer" in a memo or had any discussions with the buyer. See ¶ 28, Exh. B at p. 4. Goldman also communicated its status as exclusive financial advisor for a Dragon deal to Dragon's prospective merger partners, for example advising L&H's bankers to communicate only through Goldman and not with the Bakers directly. See ¶ 31.

[10]    Goldman claims that the parties' interactions "do not substitute for the basic requirements of contract . . . offer, acceptance and consideration." See Reply at 6. These elements were present in the Engagement Agreement, and the Bakers properly plead the existence of the contract and consideration, which Goldman does not deny. ¶¶ 165-169. Furthermore, what the parties "negotiated for" is a fact issue improperly injected by Goldman. However, and as a matter of fact, the parties did negotiate that Dragon, rather than the shareholders, would be responsible for payment of Goldman's engagement fee and for any indemnity obligation. Moreover, the face of the Agreement and the nature of the engagement reflect Goldman's understanding that its interactions with Janet Baker would be in her capacity not just as a Board member but also as a controlling shareholder. The draft and final agreements were addressed to her as a shareholder and she signed as a shareholder. That her signature indicates her agreement to sentence five only in Annex A exculpating Goldman from derivative claims for negligence does not negate or diminish the direct contractual and extra-contractual duties Goldman owed to her and to James Baker under the Engagement Agreement and common law.

their questions, allaying their concerns, even setting up a telephone conference at Janet Baker's request with Goldman's research analysts — for over six months. Goldman was dealing and communicating with the Bakers in their own right as Dragon's controlling shareholders and majority owners. Goldman's "defense" that it did not intend and could not be "reasonably aware" (see Reply at 12) that the Bakers would rely on the advice and information Goldman gave them in deciding whether to approve the merger with L&H is inconsistent with the facts pled and not a basis for a motion to dismiss. Goldman can tell that story to the jury.[11]

The most Goldman can argue with its disingenuous misinterpretation of the Engagement Agreement is that the Agreement is ambiguous, which also requires denial of Goldman's motion to dismiss.[12] And here again, the parties' conduct during the engagement and other facts and circumstances surrounding the contract, which the courts look to in interpreting a contract, support the Bakers' claims. *See 67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-49, 333 N.E.2d 184, 186-87 (1975); *Fed. Ins. Co.*, 280 A.D.2d at 44.

---

[11]    Moreover, Goldman now admits that Annex A to the Engagement Agreement places no limitation upon any **direct** claims brought by the Bakers including their negligence and negligent misrepresentation claims. Goldman's claim that the Bakers attempt to "extrapolate contractual rights from the exculpation provision" deliberately misconstrues the Bakers' arguments. Goldman's direct contractual duties to the Bakers are created by the language of the Agreement, the circumstances surrounding it, and the subsequent conduct of the parties — not by virtue of the exculpatory clause. The Bakers' argument in their initial Brief, made in contravention to Goldman's reliance on the exculpatory clause, was that these direct duties are not exculpated by Annex A because, as Goldman now concedes, the exculpatory provision relates only to derivative claims. See Reply at 5.

[12]    *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004) (applying New York law) (ambiguity is found in a contract where "the wording [fails] to classify or characterize something that has potential significance"). Goldman's charge that the Bakers are improperly trying to inject ambiguity into clear contractual language with an unreasonable interpretation is truly a case of the pot calling the kettle black. In any event, Goldman relies on two cases where the meaning of the specific words in the contract was not at issue. *See Riverside S. Planning Corp. v. CRP/Extell Riverside, LP*, 869 N.Y.S.2d 511, 517 (N.Y. App. Div. 2008) (rejecting plaintiff's argument where its interpretation was supported with only "the self-serving affidavit of its counsel as evidence of the parties' supposed intent"); *Keeney v. Kemper Nat'l Ins. Co.*, 1998 WL 29815, at *1 (2d Cir. Jan. 27, 1998) (unpublished table decision) (rejecting plaintiff's interpretation of termination provision where plaintiff claimed modification by later clause in agreement rather than ambiguity).

Alternatively, the Bakers were intended third party beneficiaries of the Engagement Agreement because the "circumstances indicate that the promisee intend[ed] to give the beneficiar[ies] the benefit of the promised performance." *See Tasseff v. Nussbaumer & Clarke, Inc.*, 298 A.D.2d 877, 878 (N.Y. App. Div. 2002); Bakers' initial Brief at 21. The circumstances demonstrate that Goldman intended for its performance under the Engagement Agreement to influence the Bakers, without whose approval the Dragon/L&H merger could not have occurred. *See Nat'l Bank of Canada v. Hale & Dorr, LLP*, 17 Mass. L. Rptr. 681, 2004 WL 1049072, at *12 (Mass. Super. Ct. Apr. 28, 2004);[13] discussion *supra* at 5-8.

