IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


JANET BAKER, et al,                    )
                                       )
                Plaintiffs             )
                                       )
        -VS-                           )  CA No. 09-10053-PBS
                                       )  Pages 1 - 36
GOLDMAN SACHS & CO., et al,            )
                                       )
                Defendants             )



MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
June 9, 2009, 2:05 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

3fb71369-d347-4d80-a20a-7610ec0670fa

1    A P P E A R A N C E S:

2

    FOR THE PLAINTIFFS:
3

4        ALAN K. COTLER, ESQ., JOAN A. YUE, ESQ., and
    STEVEN T. VOIGT, ESQ., Reed Smith, 2500 One Liberty Place,
5    1650 Market Street, Philadelphia, Pennsylvania, 19103.

6        TERENCE K. ANKNER, ESQ., Partridge, Ankner & Horstmann,
    LLP, 200 Berkeley Street, 16th Floor, Boston, Massachusetts,
7    02116.

8

    FOR THE DEFENDANTS:
9

10        JOHN D. DONOVAN, JR., ESQ., ANNMARIE A. TENN, ESQ., and
    MATTHEW L. McGINNIS, ESQ., Ropes & Gray, One International
11    Place, Boston, Massachusetts, 02110-2624.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2          THE CLERK:  The case of Janet Baker and James
3   Baker V. Goldman Sachs & Company, et al, Civil Action
4   No. 09-10053, will now be heard before this Court.  Will
5   counsel please identify themselves for the record.
6          MR. COTLER:  Alan Cotler, your Honor, and Joan
7   Yue, Terence Ankner, and Steven Voigt for the plaintiffs.
8   Thank you, your Honor.
9          THE COURT:  Thank you.
10         MR. DONOVAN:  Good afternoon, your Honor.  John
11  Donovan.  With me, Annmarie Tenn and Matthew McGinnis for
12  Goldman Sachs.
13         THE COURT:  We have a summer class here, is that
14  right, from Weil Gotshal?
15         FROM THE FLOOR:  That's right, your Honor.
16         THE COURT:  All right, so I've promised -- and
17  you're all welcome to stay if you want -- to talk with them
18  a little bit afterwards.  You have some role, Weil Gotshal
19  does in this, right?
20         MR. DONOVAN:  Weil Gotshal is not in this case,
21  your Honor.
22         THE COURT:  Not at all?
23         MR. DONOVAN:  Not at all.  I think there is also a
24  few from Ropes & Gray who are also summer associates
25  watching.
```

3fb71369-d347-4d80-a20a-7610ec0670fa

1          THE COURT:  Okay, great, thank you.  Well, you're

2    welcome, all of you.  So I will probably be talking to you a

3    little bit around 2:30, and then I have a conference call at

4    3:00, so let's get going on this.

5          You're the moving party?

6          MR. DONOVAN:  Okay, your Honor, thank you.  John

7    Donovan for Goldman Sachs.  Your Honor has before you a pile

8    of briefings that I'm sure you have --

9          THE COURT:  I've read it, and I've read the

10   complaint.

11         MR. DONOVAN:  And I know that you are stressed for

12   time, so let me see if I can unpack what I think is in

13   dispute, really in dispute, and see if I can unpack the

14   legal circumstances of that.

15         As you know, the primary claim here is that there

16   is a contract between Goldman Sachs and Dragon Systems,

17   pursuant to which Goldman gave advice to Dragon about the

18   ultimate disposition of the company, its sale to Lernout &

19   Hauspie.  It turns out, as, again, more than anyone here you

20   know, Lernout & Hauspie was a fraud, and the securities that

21   were acquired in respect of Dragon became worthless.

22         The question is whether that contract can be

23   enforced by someone who is not a party to it, by Ms. Baker

24   and her husband.  And the second question is, whether it can

25   or it cannot, are there any additional extracontractual

1   duties, common law duties that were owed by Goldman Sachs

2   that can be enforced here?

3          If you start with the contract, I don't think that

4   there is a really serious dispute that pure contractual

5   claims can be asserted by Ms. Baker here.

6          THE COURT:  Well, can I just stop you right

7   there --

8          MR. DONOVAN:  Sure.

9          THE COURT:  -- which is, so I've read the

10  contract, and it seems as if that governs the duties between

11  the parties.

12         MR. DONOVAN:  Correct.

13         THE COURT:  And it explicitly acknowledges at

14  least Mrs. Baker because she's in the heading and she signed

15  Sentence 5 to the attachment.  And as I read this, whether

16  it's under a common law theory or a third-party beneficiary

17  theory -- I mean, this is for both of you, this question --

18  why didn't the parties expressly set forth what the standard

19  is, gross negligence, bad faith, or intentional

20  misrepresentations?  And that's what the duties among the --

21         MR. DONOVAN:  They did.

22         THE COURT:  -- however you want to style it,

23  whether as a third-party beneficiary, that's the standard,

24  or whether it's as a common law matter.

25         MR. DONOVAN:  There are two questions, I think,

1    embedded in your question.  One is, who can enforce whatever

2    the contract says?

3              THE COURT:  It says to her.  She signs it.  This

4    is an unusual case, in that unlike many of the cases that

5    you've cited, right, she signs it.  They know she's there;

6    she knows they're there, right?  And she signs it.  She's

7    given up a lower standard, as far as I'm concerned.