Goldman's cases are inapposite because the contracts in those cases, unlike here, contained provisions expressly disclaiming liability to third parties. In *Onanuga v. Pfizer, Inc.*, the stock option service agreement specifically stated: "[t]his Agreement is for the benefit of [the corporation] and [the stock option administrator] and **not for any other person, including any Grantee**." 2003 WL 22670842, at *5 (S.D.N.Y. Nov. 7, 2003) (emphasis added).[14] The Goldman Engagement Agreement contained no such disclaimer of liability. Indeed, recognition of the potential for disclosure of information to third parties (with Goldman's consent) supports rather than "negates" the Bakers' third party beneficiary claim, particularly where as here it was **Goldman itself dealing consistently and intently with the Bakers and conveying the information and advice for six**

---

[13]        Goldman's attempt to distinguish *National Bank of Canada* is artificial. The principle in *National Bank of Canada* is equally applicable whether the entity at issue is a law firm or an investment bank. See Bakers' initial Brief at 21.

[14]        Goldman initially argued that the appropriate standard for determination of third party beneficiary status is whether "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." See Goldman's initial Brief at 8 (citing *Gupta v. Nat'l Life Ins. Co.*, 2006 WL 2000118, at *3 (W.D.N.Y. July 17, 2006) (emphasis omitted)). In its Reply, Goldman now strategically omits its reference to consideration of the circumstances, which demonstrate that the Bakers are intended beneficiaries of Goldman's performance. Unlike here, the plaintiffs in *Kolodziej v. Gosciak*, which Goldman cites again in its Reply, made only conclusory allegations and alleged no circumstances evidencing third party beneficiary rights. 2008 WL 2260601, at *3 (W.D.N.Y. May 30, 2008). See note 17 *infra*; Bakers' initial Brief at 21-22 (distinguishing Goldman's other cases).

**months**.  Goldman says "extrinsic circumstances are irrelevant" to third party beneficiary liability. Reply at 6.  Goldman cannot be more wrong.

The bottom line is that Goldman's arguments require factual determinations and factual inferences favorable to Goldman which the law does not permit and may not be made in the face of the allegations in the Complaint.  Goldman dealt directly with the Bakers and knew the Bakers were relying on Goldman's advice for their $300 million investment — whether by contract or as third-party beneficiaries.  And a jury can so find when the evidence is presented.

### C.    Goldman Owed A Duty Of Care To The Bakers

As detailed in the Complaint, for six months, Goldman solicited and engendered the Bakers' trust in Goldman, made numerous misrepresentations to the Bakers, answered the Bakers' questions about L&H, and falsely led the Bakers to believe that it was conducting a due diligence investigation into all aspects of L&H.  Goldman's attempt to gain immunity for the consequences of its gross negligence, omissions, and misrepresentations by claiming that its Engagement Agreement "expressly limit[ed] its duties" to exclude direct obligations to the Bakers fails because 1) regardless what Goldman wrote in its Engagement Agreement, Goldman did in fact deal directly with and make misrepresentations to the Bakers for which it is liable in tort, and 2) nothing in the Agreement limits Goldman's liability to the Bakers.

As set forth in Section II.B *supra*, Goldman had obligations under the contract to both Dragon **and** the Bakers.  Goldman's singular reliance on the word "exclusive" in two sentences to immunize itself from direct liability to the Bakers overstates the meaning and significance of the word in context, to the exclusion of the parties' intentions as shown by their conduct throughout the course of the engagement.