8              MR. DONOVAN:  She has signed it in one respect --

9              THE COURT:  As a stockholder.

10             MR. DONOVAN:  -- as to one sentence as a

11   stockholder for one reason.  And, first of all, with

12   respect --

13             THE COURT:  I want to get beyond all the other

14   cases that really were quite on the mark but didn't have

15   this situation.  They dealt with her directly, they knew she

16   was there, they were worried about her, and they had her

17   sign off on the standard.

18             MR. DONOVAN:  No.  They had her sign off on the

19   standard and on the kind of claim that she could pursue.

20             THE COURT:  All right, so let's just jump right

21   into that because --

22             MR. DONOVAN:  She signed as to one sentence in

23   Annex A.  Now, what is Annex A, and why do you have it?

24   Well, first of all, you have a contract between Goldman and

25   Dragon.  Goldman owes its obligation to Dragon.  You get

1  worried:  Can anybody else enforce a right?  Answer:  In the

2  contract it says, no, our duty is exclusively to Dragon.

3  Our information only goes to its board and its management of

4  Dragon and not to shareholders.  And in that respect, this

5  fits into all those cases we cited, Young and Massey and the

6  rest that say that an investment advisor or other

7  professional owes no duty beyond what the contract says.

8          Then you have Annex A.  Well, first, you have to

9  ask, why is Annex A there?  What sentence applies to

10  Ms. Baker?  Why does she sign, and in what capacity does she

11  sign?  Well, first, the terms of the contract say -- we have

12  Annex A for a reason.  The contract says, "Attached hereto

13  is matters related to indemnity."  It actually says, "It is

14  customary for Goldman Sachs to require indemnification with

15  respect to the performance of its obligations," and that is

16  set forth in Annex A.  Annex A then says at 30,000 feet,

17  "You will indemnify us and hold us harmless for anything

18  that we do other than gross negligence."  Well, who is "you"

19  in that respect?  Again, it is the party to the contract;

20  it's Dragon.

21          Two people sign as stockholders, Mr. Waite and

22  Ms. Baker, as to exclusively the fifth sentence.  What is

23  the fifth sentence for?  Well, the contract can be enforced

24  by only Dragon, it's the only one party to it, to the

25  primary duty.  And then with respect to the indemnity piece,

3fb71369-d347-4d80-a20a-7610ec0670fa

1    Goldman is worried about third-party claims, claims by

2    Dragon, whatever; and the indemnity piece in Annex A sets

3    forth the standard.  Why would you have Ms. Baker sign or

4    Seagate or Mr. Waite sign with respect to that one sentence?

5    Well, sometimes contracts or other liabilities of a company

6    owed to a company can be enforced by someone else

7    derivatively.  A stockholder can pursue a claim derivatively

8    on behalf of the company --

9            THE COURT:  Sure, and that's part of it.

10            MR. DONOVAN:  Well, that's all of it.  In fact,

11    what Annex A says is that Ms. Baker says that she will not

12    bring a claim by herself or on behalf of the company.  It

13    says --

14            THE COURT:  Well, no, it doesn't say that.  It

15    says --

16            MR. DONOVAN:  By or on behalf of.

17            THE COURT:  "The company, Seagate, and Janet Baker

18    also agree that neither Goldman Sachs nor its employees

19    shall have any liability to the company, Seagate Technology,

20    Janet Baker, or any other person asserting claims on behalf

21    of or in the right of the company --"

22            MR. DONOVAN:  That's where you have to stop, your

23    Honor.  "Or other persons seeking claims on behalf of the

24    company."

25            THE COURT:  Well, I don't think that -- all right,

1    just so we can narrow this down, you're seeking to have that

2    phrase modify "Janet Baker"?

3              MR. DONOVAN:  Yes, absolutely.

4              THE COURT:  As opposed to "any person"?

5              MR. DONOVAN:  Absolutely.

6              THE COURT:  I'm not sure.  At best, that's

7    ambiguous, if that's what you're trying to do.

8              MR. DONOVAN:  The phrase says, "The company,

9    Seagate Technology, and Baker agree that neither Goldman

10   Sachs nor any of such affiliates, partners, et cetera, of

11   Goldman Sachs shall have liability to the company, Seagate,

12   or Janet Baker, or any person asserting claims on behalf of

13   the company."  If you give meaning --

14             THE COURT:  But, see, I view the "asserting claims

15   on behalf of or in the right" is likely modifying "person."

16   But even if it isn't, if you say it's modifying everyone,

17   then it doesn't make sense.

18             MR. DONOVAN:  It has to because of the word "or."

19             THE COURT:  I don't know if you're right.  It's at

20   best ambiguous.

21             MR. DONOVAN:  Well, I have to disagree that it's

22   ambiguous.  So what is the alternative construction?  If

23   something is ambiguous, it has to give rise to some other

24   responsible, reasonable interpretation.  Does that mean that

25   Janet Baker, who signs as to one sentence of one contract

3fb71369-d347-4d80-a20a-7610ec0670fa

1    that limits Goldman's liability, and does it exclusively

2    with respect to claims asserted, quote, "on behalf of the

3    company," means that she can sue them in a different

4    capacity that she has not otherwise bargained for?

5    Ultimately what she is saying is, "I get the benefit of all

6    of the obligations that are owed to the company, an

7    insurance policy, if you will, for what Goldman did without

8    paying the premium."  Your Honor asked the question --

9              THE COURT:  Say that again.  I don't understand

10    it.

11             MR. DONOVAN:  I said that she is asking for the

12    benefit of what was owed to the company, for which the

13    company paid, as though it were an insurance policy for her,

14    even though she didn't pay the premium.