Furthermore, Goldman's cases do not support its contention that it did not have extra-contractual duties to the Bakers.  Indeed, Goldman's cases demonstrate that even if the Engagement

Agreement had language limiting Goldman's contractual duties only to Dragon — and it does not — this would do nothing to preclude the Bakers' extra-contractual tort claims. *Meyer v. Goldman Sachs & Co.*, 234 A.D.2d 129 (N.Y. App. Div. 1996), is a two-paragraph opinion that does not say anything about a contract "limiting" a duty of care. In *Meyer*, the plaintiffs failed to allege a "relationship" with the defendant investment bank. *Id.* at 130.[15]

Here, in contrast, the Bakers have pled an extensive relationship with Goldman. As in *European American Bank & Trust Co. v. Strauhs & Kaye,* Goldman "knew the identity" of the Bakers and that they would rely on Goldman's representations, was "aware[] of a particular purpose for [its] services," "remained in direct communication both orally and in writing" with the Bakers, and made "repeated representations personally to" the Bakers over an extended period of time. 65 N.Y.2d 536, 554, 483 N.E.2d 110, 120 (1985). Goldman's reliance on *Credit Alliance Corp. v. Arthur Andersen & Co.*, the companion case to *European American Bank*, is unavailing because in *Credit Alliance*, unlike here, "there [wa]s simply no allegation of any word or action on the part of [the defendant] directed to plaintiffs." *Credit Alliance Corp.*, 65 N.Y.2d at 553-54, 483 N.E.2d at 119.

Goldman argues that an investment banker can never be held liable to any shareholder of any company, regardless of the circumstances and facts ("even when . . . advice has been communicated directly to shareholders, the . . . arguments . . . are still meritless" (Reply at 8 n.6)). This argument is not supported by any of the cases Goldman cites, and it is resoundingly refuted by *European American Bank,* as well as cases such as *Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 124-25, 787 N.E.2d 1060, 1078 (2003) (denying accounting firm's motion for

---

[15]    See Bakers' initial Brief at 16 n.15 (distinguishing *Joyce v. Morgan Stanley & Co., Inc.*, 538 F.3d 797 (7th Cir. 2008) and *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642 (7th Cir. 2006)) and 23 n.24 (distinguishing *Reder v. Travelers Plan Administrators of Connecticut, Inc.*, 44 F. Supp. 2d 92 (D. Mass. 1999)); see also *supra* at 4 (discussing *Joyce*); *infra* at 12-13 (discussing *Massey*).

summary judgment where accounting firm and shareholders had a "relationship" that was "more than trivial"), *Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105, 1125 (D.R.I. 1990) (investment bank's "assessment was patently intended to guide shareholders in deciding whether to approve the sale"), and *Schneider v. Lazard Freres & Co.*, 159 A.D.2d 291, 296 (N.Y. App. Div. 1990) ("we do not see how it can be said that a duty of care owed by the bankers to the special committee was not intended for the benefit of the shareholders").[16]

Goldman's argument on pages 7 to 10 of its Reply about "'insider' entitlement," "self-proclaimed exalted status," and "alleged superior 'insider' status" is strident, disingenuous, misdirected hyperbole. The issue on this motion to dismiss is not the pejorative terms coined by Goldman's lawyers. Rather, it is the conduct of the parties alleged in the Complaint. The Bakers' argument relies not on their status alone but on Goldman's direct dealings with them because Goldman knew the Bakers controlled the decision to sell all or part of Dragon, which was the object of the engagement.

Moreover, the facts here are entirely different from the facts in *Massey v. Merrill Lynch & Co.*, 464 F.3d 642 (7th Cir. 2006), and Goldman's other cases.[17] In *Massey*, the plaintiffs did "not

---

[16]    Goldman's claim that *Schneider* may no longer be "good law" is wrong, considering courts continue to rely on and apply *Schneider*. *See, e.g., Herrington v. Verrilli*, 151 F. Supp. 2d 449, 463 (S.D.N.Y. 2001). Moreover, *Schneider* highlights the artificiality of the dichotomy Goldman tries to draw between the Bakers as Dragon "representatives" and the Bakers in their own right as Dragon's owners and controlling shareholders. The Bakers as individuals are not farther removed from the Bakers wearing their official hats than the relationship between a special committee and a company's shareholders, as was the case in *Schneider*, where the court held that the bankers had a duty to the shareholders via the special committee. *Schneider*, 159 A.D.2d at 296. The law review article that Goldman cites also argues that "investment banks [should] be held responsible to shareholders." Ted. J. Fiflis, *Responsibility of Investment Bankers to Shareholders*, 70 Wash. U. L.Q. 497, 497 (1992).