15             THE COURT:  And it is unusual, I agree.  Most of

16    your cases don't go that way, but this is an unusual

17    contract because she's named in the heading.  She signs off

18    on the agreement.  I don't know what this does with respect,

19    by the way, to James Baker.  We can push that aside for a

20    minute but -- do you think there's a difference between

21    Janet and James?

22             MR. DONOVAN:  I do, but only for the reason --

23             THE COURT:  Legally?  I mean, obviously there's a

24    difference between them, but legally?

25             MR. DONOVAN:  There are two reasons I think you

1   can draw from the complaint.  One is that she signed this

2   document as, quote, "stockholder," and James Baker did not.

3   And, second, it's not clear from the complaint what role

4   Mr. Baker had with the company, where it's clear that

5   Ms. Baker was part of management from the allegations in the

6   complaint.

7            It is not unusual at all, and I would respectfully

8   disagree with your Honor that the fact that an engagement

9   letter is addressed to officers or representatives of a

10  company, that that means that the contract owes duties to

11  them.  The addressees of an engagement letter don't thereby

12  become parties to it if they are addressees in their

13  capacity as officers, directors, or management of the

14  company.

15           THE COURT:  But she signs as shareholder.  This is

16  what makes this highly unusual.

17           MR. DONOVAN:  But the entire contract, your Honor,

18  is signed for Dragon Systems by an authorized officer.  She

19  then appends her signature with respect to that one simple

20  sentence.

21           THE COURT:  Well, someone must have asked her to

22  do that.  Probably Goldman, right?

23           MR. DONOVAN:  Presumably Goldman.  That we don't

24  know yet.  But it doesn't make sense that if she signs the

25  contract as to one provision, an indemnity provision and a

1  provision that limits her rights, she is entitled to say

2  that "Because I'm an addressee, I can enforce the balance of

3  the contract in a different capacity than even I was an

4  addressee for."  Clearly she was an addressee in her

5  capacity as management.  That ultimately is what this case

6  comes down to, the capacity in which individuals act.

7        Goldman here had a contract, I think there is no

8  dispute, with Dragon, qua Dragon, the corporation as a

9  corporation.  Who then can assert additional rights who is

10 not the company?

11       THE COURT:  But let me just push it.  So from

12 Goldman's point of view, though, no one would ever have a

13 cause of action against it because the company disappears.

14       MR. DONOVAN:  Ultimately in this case, because the

15 company disappeared, yes.

16       THE COURT:  So if in fact Goldman even were

17 involved in a fraud, from your point of view, no one gets to

18 collect?

19       MR. DONOVAN:  Right, it depends upon the

20 transaction, but let's --

21       THE COURT:  In this one.

22       MR. DONOVAN:  Well, Lernout & Hauspie at one point

23 could have.  Lernout & Hauspie owned the company.  They

24 succeeded to it by operation of law.  They could have

25 asserted the claim.

3fb71369-d347-4d80-a20a-7610ec0670fa

1          THE COURT:  Sure, if in fact Dragon wasn't worth

2     it.

3          MR. DONOVAN:  Dragon became a wholly owned

4     subsidiary of L & H, so --

5          THE COURT:  I've watched this play out, as you

6     know, and everyone's rights -- it's such an odd duck because

7     everyone -- because the company disappears, the company can

8     never enforce its own rights with respect to the bad advice

9     on the stock swap, right?

10          MR. DONOVAN:  Well, if the --

11          THE COURT:  Because it disappeared.

12          MR. DONOVAN:  If the transaction closes, that's

13     correct.  But, you know, ironically, your Honor, the way

14     that these parties privately ordered their affairs was to

15     say, even if Goldman had never rendered advice, it still

16     could have gotten paid.  Under this contract, if Goldman had

17     come up with a list of names of companies, and then stopped

18     and quit, as it was entitled to quit unilaterally, said "I'm

19     not doing anymore," and within the next eighteen months

20     Dragon did a deal with anyone on the list of names, Goldman

21     gets paid.  That's really the question here is, when does

22     the private ordering of parties' affairs by contract give

23     way to some third party's rights?

24          THE COURT:  And that's what I agree with you

25     totally, but it just seems as if they'd given her some

1   limited rights.

2          MR. DONOVAN:  They gave her one limited right in

3   the event she was to try to enforce Dragon's rights.  That's

4   why "on behalf of Dragon" is the critical phrase of that one

5   sentence to which she agreed in her capacity --

6          THE COURT:  Well, that's if I accept that

7   "asserting claims," it modifies her as opposed to "person."

8          MR. DONOVAN:  And your Honor's suggestion that

9   there is ambiguity requires that there be some other

10  reasonable explanation.  Why, for example, would Goldman

11  insist that a contract that gave Ms. Baker no independent

12  rights of her own be limited to this right other than

13  derivatively?  I mean, if you think about that for a minute,

14  had the contract been --

15         THE COURT:  Because they knew how critical she was

16  in this company.  I mean, if I draw all reasonable

17  inferences their way, which I must at this point, because

18  they knew she was, at least the way they describe it, the

19  linchpin.

20         MR. DONOVAN:  Well, but they knew a couple of

21  things.  Acknowledge that, she's the linchpin.  You cannot

22  do a deal without her acquiescence, her approval, and her

23  vote as a stockholder.