[17]    See Bakers' initial Brief at 14 n.13, 16 n.15, 21-22, 24 n.27, 31 n.39. In *Young v. Goldman Sachs & Co.*, 2009 WL 247626, at 3-4 (Ill. Cir. Ct. Jan. 13, 2009), the putative class plaintiff was a "Wrigley stockholder . . . [having] no relationship with Goldman Sachs" and, unlike the Engagement Agreement here, the fairness opinion and engagement agreement in *Young* expressly disclaimed any reliance by Wrigley's stockholders. The only connection between the plaintiffs and the investment bank in *Ormond v. Anthem, Inc.*, 2008 WL 906157, at *5, 26 (S.D. Ind. Mar. 31, 2008), was that the plaintiffs received a copy of a fairness opinion that expressly disclaimed their reliance for an upcoming vote on a potential merger. The engagement contract for the engineering firm in *Edward B. Fitzpatrick, Jr. Construction Corp. v. County of Suffolk*, 138 A.D.2d 446, 447, 450 (N.Y. App. Div. 1988), "expressly negate[d]
*Continued on following page*

- 12 -

allege that Merrill Lynch made any misrepresentations to them as individual shareholders . . . .

[T]he allegations in the complaint consistently state that Merrill Lynch . . . made representations to

[the company] or the Board.  In other words, the plaintiffs were acting solely in their capacity as

board members . . . ."  *Id.* at 650.  The **only** interaction between the plaintiffs and Merrill Lynch was

during a single official meeting of the board of directors, when Merrill Lynch made a presentation

and distributed a fairness opinion.  *Id.* at 644.[18]

     In contrast to *Massey*, the Bakers plead numerous instances of Goldman's direct

representations to them — both individually (*e.g.*, ¶¶ 14, 20, 45-47, 52-57, 59, 112, 116, and 152)

and in meetings of the Board of Directors (¶¶ 109-111).  Goldman's claim that it had "direct

dealings with the Bakers" only because "they were representatives of Dragon" not only improperly

injects Goldman's spin on factual issues into the analysis but is also logically flawed.  If the Bakers

were merely "representatives" of Dragon, Goldman had no reason to communicate with them at all,

---

*Continued from previous page*

enforcement by third parties."  In *New Castle Siding Co. v. Wolfson*, 97 A.D.2d 501, 502 (N.Y. App. Div. 1983), the plaintiff shareholder, unlike here, "concede[d] that [the defendant's] contract to perform accounting services was with the corporation and not with him as an individual" and, unlike here, there was "no indication that . . . an independent duty exist[ed] as between" the shareholder and the accounting firm.  Moreover, the *New Castle* court acknowledged that in some circumstances a wrongdoer accounting firm does have a duty to a shareholder.  *Id.  Hirshberg v. Appel*, 266 Mass. 98, 100, 164 N.E. 915, 915 (1929), is a corporate waste case.  *HA2003 Liquidating Trust* and *Joyce* are respectively distinguished *supra* at note 2 and at 4.

[18]    Goldman criticizes the Bakers' distinction of the fairness opinion cases, but **the distinctions between the fairness opinion cases Goldman cites and this case do make a difference to the analysis and require a different result here**.  A shareholder's mere status qua shareholder was not the single or determinative factor for the courts in denying the shareholder's claim.  Rather, the courts looked to the express disclaimers of third party rights and shareholder reliance in the engagement agreements and fairness opinions, which are not present here, as well as the absence of direct dealings that otherwise would show a "connection" or "relationship" between the investment bank and the shareholder.  See Bakers' initial Brief at 16-18.  Unlike the extensive interactions between Goldman and the Bakers alleged here, the fairness opinion cases are not "relationship" cases.  They involve a single written communication, which is typically prepared to protect a company's board and management from liability under the business judgment rule and which usually includes an express disclaimer of shareholder reliance.  Goldman's obligations in this case were much broader than opining on the "fairness" of the price for Dragon.  See ¶¶ 17, 18, 30-35, 40, 46, 54, 57, 58 and Exh. B.  And unlike in the fairness opinion cases, there is no express disclaimer of third party rights or shareholder reliance in the Goldman Engagement Agreement here.  **Analogizing to the fairness opinion cases would require a disclaimer of personal reliance with every Goldman communication and representation to the Bakers over the six-month course of the engagement.  That, of course, did not occur because Goldman intended and expected the Bakers to rely on the information and advice it gave them.**

much less have the extensive direct dealings with them that it did.[19]  Moreover, if Goldman were interacting solely with the corporate entity, then all of its discussions would have been with Dragon's CFO (Ellen Chamberlain) and Dragon's President (John Shagoury).  And there certainly would have been no reason at all for any discussions with James Baker, who was not an officer or Board member, even though he participated in Board meetings as a principal owner and controlling shareholder of Dragon and part of senior management.  See Bakers' initial Brief at II.A.