24         THE COURT:  So she wouldn't have approved the

25  contract, arguably, unless she had a few rights coming out

1    of it.

2           MR. DONOVAN:  Likewise, assuming this were

3    Microsoft, you know, no one who deals with Microsoft can

4    avoid getting the acquiescence or approval of Bill Gates.  I

5    mean, if Goldman Sachs or someone else represented Microsoft

6    in connection with a deal, you know that you have to deal

7    with Gates, you have to tell him what's going on, you have

8    to meet with him, you have to give him information, and you

9    have to secure his approval; and you aren't going to have a

10   deal go through unless Bill Gates says "yes."  But that

11   doesn't mean that Bill Gates is Microsoft, and it doesn't

12   mean that if there is a contract between Goldman and

13   Microsoft or anybody else and Microsoft, that Bill Gates

14   suddenly has rights under it.

15          So assume we had for a moment no Annex A, and you

16   had a contract, as you do, exclusively between Goldman and

17   the company that only the company can enforce, even

18   acknowledging, as you point out, that had the deal gone sour

19   after the closing, no one has a claim and Dragon is gone.

20   Answer:  As a matter of contract law, so what?  So then the

21   question is:  You know under those circumstances Ms. Baker

22   has no claim.  She can't sue you.  She can't sue as a

23   stockholder.  She can't sue you as anything because she's

24   not a party.

25          THE COURT:  Basically Goldman would be immune from

1    any liability at all?

2           MR. DONOVAN:  Correct.  And then so why would you

3    have her sign this --

4           THE COURT:  I mean, it sounds too good, doesn't

5    it?

6           MR. DONOVAN:  No, not at all.  That's why

7    financial advisors order their affairs that way.

8           THE COURT:  I don't know why some lawyer had them

9    sign off on old Annex A, but --

10          MR. DONOVAN:  Well, for the reason that knowing

11   that Ms. Baker could not sue them in her capacity as a

12   stockholder, could not sue them in her capacity as an

13   officer and director, had escaped everything other than a

14   claim by Dragon, what's the one thing they're worried about?

15   A derivative suit.  That's the only reason Annex A makes

16   sense in having her sign it, because if she has no other

17   right except to proceed on behalf of the company, that's the

18   only claim they want to avoid.  And so good lawyering means

19   that they're going to insulate Goldman from everything.

20          THE COURT:  All right, so I understand how you're

21   construing this.  Let me jump to the other side here.

22          So you've been arguing for all sorts of duties,

23   this and that.  Why doesn't this contract just limit you?

24          MR. COTLER:  Well, your Honor, I'd like to talk

25   about Janet first, if I may, and then Jim.  What Janet

1  signed was agreeing only to that fifth sentence, and what

2  Goldman has said -- this is their document, they drafted

3  it -- if there are any ambiguities in the document, they're

4  interpreted against Goldman.  But what Goldman has said is

5  that that fifth sentence, the limitation, your Honor, about

6  only being liable for gross negligence, et cetera, what

7  Goldman says is, that applies only to derivative claims;

8  that is, claims --

9         THE COURT:  Well, do you agree with that?

10        MR. COTLER:  In this letter?  Yes.

11        THE COURT:  So you're willing to buy their

12 interpretation?

13        MR. COTLER:  I think that that sentence says that

14 if you're bringing a derivative claim on behalf of Dragon,

15 this is the people listed, including Janet.

16        THE COURT:  So you don't want to be limited to

17 gross negligence, bad faith, and intentional misconduct.

18        MR. COTLER:  No, but that's -- that's -- thank

19 you, your Honor, because I was going to segue into the next

20 aspect --

21        THE COURT:  So wait a minute.  This is very

22 important because if you both agree, I'm happy.

23        MR. DONOVAN:  I'll accept that as a stipulation

24 that it means that.

25        THE COURT:  Do you agree that Annex A only applies

1  to derivative claims?

2            MR. COTLER:  Yes.

3            THE COURT:  Okay.

4            MR. COTLER:  Because what we're asserting are

5  direct claims, and that's what our complaint is all about.

6            THE COURT:  No, but do you agree that the standard

7  here, because in your briefing I would have thought

8  otherwise, that the standard here --

9            MR. COTLER:  If you're bringing a derivative

10  claim.

11            THE COURT:  All right, if you both agree, I agree.

12  So basically I throw Annex A out the window because we all

13  agree it's not a derivative claim.  And so you're basically

14  going back to basics.  You're claiming --

15            MR. COTLER:  Yes, your Honor, we're making -- so

16  for Janet Baker --

17            THE COURT:  Don't you lose then?

18            MR. COTLER:  No.  Janet Baker and Jim Baker have

19  direct claims against Goldman for what happened.  Our whole

20  complaint is about --

21            THE COURT:  But the contract is with Dragon.  If I

22  take out Annex A and you agree with their interpretation --

23  maybe it's because she was sitting there and she agrees with

24  that --

25            MR. COTLER:  No, Jim Baker never signed it, so Jim

1   Baker never agreed to it.

2            THE COURT:  All right, fair enough, but the

3   contract says exclusively with Dragon.  So unless there's a

4   fraud, I don't know how she gets the benefit of this

5   contract.