Goldman cannot now hide behind a "corporate form" argument to ignore the effect of its direct relationship with the Bakers and the consequences of its misrepresentations (see Reply at 9) when it ignored the corporate form and dealt directly with the Bakers as Dragon's majority owners and controlling shareholders throughout the entire course of the engagement.[20]

### D.    The Bakers Plead Actionable Factual Misrepresentations

Goldman's argument against the Bakers' misrepresentation claims hinges on its contorted interpretation of the Engagement Agreement, inapposite cases, and its factual contention that all of its dealings with and representations to the Bakers were in the Bakers' representative capacities. See Reply at 14, 15 n.16.  Goldman claims its misrepresentations are not actionable by the Bakers, either in their own right because they had no relation to Goldman apart from the company, or derivatively because Dragon (as a consequence of Goldman's breaches of its duties) no longer

---

[19]    Goldman's argument fails to explain away Goldman's communications with Janet Baker when it was supposedly answering to Dragon's CFO (e.g., ¶ 54) or Goldman's communications to James and Janet Baker exclusive of the Board of Directors.  E.g., ¶ 44 (referring to memorandum to Janet Baker and Dragon's CFO); ¶ 45 (facsimile to Janet Baker); ¶ 55 (email to James and Janet Baker); ¶ 59 (email to Janet Baker).

[20]    In Alford v. Frontier Enterprises, Inc., 599 F.2d 483, 484 (1st Cir. 1979), the court dismissed the principal stockholder's claim because the defendant did not have a "relationship" with the plaintiff.  Rohtstein Corp. v. KMPG, LLP, 2007 WL 4416840, at *3 (Mass. Super. Ct. Dec. 10, 2007), involved the enforcement of a limitation of liability provision which is not present in Goldman's Engagement Agreement.  The plaintiff, the president of the company, had no interactions at all with KMPG.  Id. at * 1, 3.  The entire foundation of his suit was the engagement agreement which expressly limited KPMG's liability and not a separate relationship of representations, reliance, and trust, as the Bakers allege here.  Id. at *3.

exists. Goldman wants immunity from suit even though, as the Bakers allege, Goldman's

misrepresentations led to the demise of Dragon and the Bakers' catastrophic loss of their entire

equity stake in the company and the intellectual property that had been their lives' work.

Goldman's argument has no merit.[21]

As the Bakers stated in their initial Brief, Goldman made numerous false misrepresentations

to the Bakers directly. ¶¶ 46-53, 55-59, 61, 82, 90, 108-118.[22] Goldman counters none of the

Bakers' factual assertions related to Goldman's misrepresentations, let alone acknowledges that

those assertions even exist in the Complaint.[23]

One example of Goldman's false representations is in the December 16, 1999 memorandum,

wherein Goldman represented that L&H "can translate 70 languages overall." ¶ 47. Prior to

writing this memorandum, Goldman had not conducted any investigation of L&H that would have

enabled Goldman to honestly portray this statement as true. ¶¶ 47-51. Goldman presented this

research as its own. ¶ 51. After December 16, 1999, Goldman conducted no due diligence that

would have been necessary to confirm this statement. ¶ 48. And, Goldman's statement was false

---

[21]    The strident opening salvo in Goldman's Reply is irrelevant to the only issue in this motion to dismiss, *i.e.*, whether the facts pled by the Bakers state cognizable claims. The fact that the Bakers joined with others in pursuit of the perpetrators of the L&H fraud before suing Goldman says nothing about the legitimacy of their claims against Goldman. Those claims were preserved by the Tolling and Document Preservation Agreement that Goldman freely entered on July 31, 2002 and had the right to terminate at any time since.

[22]    In *Mandarin Trading Ltd. v. Wildenstein*, 851 N.Y.S.2d 71, 2007 WL 3101235 (N.Y. Sup. Ct. 2007), cited by Goldman, "[t]he record . . . d[id] not reflect that defendants ever met plaintiff or had knowledge of plaintiff. Also, there is no indication that the Appraisal was made for plaintiff's benefit, or that defendants had any knowledge that plaintiff would rely on the Appraisal." *Id.* at *4. In this case, Goldman made numerous representations to the Bakers and knew that the Bakers were relying on those representations.