6            MR. COTLER:  Third-party beneficiary, Jim Baker --

7            THE COURT:  It says "exclusively."

8            MR. COTLER:  It says that -- a jury could find,

9   and we believe, that "exclusively" means that they will be

10  our exclusive representative, your Honor.  This is not like

11  the other cases that they cite.  There is nothing in this

12  agreement that precludes fiduciary duty claims, third-party

13  beneficiary claims --

14           THE COURT:  Fiduciary you're not going to get.  Do

15  you agree it's New York law?

16           MR. COTLER:  I think the contract is governed by

17  New York law, but tort law is governed by Massachusetts law.

18           THE COURT:  Okay, so I misread your brief.  You're

19  not -- you're saying that you're not -- you say somewhere in

20  your briefing, and they've even conceded that there are

21  causes of action for gross negligence, fraud,

22  blah-blah-blah.  So you're basically abandoning the

23  appendix.

24           MR. COTLER:  We are not abandoning the appendix,

25  your Honor.  What I am saying is that a jury could find, for

1    purposes of our direct claims, that gross negligence

2    standard does not apply.  It doesn't apply to Jim Baker, and

3    it doesn't apply to Janet Baker.

4            THE COURT:  Skip jury.  You've just now agreed

5    with him that Appendix A only deals with derivative.  That's

6    your legal position?

7            MR. COTLER:  I think a jury could find --

8            THE COURT:  No, not -- how could a jury -- I want

9    to just understand flat up:  Do you think that that

10    sentence, the clause that I thought was ambiguous,

11    "asserting claims on behalf of or in the right of the

12    company," modifies Janet Baker?  That's what you were just

13    agreeing with him on, right?

14            MR. COTLER:  I would say that Janet Baker has

15    direct claims that she can bring for the regular standard of

16    negligence.

17            THE COURT:  Right.

18            MR. COTLER:  And I would say for derivative

19    claims. . .  Can I confer with my co-counsel just for a

20    second, your Honor?

21            THE COURT:  Sure.

22            (Pause.)

23            MR. COTLER:  We would say that if she was bringing

24    a derivative claim -- right, if she was bringing a

25    derivative claim, she would have to show gross negligence.

1          THE COURT:  All right, so you're agreeing with

2     him.  I know that's painful.

3          MR. DONOVAN:  Can I object to that?

4          MR. COTLER:  I think we are agreeing that. . .

5          THE COURT:  You're agreeing that this annex only

6     applies -- you're agreeing with him -- maybe she was there

7     and she agrees with the intent of it -- that this is only --

8     is she here?

9          MR. COTLER:  Yes.  She would have to say -- your

10    Honor, I would agree that Dragon, Seagate, and Janet

11    Baker --

12         THE COURT:  All right, well, let's move on.

13         MR. COTLER:  -- would be able to bring claims for

14    gross negligence in a derivative manner.

15         THE COURT:  Right, so you're agreeing with him.

16         MR. COTLER:  But she does have direct claims --

17         THE COURT:  All right, fine, but then you're both

18    agreeing.

19         MR. COTLER:  -- for a lower standard, as does Jim

20    Baker.

21         THE COURT:  You're both agreeing that Annex A,

22    that Clause 5 that she signed off on only applies to her as

23    a derivative plaintiff.  That's fine.  Let's go on because

24    we don't have all day for the reasons we talked about

25    before.

1       MR. COTLER:  Your Honor, if that paragraph applies

2   here, it still only deals with the standard, which would be

3   gross negligence.

4       THE COURT:  You've just said it doesn't apply, so

5   let's go on to what your claims are.

6       MR. COTLER:  What our claims really are, your

7   Honor, Jim and Janet were Dragon.  They owned the company.

8   No deal could be done without the approval of Jim and Janet.

9   Jim was not in management.  He was not on the board of

10  directors.  He was a shareholder.  They had direct

11  communications --

12      THE COURT:  I know that, but the issue is this

13  whole line of cases in general.  They're majority

14  shareholders, and they generally don't get a breach of

15  fiduciary duty claim, and they generally -- I mean, they

16  will get a fraud claim if you can prove that up, but they

17  generally -- and I want to get to 9(b) in a minute, but in

18  general -- New York law applies, right?

19      MR. COTLER:  For the tort claims, we believe

20  Massachusetts law applies.

21      THE COURT:  I thought it said -- didn't it say --

22  what do you think which law applies?  Neither of you briefed

23  this.

24      MR. DONOVAN:  I think New York law applies, your

25  Honor.

1          THE COURT:  I thought it said that somewhere.

2          MR. COTLER:  We cite cases in our brief, your

3    Honor, that say Massachusetts law would apply.

4          THE COURT:  Well, it says here that with respect

5    to Annex A, which keeps coming up again and again, the laws

6    of New York apply to it.  Now, I didn't see that in the

7    actual body of the engagement letter.

8          MR. COTLER:  And Jim Baker did not sign this, your

9    Honor.  He has his own independent tort claims that are

10   direct claims against --

11         THE COURT:  I do agree I have to consider the two

12   of them separately.

13         So you think Massachusetts law applies why?  In

14   other words, Annex A is governed by New York law.

15         MR. COTLER:  I think the central focus of facts

16   took place in Massachusetts, your Honor.

17         THE COURT:  Help me.  No one briefed this, so help

18   me with that.  Why?

19         MR. COTLER:  Well, I think Massachusetts has the

20   greater interest.  The plaintiffs are from Massachusetts.

21         THE COURT:  No one has briefed the choice-of-law

22   issue, and it may be relevant here.  In what sense?  Tell me

23   what happened here.  I mean, the plaintiffs are from here.