[23]    Goldman's lone reference to a fact in the Complaint mis-states that fact. See Reply at 14. Paragraph 47 of the Complaint discusses a memorandum that Goldman wrote for the benefit of the Board of Directors but also for the Bakers specifically. Goldman also omitted any discussion of *Stone v. Tavares*, 8 Mass. L. Rptr. 192, 1998 WL 90738, at *2 (Mass. Super. Ct. Feb. 25, 1998) (in a misrepresentation claim, "liability will attach where the speaker could have obtained accurate facts through the exercise of a modicum of diligence"). Apparently conceding that the Bakers' case law conclusively establishes that "opinions" can be actionable, Goldman no longer asserts in its Reply that statements of "opinion" are not actionable nor does it attempt to distinguish the Bakers' cases on this issue. See Bakers' initial Brief at 28-29.

— L&H's international linguistic capabilities were a sham.  ¶¶ 64-84.  As another example, Goldman arranged a teleconference for Janet Baker, at her request, with its research analysts, where the analysts made positive representations about L&H that were entirely at odds and inconsistent with their conclusions in published research reports.  ¶¶ 113-116.  These and other misrepresentations pled in the Complaint[24] were made directly to the Bakers with no disclaimer of individual reliance and are actionable by the Bakers in tort.[25]

### E.    The Bakers State A Claim For Violation Of Chapter 93A

The Bakers state a valid Chapter 93A claim against Goldman, and nothing in Goldman's Reply changes this.  Goldman's contention that the Bakers were not engaged in "trade or commerce" fails under the law.  As individuals selling their majority stake in the company they built and managed for nearly two decades, the Bakers were engaging in trade or commerce.  *See Nanfelt v. Asher*, 16 Mass. L. Rptr. 493, 2003 WL 21961421, at *10 (Mass. Super. Ct. June 11, 2003) (corporate officer engaged in "trade" or "commerce" where she sold her shares in company to other investors) (cited in Bakers' initial Brief at 29); *see also* Mass. Gen. Laws. ch. 93A § 1(b) ("trade" and "commerce" includes "sale" of "any property").  Goldman ignores *Nanfelt* completely.

---

[24]    *E.g.,* ¶ 45 (Goldman provided a list of "Due Diligence Questions" and led the Bakers to believe that it was actually going to investigate and research all of the areas on the list); ¶ 46 ("Goldman submitted a memorandum to [the Bakers] . . . which compared and contrasted possible acquisitions of Dragon by L&H and Visteon."); ¶ 47 (Goldman told the Bakers that L&H had a "pipeline of recurring revenue"); ¶ 52 (Goldman calculated "EPS" and "Total Debt" for the combined company); ¶ 53 ("Goldman assured . . . Plaintiffs that fluctuations in the price of L&H stock was not based on any issue related specifically to L&H"); ¶ 57 ("Goldman sent a memorandum . . . that purported to outline a plan of action for analysis of L&H," which Goldman never completed or even started, despite creating the appearance of doing so).

[25]    Goldman criticizes the Bakers' citation of *McEneaney v. Chestnut Hill Realty*, 38 Mass. App. Ct. 573, 650 N.E.2d 93 (1995), but the limited abrogation of the motion to dismiss standard in that case does not relate to the principle for which the Bakers cited *McEneaney.  See Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 636, 888 N.E.2d 879, 890 (2008) (adopting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), as standard for motion to dismiss).  Moreover, the Bakers' claims exceed the *Twombly* standard.  *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65.  Goldman's citation of an unpublished District of New Hampshire case, *In re Tyco International, Ltd.*, 2007 WL 1687775 (D.N.H. June 11, 2007), in support of the Rule 9(b) pleading standard for negligent misrepresentation is a questionable but moot issue. S*ee Gerber v. Bowditch*, 2006 WL 1284232, at *13 (D. Mass. May 8, 2006).  The Bakers' claim is pled with specificity and withstands scrutiny under Rule 9(b).

Goldman tries to distinguish *Reisman v. KPMG Peat Marwick*, 57 Mass. App. Ct. 100, 787 N.E.2d 1060 (2003), by noting that KPMG did not have a written engagement agreement (see Reply at 13). Here again, Goldman is relying exclusively on its spin of contractual language and a non-existent disclaimer in the Engagement Agreement as its sole defense to liability to the Bakers under Chapter 93A for its actionable misconduct. As discussed at II.A-C *supra*, Goldman's contract does not expressly or implicitly limit or exclude contractual obligations to the Bakers, and does nothing to preclude liability for extra-contractual obligations independent and apart from the contract. Moreover, Goldman's contract-based argument improperly injects factual issues that contradict the allegations in the Complaint.