24   Goldman, I think, is from New York.

25         MR. COTLER:  And I think the conversations were

1    had here.  The meetings were held here.  The board of

2    directors' meetings were held here.  The decisions were made

3    here.

4              THE COURT:  Is Dragon from Boston, is a

5    Massachusetts company?

6              MR. COTLER:  Yes.

7              THE COURT:  Have you thought about choice of law?

8              MR. DONOVAN:  We have not, only in the sense that

9    since the contract by its terms has a choice-of-law clause,

10   that --

11             THE COURT:  But only as to that annex, wherever

12   that came from.

13             MR. DONOVAN:  Well, actually, the annex is

14   intended, as the body of the contract says, to deal with the

15   liabilities of Goldman, any indemnity that Goldman is owed,

16   and so that's why the choice-of-law clause is put in the

17   annex.

18             MR. COTLER:  Your Honor, if I could just come back

19   to one point that bothered me.  Your Honor referred to the

20   word "exclusively."  You know, on a motion to dismiss, in

21   the second line, the word "exclusively," all that means is

22   that Goldman will be our exclusive representative.  It

23   doesn't mean that there's exclusive liability to Dragon.

24   And at the very least, that's an issue for the jury, but

25   that's really a term of art that deals more with the fact

1   that Goldman will be the exclusive representative speaking

2   for Dragon.  It doesn't mean --

3          THE COURT:  I can see that.

4          MR. COTLER:  Okay.  But I just wanted to comment

5   on that because I thought your Honor said something about

6   that.  It doesn't mean exclusive liability only to Dragon.

7          THE COURT:  Is there a difference between

8   Massachusetts and New York law on issues like breach of

9   fiduciary duty and who --

10          MR. COTLER:  I think that for purposes of the

11   motion to dismiss, the case law is not that much different.

12   New York law might be a little more stringent on privity

13   concepts and negligence concepts but not on fiduciary duty.

14          THE COURT:  I think that if you're both agreeing

15   that Annex A is irrelevant essentially for purposes of the

16   duties between the parties, if you're just finding that it's

17   irrelevant and you both agree on that, other than in the

18   area of derivative suits, then I need to know whether

19   Massachusetts or New York law applies, because Annex A says

20   New York, and I have been assuming it's been New York.

21          MR. COTLER:  I think we briefed that, but we can

22   fine-tune that, your Honor, with an additional submission.

23          THE COURT:  Did you, the choice of law?  I don't

24   know that choice of law is briefed, is it?

25          MR. COTLER:  I think we have it in a footnote.

3fb71369-d347-4d80-a20a-7610ec0670fa

1          THE COURT:  Usually footnote means --

2          MS. YUE:  Your Honor, I'm sorry, if I might

3   interject on this.

4          THE COURT:  Yes, where is it?

5          MS. YUE:  With respect to choice of law, let me

6   say two things.  With respect to Annex A and New York law,

7   Janet only agreed to the fifth sentence and not --

8          THE COURT:  Wait, did I miss it?  Is it in a

9   footnote somewhere here?

10         MS. YUE:  Yes, your Honor, it is in a footnote.

11         THE COURT:  Where?

12         MS. YUE:  But what we noted was that the law is

13  not that different between New York law and Massachusetts

14  law.  New York has a privity-like concept.  Massachusetts

15  law has a concept that --

16         THE COURT:  Do you have --

17         MS. YUE:  Let me just find Reisman, your Honor,

18  and two of the cases, and I'll tell you what footnote it is.

19         THE COURT:  All right, so you'll get that to me,

20  and why don't you continue.  All right, so we're putting

21  aside Annex A, both sides agree, because you don't want that

22  higher standard, and you think it only applies to

23  derivatives.

24         MR. COTLER:  Yes.

25         THE COURT:  So you're saying what?

1          MR. COTLER:  What we're saying, your Honor, is

2     that there is absolutely nothing in the contract that

3     Goldman drafted, there's no language like the other cases

4     that they cite where they expressly in those contracts,

5     usually fairness opinions, where they say, "This is not to

6     be relied on by shareholders," or, "We are specifically

7     excluding third-party beneficiary claims or fiduciary duty

8     claims."

9          You'll find that language in some other cases,

10    like the Young case, like the Massey case.  If you look

11    closely at all those cases, there is language where Goldman

12    specifically precludes claims by third parties or by

13    shareholders.  None of that language is in this engagement

14    letter.  And all of the case law uniformly holds that when

15    an entity like Goldman deals specifically, your Honor -- and

16    I have all of the direct communications they had with us

17    where they know that Janet and Jim are the company.  They

18    own over 51 percent of the company.  No deals could be done

19    without Janet and Jim.  Jim is not part of management.  Jim

20    is not on the board of directors.  He's a shareholder.  And

21    they actually, Goldman had a six-month relationship with Jim

22    and Janet talking to them, getting their input on the

23    transaction.  That creates a fiduciary duty that is not

24    derivative, it's direct, regardless of the engagement

25    letter.  And that's the law, your Honor.  And Jim never even

1    signed the agreement, so he couldn't give any of his rights

2    away anyway.