Goldman's argument does not undermine *Reisman*'s rationale or relevance. Like the Bakers, the plaintiffs in *Reisman* were controlling shareholders in a corporation that was acquired through a stock swap merger. 57 Mass. App. Ct. at 102, 787 N.E.2d at 1062. Like the Bakers, the *Reisman* plaintiffs and their company, Varnet, sought advice from a professional services firm, KPMG Peat Marwick, regarding the transaction. *Id.* at 105; 787 N.E.2d at 1064. Like Goldman, KPMG was in direct contact with the *Reisman* plaintiffs and provided them with advice concerning the merger. *Id.* at 105, 125, 787 N.E.2d at 1064, 1078. The *Reisman* court found a sufficient business relationship between the plaintiffs and KPMG to hold KPMG liable for any violation of Chapter 93A. *Id.* at 125, 787 N.E.2d at 1078. Like the Reismans did, the Bakers state a valid claim for violation of Chapter 93A.[26]

---

[26]    Goldman relies on its limiting interpretation of the Engagement Agreement in attempting to distinguish *Manhattan Tops, USA, Inc. v. Kenneth Leventhal & Co.*, 4 Mass. L. Rptr. 700, 1995 Mass. Super. LEXIS 50, at *4 (Mass. Super. Ct. Dec. 1995). However, as both *Manhattan Tops* and *Reisman* make clear, the parties' relationship for purposes of Chapter 93A liability can be independent of a contract. Moreover, the Bakers plead that Goldman intended for the Bakers to rely on its misrepresentations. See Bakers' initial Brief at 30 (distinguishing *Milliken Co. v. Duro Textiles, LLC*, 451 Mass. 547, 887 N.E.2d 244 (2008)).

## F.    The Bakers' Claims Against Goldman Are Direct Claims

"[T]he proper inquiry in distinguishing between a direct and derivative claim is what is the nature of the harm alleged and who is principally harmed:  the corporation or the individual shareholders." *Higgins v. N. Y. Stock Exch., Inc.*, 806 N.Y.S.2d 339, 348-49 (N.Y. Sup. Ct. 2005). In addition, the proper question for inquiry is "who would receive the benefit of the recovery or other remedy?" *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004). To assert that the Bakers have no standing, Goldman ignores all of the facts in the Complaint.

The Bakers allege injuries distinct from any injury sustained by Dragon.  Their injury was a near-total loss of their equity in Dragon, for which they received worthless L&H stock as a result of Goldman's actions.  They lost their lives' work and they lost a future of developing the speech recognition technologies so prevalent today, which was an important consideration during the selection of a merger partner.  In contrast, at the close of the merger, the Dragon corporate form and its assets became part of L&H.  The Bakers are not suing to recover the assets of Dragon.  *See Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002) ("[W]hen the shareholders of a corporation suffer an injury that is distinct from that of the corporation, the shareholders may bring direct suit for redress of that injury"); *Higgins*, 806 N.Y.S.2d at 355-56 (seat holders in stock exchange stated direct claims against directors and Goldman based on harm to their equity).

Goldman's argument that only Dragon could ever sue Goldman for its wrongdoing would immunize Goldman from responsibility for its wrongful conduct.  Moreover, even if Dragon still existed, it could not sue Goldman for the Bakers' injuries.  "[W]hen a shareholder, investor, or creditor of a corporation has a claim of right that it can assert directly against a third party, the corporation may not sue the third party on behalf of the plaintiff even if the corporation may also have been harmed by the third party's actions." *Branch v. Ernst & Young U.S.*, 1995 WL 791941,

at *4 (D. Mass. Dec. 22, 1995). Only the Bakers can sue for their injuries that were caused by their

reliance on Goldman's acts and omissions in its direct dealings with them.[27]

As stated at II.A-D *supra*, the Bakers plead that Goldman owed them a duty, dealt directly

with them, and made material misrepresentations to them individually.[28] Even Goldman now

concedes that "Shareholders have direct standing to sue . . . when there are material

misrepresentations or omissions provided to the shareholders and upon which the shareholders

reasonably act." Reply at 16 (emphasis omitted).[29] The Bakers make the requisite allegations and

have standing to sue.