3              THE COURT:  Well, you both agreed that Annex A is

4    just derivative.  Arguably, there's an explicit recognition

5    of Janet but no recognition of Jim.  None of you have

6    briefed it.  By the way, I don't think -- it may be

7    somewhere in some little tiny-font footnote somewhere, but

8    none of you have briefed them separately as potentially

9    having --

10             MR. DONOVAN:  May I address three points, your

11   Honor.

12             THE COURT:  Yes.

13             MR. DONOVAN:  One, just to put a belt and

14   suspenders upon the derivative point --

15             THE COURT:  No, no, no, let him finish then if

16   that's rebuttal.  So I haven't begun to think about the two

17   of them separately.

18             MR. COTLER:  Jim doesn't need a contract or a

19   written document with Goldman to have them liable to him,

20   when by their conduct they created a fiduciary duty with

21   him, giving him advice, telling him "We'll take care of

22   you," and getting his input.  We have memos and documents

23   which are listed in the complaint, your Honor, dealing with

24   their direct communications.  And this is basic case law,

25   your Honor.  I can give your Honor the paragraphs dealing

1  with the direct communications between Goldman and Janet and

2  Jim where they are treated as individuals, not as the

3  corporation.  And that's the heart of this case.  The heart

4  of this case is, Goldman wants to say -- and they say this

5  in their brief, your Honor -- "Every time we talked with Jim

6  and Janet we were talking with Dragon, and therefore all of

7  the claims should be derivative and dismissed because there

8  is no Dragon."  That's the heart of the case, when the facts

9  as alleged in the complaint and which a jury can find is

10 that Goldman knew they were talking to Jim and Janet, not

11 wearing some Dragon uniform, but Jim and Janet as individual

12 people with individual rights, and Jim was not even Dragon.

13 So they knew.  And I have a --

14            THE COURT:  Let me ask you this.  I was looking

15 under the 9(b) claim, and I need to move this on, as you

16 know --

17            MR. COTLER:  Thank you.

18            THE COURT:  You don't specifically list any

19 affirmative misrepresentations.  When I read the fraud

20 claim, it said, "Look at Paragraphs 1 through 190."  And

21 even in your brief you sort of scattershot, "See these a

22 thousand paragraphs."  So if you could just help me with

23 what the specific misrepresentations are.

24            MR. COTLER:  Your Honor, the paragraphs that I

25 would refer your Honor to for the affirmative --

1          THE COURT:  I want to figure out.  I've got the

2     complaint right here because I tried to read it this

3     morning.

4          MR. COTLER:  What I did, your Honor -- I had a

5     feeling you might ask for this, your Honor -- what I did

6     was, I listed the paragraphs that deal with the direct

7     communications, and we also listed the paragraphs --

8          THE COURT:  So show me, show me your best case of

9     a fraud with specificity.  I've got Exhibit A, Parts 1 and

10    2.

11         MR. COTLER:  The paragraphs for the direct

12    communications --

13         THE COURT:  No, I want the fraud.  What's your

14    best, your most specific --

15         MR. COTLER:  The misrepresentations are separate

16    and apart from the work they were supposed to do to protect

17    us.

18         THE COURT:  I want where it's pled with

19    specificity the intentional misrepresentations.  I've got it

20    right here.

21         MR. COTLER:  Paragraphs 47 --

22         THE COURT:  Well, let me start, let me start.  47.

23    Because it was not in this complaint.  So you're saying that

24    memorandum was fraud, the December 16, 1999 memorandum?

25         MR. COTLER:  Yes.  They knew they were inaccurate,

1   your Honor.  And this is just one part of our claim.

2        THE COURT:  So you're saying they actually knew

3   that these were inaccurate, as opposed to negligent

4   misrepresentation?  Because it's really impossible to read

5   under 9(b).

6        MR. COTLER:  We're saying they're negligent or

7   intentional.

8        THE COURT:  No, I want to know what you're

9   claiming under 9(b) was the fraud.  It can't be bullet

10  point 1.

11       MR. COTLER:  They're either negligent or

12  intentional.  We don't say they're fraud.

13       THE COURT:  So I might dismiss under 9(b) and let

14  you replead.

15       MR. COTLER:  We don't say they're fraudulent, your

16  Honor.

17       THE COURT:  Yes, you do.  You have a fraudulent

18  claim in there, I think, right?

19       MR. COTLER:  I don't think we do, your Honor.

20       THE COURT:  I was reading it this morning.  So

21  what is --

22       MR. DONOVAN:  I don't believe they do, your Honor.

23       THE COURT:  Intentional misrepresentation, that's

24  what I'm calling fraud.  Count 8, Page 61, is that not

25  fraud?

Page 32

1          MR. COTLER:  Well --

2          THE COURT:  I mean, maybe you didn't mean it that

3     way, but intentional misrepresentation is usually fraud.

4          MR. COTLER:  Your Honor, we have not -- there are

5     at least negligent misrepresentations, if not reckless.

6          THE COURT:  So you're abandoning for this purpose

7     intentional misrepresentation.

8          MR. COTLER:  For pleading purposes, we would call

9     it negligent misrepresentation.  Discovery may --

10         THE COURT:  All right, so I'll dismiss anyway

11    Count 8, and then I'll worry about negligent

12    misrepresentation in another, because I don't have to worry

13    about 9(b), right?

14         MR. COTLER:  No, your Honor.

15         THE COURT:  Okay.  So, see, a quick little

16    victory.

17         MR. DONOVAN:  If I can just respond to that.

18         THE COURT:  Yes, you'll respond for five minutes,

19    and then I need to go talk to the others.  Thank you.

20         MS. YUE:  Your Honor, if I might, with respect to

21    the choice of law?