G.    **Goldman Sachs Group, Inc. And Goldman, Sachs & Co., LLC Are Properly
        Named As Defendants In This Action**

Goldman's claim that Goldman Sachs Group, Inc. and Goldman, Sachs & Co., LLC, which

were general partners of Goldman Sachs & Co. at the time of the conduct pled in the Bakers'

Complaint, are not proper defendants in this action fails. As general partners of a limited

partnership, these entities are jointly liable for the limited partnership's breaches of contractual

obligations and jointly and severally liable for the limited partnership's tortious conduct. N.Y.

---

[27]    *Feldman v. Cutaia*, 951 A.2d 727 (Del. 2008), cited by Goldman, is inapposite. In *Feldman*, the plaintiff was a shareholder who disputed management's decision to grant stock options to certain members of management, which the plaintiff asserted diluted the value of his shares. *Id.* at 729. Such claims of corporate mismanagement resulting in waste are usually considered derivative. *Id.* at 734-35.

[28]    *See Hurley v. Fed. Deposit Ins. Corp.*, 719 F. Supp. 27, 30 (D. Mass. 1989) (holding that shareholders had standing to sue defendant bank — "where the shareholders themselves have been defrauded . . . they [can] sue the wrongdoer"); *Fidelis Corp. v. Litton Industries, Inc.*, 293 F. Supp. 164, 168 (S.D.N.Y. 1968) (holding that shareholders of acquired company, as well as company, had "capacity to sue" after shareholders allegedly "relied on . . . representations made directly to them by" acquiring company in merger); *Kitchens of the Oceans, Inc. v. McGladrey & Pullen, LLP*, 832 So. 2d 270, 273 (Fla. Dist. Ct. App. 2002) (company's president "stated a cause of action on his own behalf" where he "alleged that auditors knew or should have known that he was one of the limited group of persons for whose benefit and guidance the audit conclusion would be used" and in reliance on audit "suffered a total loss in value of his stock"); *Post & Co. v. Sidney Bitterman, Inc.*, 219 A.D.2d 214, 225 (N.Y. App. Div. 1996) (holding that accounting firm "owed an independent duty" to individual owners of two companies "because of its professional relationship to them").

[29]    Indeed, Goldman acknowledges the holdings in *Hurley* and *Kitchens of the Ocean* without comment. See Reply at 16.

Partnership Law § 26(a); s*ee Zuckerman v. Antenucci*, 478 N.Y.S.2d 578, 580 (N.Y. Sup. Ct. 1984)

("[w]hen a tort is committed by the [partnership], the wrong is imputable to all of the partners

jointly and severally").  So long as the limited partnership is a named defendant (as is the case

here), there is no requirement to plead insolvency or inability to pay debts.  *See U.S. Trust Co. of

N.Y. v. Bamco 18*, 183 A.D.2d 549, 551 (N.Y. App. Div. 1992).[30]

## III.    CONCLUSION

For the reasons stated in this Sur Reply and in the Bakers' initial Brief, the Bakers

respectfully request that the Court deny Goldman's motion to dismiss.

Respectfully submitted

Dated:  May 6, 2009

/s/ Terence K. Ankner
Terence K. Ankner, Esq. (BBO #552469)
Partridge Ankner & Horstmann LLP
200 Berkeley Street, 16th Floor
Boston, MA  02116
(617) 859-9999

and

/s/ Alan K. Cotler
Alan K. Cotler, Esq.
Joan A. Yue, Esq. (BBO #538220)
Steven T. Voigt, Esq.
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103
(215) 851-8100

Attorneys for Plaintiffs
Janet Baker and James Baker

---

[30]    Goldman cites *Helmsley v. Cohen*, 56 A.D.2d 519, 519 (N.Y. App. Div. 1977), for the proposition that no cause of action lies against partners individually absent an allegation that the partnership is insolvent or unable to pay its debts.  See Reply Brief at 17.  Goldman also cites *Meyer v. Park South Associates*, 159 A.D.2d 337, 338-39 (N.Y. App. Div. 1990), which relies upon the *Helmsley* rule.  The Appellate Division explained the *Helmsley* rule in *U.S. Trust Co.*, where it found that "[t]his rule is . . . one of pleading, requiring only that a plaintiff either name the partnership as a party defendant, along with the individual partners, or aver the insufficiency of partnership assets to satisfy the claim." 183 A.D.2d at 551.  The Bakers name both the limited partnership and the general partners as defendants in their Complaint; therefore, the pleading requirement is satisfied.

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 6, 2009.

　/s/ Joan A. Yue
Joan A. Yue