22         THE COURT:  Which footnote is it?

23         MS. YUE:  It is Footnote 20 in our initial brief.

24         THE COURT:  Wait, wait, let me get there.

25    Footnote 20.

1          MS. YUE:  Footnote 20 at Page 21, and the standard

2     for --

3          THE COURT:  Wait, hold on, hold on.  All you're

4     doing is acknowledging the fight, but you haven't briefed

5     it.

6          MS. YUE:  And we indicate that the standard is

7     very similar for the tort claims, your Honor, and the

8     standards are set forth at 22-23.

9          THE COURT:  I don't know if that's true or not.

10    You would say they're the same.  Do you think they're the

11    same?

12         MR. DONOVAN:  I don't think they're the same, but

13    I don't think it makes a dispositive difference either.  If

14    I can address four things.

15         THE COURT:  Four things and then --

16         MR. DONOVAN:  One, on the derivative direct,

17    Page 20 of their brief, the sentence plainly refers only --

18         THE COURT:  Wait, wait, I'm getting there.

19         MR. DONOVAN:  Page 20 of their brief, top of the

20    page, bold only.

21         THE COURT:  I'm going to get there.  Okay.

22         MR. DONOVAN:  Okay, and following the second

23    sentence, this is clear from the phrasing which relies upon

24    claims, quote, "asserted on behalf of or in right of the

25    company."  I think we agree.  I think the oral concession

Page 34

1    matches the brief concession.  It's got to be derivative

2    only.  That's number one.

3            Number two, Mr. Cotler said that there was no

4    limitation, and the distinction of this case from Young or

5    Massey or the rest is that the word "exclusively" referred

6    to "You're my exclusive agent."  The word "exclusively"

7    appears elsewhere and does supply limitation --

8            THE COURT:  Where?  Where elsewhere?

9            MR. DONOVAN:  At Page 4 of the engagement letter,

10   your Honor, the third full paragraph:  "Any written or oral

11   advice rendered by Goldman is exclusively for the

12   information of the Board of Directors and senior management

13   and may not be disclosed even to any third party without

14   Goldman's prior written consent."  That is precisely the

15   limitation that existed in Massey, in Young, and these other

16   cases.

17           Third point --

18           THE COURT:  Page 4 at the bottom?

19           MR. DONOVAN:  Page 4, the paragraph begins "Please

20   note."

21           THE COURT:  I'm looking at a different Page 4

22   then.  All right, I know where it is.  I see it.  It's the

23   next -- I see.

24           MR. DONOVAN:  Fair enough, it's at the bottom of

25   the page.  The cover page is missing, so it says Page 5 at

1   the bottom.

2          THE COURT:  What's the third point because I need

3   to talk to this group?

4          MR. DONOVAN:  The third point, the choice of law

5   provision does not make a dispositive difference.  We have

6   said that New York law applies, but if you apply

7   Massachusetts law, the case that you have to read is not

8   Reisman.  In Reisman there was no contract.  The case is

9   Nycal.  And the difference between Massachusetts law and New

10  York law briefly is, as Mr. Cotler said --

11         THE COURT:  Well, I'm going to apply Massachusetts

12  law then because I'm not going to sit and do a side-by-side

13  comparison if you're telling me that --

14         MR. DONOVAN:  Then all you have to do, it is a

15  little bit different, it's less stringent, but Section 552

16  of the Restatement is what Nycal adopts for claims by

17  third-parties when there is a contractual relationship; and

18  it says that the limited group of people to whom a duty can

19  be owed of any kind of extracontractual duty, fiduciary,

20  misrepresentations, negligence, anything else, is limited to

21  parties intended by the contract to be --

22         THE COURT:  All right, I've got it.  What's the

23  next point?

24         MR. DONOVAN:  That's enough, your Honor.

25         THE COURT:  That's fine, good.

1          MR. COTLER:  Fifteen seconds, your Honor?

2          THE COURT:  Yes.

3          MR. COTLER:  When it says "by consent," they

4    voluntarily gave the information to Jim Baker as a

5    shareholder and Janet Baker as a shareholder.

6          THE COURT:  Good point.  Okay, thank you.  That's

7    wonderful.

8          MR. COTLER:  The Massey case which they cite says

9    that individual shareholders can bring claims like this,

10   your Honor.  It's the Massey case.

11         THE COURT:  All right, we'll do that.  You've

12   shortcutted my work a lot because you all agree Annex A is

13   irrelevant, right?

14         MR. COTLER:  I'm sorry, your Honor?

15         THE COURT:  You all agree Annex A is irrelevant?

16         MR. COTLER:  Yes.

17         MR. DONOVAN:  Yes.

18         THE COURT:  Fabulous.  Thank you.

19         THE CLERK:  Court is in recess.

20         (Adjourned, 2:45 p.m.)

21

22

23

24

25

Page 37

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court

8   Reporter, do hereby certify that the foregoing transcript,

9   Pages 1 through 36 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in Civil

11  Action No. 09-10053-PBS, Janet Baker, et al V. Goldman Sachs

12  & Co., et al, and thereafter by me reduced to typewriting

13  and is a true and accurate record of the proceedings.

14          In witness whereof I have hereunto set my hand

15  this 10th day of June, 2009.

16

17

18

19

20          /s/ Lee A. Marzilli

            _____
21          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
22

23

24

25