# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JANET BAKER and JAMES BAKER, | : |
| Plaintiffs | : |
| v. | : |
| GOLDMAN SACHS & CO., GOLDMAN SACHS GROUP, INC., and GOLDMAN SACHS & CO., LLC | : |
| Defendants. | : |

**JURY TRIAL DEMANDED**

Civil Action No. 09-10053-PBS

## MOTION FOR LEAVE TO FILE SUPPLEMENTAL MEMORANDUM

Janet Baker and James Baker (the "Bakers"), through their undersigned counsel, respectfully request leave to file a Supplemental Memorandum, which is attached hereto as Exhibit "1." The Bakers seek leave to submit this Supplemental Memorandum to address the following issues raised at oral argument on June 9, 2009: (1) the meaning and effect of the term "exclusively" as used in the contract, (2) Goldman's duty and standard of care, respectively, to Janet Baker and to James Baker under contract, third party beneficiary, and common law theories, (3) choice of law, (4) the misrepresentation claims, and (5) Annex A and its impact on Janet Baker's claims. The Supplemental Memorandum also addresses the recent First Circuit case in Goldman's Notice of Supplemental Authority filed June 11, 2009 and the pleading standard for a negligent misrepresentation claim not based on fraud.

Respectfully submitted

Dated:  June 15, 2009

/s/ Terence K. Ankner
Terence K. Ankner, Esq. (BBO #552469)
Partridge Ankner & Horstmann LLP
200 Berkeley Street, 16th Floor
Boston, MA  02116
(617) 859-9999

and

/s/ Alan K. Cotler
Alan K. Cotler, Esq.
Joan A. Yue, Esq. (BBO #538220)
Steven T. Voigt, Esq.
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103
(215) 851-8100

Attorneys for Plaintiffs
Janet Baker and James Baker

# EXHIBIT

# 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JANET BAKER and JAMES BAKER, | : | |
| Plaintiffs | : | **JURY TRIAL DEMANDED** |
| v. | : | Civil Action No. 09-10053-PBS |
| GOLDMAN SACHS & CO., | : | |
| GOLDMAN SACHS GROUP, INC., and | : | |
| GOLDMAN SACHS & CO., LLC | : | |
| Defendants. | : | |

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM
## ON ISSUES RAISED AT ORAL ARGUMENT

Your Honor raised several issues at argument on June 9, 2009. The Bakers respectfully believe that some of these issues were not fully addressed given the time constraints. Accordingly, the Bakers seek leave to submit this supplemental memorandum to address (1) the meaning and effect of the term "exclusively" as used in the contract, (2) Goldman's duty and standard of care, respectively, to Janet Baker and to James Baker under contract, third party beneficiary, and common law, (3) choice of law, and (4) the misrepresentation claims. We also clarify the issue raised with respect to Annex A and its impact on Janet Baker's claims.

The Bakers have properly pled the scope of the Goldman engagement and the bases of Goldman's duties to them. "Exclusively engaged" means simply that Goldman was the "exclusive financial advisor" for a Dragon merger deal. No other financial advisor could do the work and take a fee. Not only is that the Bakers' understanding, but it is undisputedly the meaning of the phrase as confirmed by banking industry usage and practice. This meaning of "exclusively" is confirmed by the Bakers' investment banking expert whose affidavit is attached. Goldman's entire argument stems from its incorrect reading of the term "exclusively" which runs counter to industry practice.

"Exclusively" does <u>not</u> mean Goldman's work and duties are "exclusively" for Dragon. When we explained what the true meaning of "exclusively" was, the Court said "I can see that." (Hearing Tr. at 24/18 - 25/6). All of Goldman's arguments fail because it misapplies "exclusively." As a result, all of Janet Baker's and James Baker's claims cannot be dismissed for that reason alone.

With respect to the Bakers' misrepresentation claims, and as we represented to the Court at argument, the Bakers do not allege fraud or a fraud-based misrepresentation claim. However, the Bakers do allege an intentional misrepresentation claim based on misrepresentations and omissions by Goldman that were knowingly false and/or made with reckless disregard of red flags, which meet the criteria for intentional misrepresentation. The allegations also satisfy a "gross negligence" standard of care to the extent that may apply to Janet Baker's negligent misrepresentation claim. The allegations in the Complaint that ground the Bakers' intentional misrepresentation claim (and also support negligent misrepresentation) are set forth herein.

With respect to Annex A, and as more fully explained herein, we said at argument that Annex A is "irrelevant" because Annex A does not apply to James Baker at all (he did not sign the document). It is not relevant to Janet Baker because she has direct contract and third party beneficiary claims arising under the contract itself, irrespective of Annex A and whether the fifth sentence applies to derivative or direct claims. With a proper reading of "exclusively," not limiting duties to Dragon, Annex A is irrelevant except for the standard of care owed Janet.

The distinction the Bakers make between direct and derivative claims with respect to Annex A was <u>in response and opposition to Goldman's argument</u> in its initial Brief that Janet Baker gave up a "negligence" standard of care with respect to her <u>personal</u> claims as a <u>shareholder</u>. Because the Court also read Annex A as addressing Janet Baker's personal claims against Goldman, Annex A is potentially relevant as an alternative basis for Janet Baker's direct personal claims against Goldman. It is, at the very least, ambiguous, as the Court noted. It also undercuts Goldman's

restrictive interpretation of "exclusively" to deny all liability for Janet Baker's direct personal claims. At most, it only applies to the standard of care Goldman owed Janet Baker. As the Court agreed, it does not apply to James Baker or the standard of care owed to him. (Hearing Tr. at 18/25 - 19/2, 23/4-12).

1.    The Meaning And Effect Of The Term "Exclusively" As Used In The Contract

Goldman focused on the word "exclusively" in the first sentence and on page four of the Goldman agreement. Goldman argued that "exclusively" means that Goldman's duties were limited to Dragon only. It is the linchpin to Goldman's attempt to dismiss the Bakers' claims. (Hearing Tr. at 6/24 - 7/2 and 34/3 - 34/6). The word "exclusively" does not mean what Goldman states. As a result, Goldman's motion to dismiss fails for that reason alone.

*First*, "exclusively engaged" in the first sentence of the Goldman contract is an industry term of art. It simply means that Goldman is the "exclusive" – *i.e.*, one and only – investment banker acting as financial advisor on the Dragon side of any deal. It does not mean that Dragon was Goldman's only client or that Goldman's duties ran only to Dragon or that Goldman did not have (or assume) any duties to the Bakers. It does not preclude liability to the Bakers for duties arising out of Goldman's purposeful direct dealings throughout the six month course of the engagement or for Goldman's material misrepresentations and omissions on which the Bakers relied in approving the merger deal with L&H. (Bakers' SurReply at pp. 6-7).

The purpose of the term "exclusive" or "exclusively" in characterizing an investment banking or financial advisory engagement like that here is to protect the investment banker's fee, not limit its duties or restrict the scope of its undertaking. This is reinforced by other provisions in the Goldman contract and Goldman's conduct in the course of the engagement. As Goldman pointed out at argument, the contract assured Goldman its fee on the closing of a deal even if the engagement were terminated so long as the buyer was on Goldman's prospect list. (Complaint ¶ 28,

Ex. B at p. 4; Hearing Tr. at 13/13-21).  Goldman also made sure that Dragon's potential merger

partners knew Goldman was Dragon's exclusive financial advisor, for example, telling L&H's

banker SG Cowen that all communications about the prospective deal were to go through Goldman.

(Complaint ¶¶ 28, 31).

  The Bakers' understanding of "exclusively engaged" conforms to investment banking

industry custom, usage, and practice.  The Court acknowledged "I can see that" when we explained

what the phrase means at argument.  (Hearing Tr. at 24/18 - 25/3).  This meaning of "exclusively" is

not a lawyer-contrived argument to avoid a motion to dismiss.  It is solidly grounded in industry

practice and confirmed by expert opinion which the Bakers are prepared to plead in the Complaint

if the Court requires.[1]  The meaning and effect of "exclusively" is, at the very least, ambiguous,

and creates a factual issue that may not be decided on a motion to dismiss.  *See Eternity Global*

*Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 173 (2d Cir. 2004) (ambiguity exists

---

[1]  If the Court has any question that the meaning of "exclusively" is based on industry practice, the Bakers respectfully refer the Court to the affidavit of R. Alan Miller, their investment banking expert, attached hereto as Exhibit "A".  Mr. Miller has worked in the investment banking field for 36 years.  He has been qualified and accepted as an expert in numerous federal and state courts throughout the country, including on investment banking practices.  He has experience with engagement letters and has testified to the meaning of "exclusivity," among other things.  His testimony on investment banking relationships and duties has been cited favorably in *Daisy Systems Corp. v. Bear Stearns and Co., Inc.,* 97 F.3d 1171, 1175-77 (9th Cir. 1996), wherein the court credited his expert testimony on the scope of an investment banker's duty of care in reversing summary judgment, and in *McKinley Allsopp, Inc. v. Jetborne International, Inc.,* 1990 WL 138959 (S.D.N.Y. Sept. 19, 1990), wherein he testified to industry custom and practice regarding the meaning of a term in an engagement letter.  Mr. Miller confirms the meaning of "exclusively" in the Goldman contract, as the Bakers have stated in their briefs and at argument.  Mr. Miller states that "'exclusively' here is understood in the investment banking community to mean that [Goldman] will be Dragon's 'exclusive' financial advisor – that is, the only financial advisor to be used.  The primary purpose of the language is to protect GS' fee." Miller Aff. at ¶ 7 (emphasis original).  This trade usage shows the true meaning of "exclusively" in the first sentence of the Goldman contract.  That "exclusively engaged" meant Goldman was the "exclusive financial advisor" for a Dragon deal is pled in the Complaint at, *inter alia,* paragraphs 14, 16, 18, 21, and 26.  If the Court deems it necessary, the Bakers are prepared to amend their Complaint to specifically assert the "custom and usage" basis for the meaning of the phrase.

where industry usage supports alternative interpretation).  The plain truth, however, is that it is a

standard phrase meant to protect the investment banker's fee.

_Second_, Goldman pointed to the provision at page four of the Goldman contract which uses

"exclusively" in connection with the flow of advice and information provided by Goldman in the

course of the engagement.  The provision states:

> Please note that any written or oral advice provided by Goldman
> Sachs in connection with our engagement is exclusively for the
> information of the Board of Directors and senior management of
> the Company, and may not be disclosed to any third party or
> circulated or referred to publicly without our prior written consent.

(Complaint, Ex. B at p. 4).  This provision recognizes Goldman's duty to provide advice and

information to Dragon's Board of Directors (including Janet Baker) and senior management.

Nothing in the provision disclaims or negates any right by any Dragon Board member or senior

manager (including Janet Baker) to rely on the advice and information in making his or her own

individual decision whether to approve a merger deal.  Moreover, it does not disclaim or negate any

right by anyone else (including Janet Baker and James Baker) who received information <u>directly

from Goldman itself</u> – or from a Board member or senior manager with Goldman's knowledge and

approval – to rely on the advice and information in deciding whether to approve a merger deal.

The language of this provision is starkly different in scope and effect from the provisions in _Young,_

_Massey_ (cases Goldman argued at the hearing, Tr. at 34/15), and the other "fairness opinion" cases

Goldman cites.  And so are the facts.[2]

---

[2]    As noted in the Bakers' Initial Brief (at p. 16 fn. 15) and in their SurReply Brief (at pp. 12-
13 and fn. 17-18) and as we stated at argument, the fairness opinion cases are not "relationship"
cases.  None of the cases involves the extensive direct dealings between the investment banker and
the shareholder throughout the course of the engagement as there is between Goldman and Janet
and James Baker.  None of the cases involves the numerous direct representations to the shareholder
as Goldman made to Janet Baker and James Baker over a period of six months.  None of the cases
involves the investment banker's knowledge of shareholder trust and reliance, as the Bakers allege
_Continued on following page_

In this case, <u>Goldman itself</u> involved Janet Baker and James Baker <u>personally and directly</u> in the process of Goldman's review and analysis of Dragon's prospective merger partners, including L&H. Goldman intentionally and purposefully had continuous direct dealings with the Bakers as Dragon's majority owners over the six month course of the engagement. (See Exhibit "B" listing pertinent paragraphs alleging representative personal dealings between Goldman and the Bakers). This flow of information between Goldman and the Bakers was a two-way street, with Goldman soliciting the Bakers' "input", answering their questions, and providing information and advice to them about the proposed merger deal with L&H.

Goldman knew that Janet Baker and James Baker were 51% majority owners and controlling shareholders of Dragon and that no deal would close without their approval. Goldman knew that Janet Baker would be relying on Goldman's expertise, and all of the information and advice presented to her by Goldman both inside and outside of the boardroom, in making her decision as a majority owner and controlling shareholder of Dragon to merge with L&H. Goldman knew that James Baker, in making his decision as a majority owner and controlling shareholder to merge Dragon with L&H, would be relying on Goldman's expertise and all of Goldman's information and advice received both directly from Goldman and, with Goldman's knowledge and consent, through Janet Baker and other Dragon Board members and managers. <u>Goldman never told</u>

---

*Continued from previous page*

here. All of the cases involve language in the contract and/or the fairness opinion expressly disclaiming or negating shareholder reliance, which is not present here. As the Court observed at the argument, this is "an unusual case" (Hearing Tr. at 6/3-5) – not only because Janet Baker is acknowledged in the contract and signed the contract as a shareholder but also because of the direct relationship between Goldman and Janet and James Baker and their extensive direct dealings, with numerous material misrepresentations, throughout the six month course of the engagement. A summary of the pertinent language noted by the courts in the fairness opinion cases and the absence of a direct relationship, which clearly distinguish those cases from this case, is attached hereto as Exhibit "C".

<u>Janet Baker or James Baker during these six months that they were not entitled to rely on what</u> <u>Goldman said or did in making their decision to approve the merger.</u>  <u>Nor is there anything in the</u> <u>engagement letter Goldman drafted that says this.</u>

"Exclusively" in the "flow of information" provision on page four is not a belt and suspenders word that in and of itself or in the context of the entire provision and the facts prevents a direct claim by either Janet Baker or James Baker.  This is a significant – and dispositive – difference between this case and the shareholder fairness opinion cases cited by Goldman.

"Exclusively" is misused by Goldman.  It is the crux of its entire motion to dismiss. Because "exclusively" undisputedly is used in these engagement letters solely to protect the investment banker's fee, Goldman's entire motion to dismiss fails.  Goldman did not limit its obligations to Dragon alone.  It just wanted to protect its fee from other investment bankers.

### 2. <u>Janet</u> Baker's Contract And Common Law Claims

Even Goldman concedes that *shareholders can sue* an investment banker where (1) there is a direct duty under the contract, (2) the shareholder is a third party beneficiary, and/or (3) the investment banker misrepresents or omits material information.  (Goldman Reply Brief at pp. 3 fn. 2, 16).  Janet Baker meets all three criteria.

<u>*First*</u>, she has direct rights under the contract, both as a Board member and as a shareholder. Goldman explicitly recognized her in the contract itself:

- the engagement letter is addressed to her without particular designation of her status;

- she signed the engagement letter as a shareholder; and

- with respect to Annex A, she agreed only as to the fifth sentence.

Goldman directly engaged her in the process of the review and analysis of the prospective Dragon deals and had extensive direct dealings with her both inside and outside of the boardroom throughout the course of the engagement.  Goldman knew:

- • a merger deal was <u>the</u> contingency to Goldman's fee;

- • Janet Baker was not merely a Dragon Board member but one of the two majority owners of Dragon whose approval was necessary to any merger deal;

- • Janet Baker was personally relying on all of the information and advice provided to her by Goldman, both in and outside of Board meetings, in deciding whether to approve the merger with L&H and to exchange all of her stock in Dragon for stock in L&H;

- • the contract itself does not disclaim or prohibit Janet Baker's individual reliance as a majority owner of Dragon on all or any of the information and advice conveyed to her by Goldman either as a Board member or personally and directly outside of Board meetings; and

- • Goldman <u>never told Janet Baker she could not rely</u> on what Goldman did and said about the merger with L&H in making her decision as a Dragon majority owner and controlling shareholder to merge Dragon with L&H.

These facts alone differentiate Janet Baker from the shareholder plaintiffs in the fairness opinion cases. The <u>only</u> limitation Goldman exacted from Janet Baker was holding Goldman to a "gross negligence" standard in Annex A with respect to derivative claims. (See Bakers' Initial Brief at pp. 19-20; Bakers' SurReply at pp. 6-7, fn. 8).

<u>Second</u>, with respect to Annex A, we stated in the hurried air of the argument that Annex A was irrelevant. This, however, was in the context of the fact that "exclusively" does not limit Goldman's duties solely to Dragon and that the Bakers have direct rights under the contract and/or as third party beneficiaries. Because "exclusively" refers to Goldman being the only advisor retained so it can protect its fee, there is no contractual limitation as to whom Goldman's duties run – and Annex A is irrelevant to Janet. At most, it could arguably apply to the standard of care owed to Janet.

Confusion about the issue of Annex A stems from Goldman's changing arguments and shifting positions. Goldman took the position in its Initial Brief that Annex A applied to Janet Baker's <u>direct personal</u> claims and that she exculpated Goldman from liability "to her personally" except for gross negligence, willful misconduct, and bad faith:

in her capacity as a "*stockholder*" of Dragon, [Janet Baker] exculpated Goldman from *liability . . . to her personally*, . . . except [for] gross negligence, willful misconduct or bad faith of [Goldman] in performing the services that are the subject of this letter.

(Goldman Initial Brief at p. 3 (emphasis added)).  The Bakers argued in response that Janet Baker had direct rights under the contract because (1) it was addressed to her, (2) it was signed by her in her capacity as a shareholder, (3) Goldman dealt directly with her throughout the course of the six month engagement, and (4) Goldman knew she was relying on its expertise and advice in deciding whether to approve the merger with L&H.  (Bakers' Initial Brief at pp. 18-22).  In response to Goldman's contention that Janet Baker gave up negligence as the standard of Goldman's care with respect to her <u>personal</u> claims as a shareholder, the Bakers argued, alternatively, that:

- the fifth sentence of Annex A exculpated Goldman from negligence only with respect to Janet Baker's derivative claims, not her personal, direct claims as a shareholder, and

- even if Annex A applied to her personal, direct claims as Goldman contended, Goldman would still have direct liability to her personally for gross negligence and other misconduct.

(Bakers' Initial Brief at pp. 19-20).

Goldman then did an about-face in its Reply Brief, arguing that Janet Baker was trying to "extrapolate contractual rights from the exculpation provision" (Goldman Reply Brief at p. 5), as if Goldman had never acknowledged its recognition of Janet Baker's shareholder status or made the argument about the exculpatory clause applying "to her personally" in the first place.

Janet Baker's direct personal claims against Goldman are not diminished by the fifth sentence of Annex A.  (See Baker SurReply at pp. 5-8 and fn. 10).  However, given Goldman's argument and the Court's reading of Annex A as ambiguous (Hearing Tr. at 9/6 - 9/20) on the issue of Janet Baker's personal rights as a shareholder, Janet Baker should be allowed to argue that Annex A evidences her personal rights against Goldman at least for gross negligence.  If the Court adopts Goldman's interpretation of "exclusively," which we contend would be plain error and

- 9 -

contrary to industry custom and usage, then Annex A becomes relevant as evidence that Janet Baker has personal claims against Goldman at least with respect to Goldman's gross negligence and willful misconduct. Annex A is the basis for Goldman's concession in its motion to dismiss that Janet Baker has <u>personal</u> rights against Goldman <u>in her capacity as a shareholder</u>. Annex A reinforces Goldman's recognition of Janet Baker as an individual shareholder and belies Goldman's disingenuous argument that it viewed Janet Baker as merely a "spectator" and "bystander" and only dealt with her in her capacity as a Board member and representative of Dragon.

    *Third*, the same considerations that give Janet Baker direct contract rights against Goldman also show that she is, at the very least, an intended third party beneficiary of Goldman's contract. Goldman concedes the third party beneficiary test in its Initial Brief: "One is an intended beneficiary:

> if recognition of a right to performance is appropriate to effectuate the intent of the parties and . . . the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance."

Goldman Initial Brief at 8 (citing *Gupta v. Nat'l Ins. Co.*, 2006 WL 2000118, at *3 (W.D.N.Y. July 17, 2006), which quotes § 301 of the Restatement (Second) of Contracts) (emphasis omitted); see Bakers' Initial Brief at pp. 20-21 (cases stating standard). Both Massachusetts and New York follow the Restatement (Second) of Contracts § 301, so the standard is the same whether the Court looks to New York or Massachusetts for the substantive law.

    Goldman knew Janet Baker was a Dragon Board member and majority owner. The contract is addressed to her and expressly recognizes her status as a shareholder. The contract does not disclaim individual reliance by any Board member or otherwise negate any third party rights. <u>Goldman itself</u> involved Janet Baker in the process of the engagement not just as a Board member but personally as Dragon's majority owner. The contract itself and Goldman's direct dealings with

Janet Baker throughout the six months leading up to and culminating in the closing of the Dragon merger deal with L&H *prima facie* show that Goldman intended to give Janet Baker the "benefit of the promised performance."

*Fourth*, Janet Baker has common law claims based on Goldman's direct misrepresentations to her. Even if the contract may be read to preclude Janet Baker's claims under contract and/or third party beneficiary theories, which it cannot, the contract cannot insulate Goldman from liability for its direct material misrepresentations and omissions made with no disclaimer of reliance. Even the shareholder fairness opinion cases do not go that far. And, Janet Baker has her fiduciary duty claims arising from the direct dealings set forth above.

### 3.    <u>James</u> Baker's Contract And Common Law Claims

James Baker's contract and common law claims against Goldman rely on the language of the contract and Goldman's direct dealings with him over the course of the engagement.

*First*, a contract can create obligations to both an entity and its principal even though the principal is not named in and did not sign the contract. (Bakers' SurReply at pp. 5-6). Dragon was a small, privately held corporation. James Baker, with Janet Baker, owned 51% of Dragon and were controlling shareholders. Goldman was hired to give Dragon's Board and the Bakers, who ultimately controlled the decision on any merger deal, comprehensive financial advice about prospective merger partners and the deal structure, not to give a fairness opinion to protect the Board from a shareholder suit on the fairness of the price. (Complaint ¶¶ 12, 17).

James Baker was privy to Goldman's information and advice because he was essential to approval of any deal and had a need to know. He received information and advice <u>directly from Goldman</u> over the course of the engagement. He participated in numerous Board meetings where Goldman made presentations and answered questions, even though (and as Goldman knew) he was not a member of Dragon's Board or senior management. Goldman communicated with him directly

outside of Board meetings and he also received information, with Goldman's knowledge and consent, from Janet Baker and Dragon managers. James Baker understood that Goldman had obligations to him as exclusive financial advisor for a Dragon merger deal and that he was entitled to rely on what Goldman said and did in approving the merger with L&H and exchanging his $150 million interest in Dragon for what ultimately was worthless L&H stock.[3]

   *Second*, James Baker, at the very least, is an intended third party beneficiary of the Goldman contract with a direct claim against Goldman. The language of the contract does not limit Goldman's duties solely to Dragon for the reasons stated above. The contract's flow of information provision does not apply to information and advice communicated by Goldman itself or with Goldman's consent and approval, as is the case here.

   All of Goldman's dealings and communications with James Baker throughout the course of the engagement were in his personal capacity as a majority owner and controlling shareholder of Dragon. He was not on the Board of Directors at any time throughout the engagement. He was not part of management. Consequently, he was involved by Goldman in the ongoing flow of information and advice from Goldman about Dragon's prospective merger partners solely in his capacity as Dragon's owner and shareholder. Goldman involved James Baker directly because his consent was necessary to effectuate a merger or investment deal, which was the purpose of the Goldman contract.

   Goldman itself communicated with James Baker directly throughout the course of the engagement, providing advice and information and soliciting his input. James Baker participated in

---

[3]    The fact that Dragon was responsible for payment of Goldman's $5 million and any indemnity says nothing about Goldman's obligations to the Bakers. In fact, the parties negotiated that the Company, not the shareholders, would pay Goldman's fee and be responsible for indemnity. (Bakers' SurReply at pp. 5-7 and fn. 10). The Bakers are prepared to amend their Complaint to plead this fact if necessary.

all of the Board meetings where Goldman provided information, answered questions, and gave advice. Goldman knew James Baker was not a Board member or senior manager but never told him he could not rely on the information and advice Goldman presented at those meetings. Goldman consented to James Baker's participation and intended his reliance because it knew he was a majority owner and controlling shareholder of Dragon whose approval was necessary to the deal.

Goldman knew that James Baker was not involved in all of the communications Goldman had directly with Janet Baker outside of Board meetings over the course of the engagement. However, Goldman knew that Janet Baker was conveying the information and advice she was receiving from Goldman about Dragon's prospective merger partners, including L&H, to James Baker. Goldman never told Janet Baker that she could not share this information and advice with James Baker because he was not a Board member or senior manager. Goldman never told James Baker that he could not rely on Goldman information and advice communicated to him through Janet Baker. Goldman consented to disclosure of this information and advice and intended James Baker's reliance because James Baker was a majority owner and shareholder of Dragon whose approval was necessary to the merger.

These facts show that James Baker is, *prima facie*, an intended third party beneficiary of the Goldman contract with a direct personal claim against Goldman. These same facts also support his extra-contractual claims for breach of fiduciary duty and misrepresentation.

A fiduciary duty arises out of an underlying relationship of trust invited and accepted by a party with superior expertise, such as a financial advisor. This creates duties independent of the duties in the contract. The fiduciary duty can be created by circumstances and conduct, including ongoing communications where the financial advisor is providing information and advice on matters within its superior expertise that are trusted and relied on by the other party. A showing of

fraud is not a predicate for a cause of action for breach of fiduciary duty. (See Bakers' Initial Brief at 14-18; Bakers' SurReply at 1-5).

Moreover, even if the contract may be read to limit Goldman's duties solely to Dragon and/or constrain a fiduciary duty claim, which it cannot, James Baker still has a direct claim against Goldman for negligent and intentional misrepresentation. The contract cannot insulate Goldman from direct liability to James Baker for misrepresentations and omissions made with no disclaimer of reliance.

In addition, even if the fifth sentence of Annex A may be read to limit the standard of care for Janet Baker's claims against Goldman, it does not affect the standard of care for Goldman's duties to James Baker. He did not sign Annex A and he is not asserting a derivative claim. The fifth sentence of Annex A, which even by its most generous reading would only affect the standard of care owed Janet Baker on her personal claims for negligence, does not apply to him.

4.    **Choice Of Law**

As a Court sitting in diversity, this Court applies Massachusetts' choice law of principles to determine which state's law applies to the issues.

For contract claims and in the absence of a choice of law provision in the contract, Massachusetts looks to the law of the state with the most significant relationship to the transaction (*i.e.*, the place of contracting, negotiation, performance, the subject matter of the contract, and where the parties do business and are incorporated). In this case, Annex A contains a provision for the application of New York law, but Janet Baker did not agree to that provision in signing the contract. James Baker did not sign the contract, although his contract-based claims against Goldman would arguably be subject to the contract's choice of law provision in Annex A, which is incorporated by reference into the contract at page 4. However, there does not appear to be a material conflict between New York and Massachusetts with respect to the standards for the

contract and third party beneficiary claims, the contractual duty of care, or the standards for negligence, gross negligence, and willful misconduct to the extent these may define the duty of care for the contract and third party beneficiary claims.

With respect to the tort claims, Massachusetts applies an interest analysis, *i.e.*, the "most significant relationship to the occurrence." As we stated at argument, this is a Massachusetts-concentric case: Dragon was here, the Bakers were here, misrepresentations were made here, the merger closing occurred here. The Bakers acknowledge a difference between New York and Massachusetts in determining the degree to which Goldman owes a duty of care. (See Bakers' Initial Brief at pp. 22-23). However, the facts here – Janet Baker's status as a Board member and Goldman's recognition of her as a shareholder in the contract, Janet Baker's and James Baker's status as 51% majority owners and controlling shareholders of Dragon whose approval was critical to the merger deal, Goldman's knowledge that James Baker was in the information loop, and Goldman's direct dealings and direct misrepresentations to both Janet Baker and James Baker throughout the course of the engagement – satisfy both New York's "linkage" test and Massachusetts' less stringent test under Restatement (Second) of Torts § 552.

### 5.     The Bakers' Misrepresentation Claims And Rule 9 (b)

The case recently submitted by Goldman, *North America Catholic Education Programming v. Cardinale*, 2009 WL 1382289 (1st Cir. May 19, 2009), applies the Rule 9 (b) pleading standard to intentional misrepresentation claims, but only to negligent misrepresentation claims grounded in fraud. As noted above, the Bakers do not assert a fraud claim or misrepresentations grounded in fraud. They base their intentional misrepresentation claim on misrepresentations and omissions made knowingly or with reckless disregard of known red flags. The negligent misrepresentation claims are based on negligence/gross negligence. The allegations that support the Bakers' claims for intentional and negligent misrepresentation include:

- Goldman knew from its prior representation of another client in late 1997/early 1998 that L&H had related party problems with FLV, and had continuing concerns about FLV at the time of the engagement that raised a red flag and should have been but was not communicated to the Bakers. (¶¶ 77-78, 80, 82-84).

- Goldman had concerns about L&H's repeated changes in structure, which lowered the visibility of L&H's earnings and reduced Goldman's confidence in L&H's estimates of financial performance. Goldman did not communicate these concerns to the Bakers, and did not take them into account in the merger analysis. (¶¶ 113-116).

- Goldman had concerns at the time of the engagement about L&H related parties and so-called strategic partners, Dictation Consortium, Brussels Translation Group, LHIC, and FLV. Dictation and BTG were the "off-balance sheet entities that funded [L&H's] R&D" and were the early models for the related party fraud that collapsed L&H. LHIC and FLV were the related party entities that were at the center of the L&H fraud exposed shortly after the merger. Goldman's concerns were significant red flags that were not communicated to the Bakers. (¶¶ 72, 79-82).

- Goldman made representations to the Bakers about L&H's "OEM licensees that build a pipeline of recurring revenue" and about forecasts of L&H's performance in several memos and in the merger analysis without taking into account known red flags that cast doubt on their representations or otherwise qualifying their representations. (¶¶ 46-52).

- Goldman made representations to the Bakers, in a memo to Janet Baker and James Baker and also during a telephone conversation with a Goldman research analyst, that changes in the L&H stock price resulted from overall market movement, not from a problem with L&H stock. Neither Goldman nor the Goldman analysts told the Bakers about red flags that made Goldman cautious about L&H stock. (¶¶ 53, 113-116).

- The change in the structure of the L&H deal from a 50/50 stock/cash transaction to an all-stock transaction following the Dictaphone merger signaled that L&H could not raise the cash needed for the Dragon part-cash/part-stock deal. This was a red flag to Goldman that the L&H stock was not worth its trading price which should have been but was not communicated to the Bakers. (¶¶ 36, 97-99).

- Goldman failed to disclose the full extent of its dealings with L&H which created conflicts of interest that were material to its engagement. (¶¶ 120-125).

- Goldman reassured the Bakers that the L&H stock was not an open issue or concern despite known red flags and Goldman's own caution about L&H stock, which was not disclosed to the Bakers. (¶¶ 53, 61, 112-116).

The foregoing misrepresentations and omissions constitute actionable intentional misrepresentations. They were made with knowledge of the facts, were material to the transaction, and were relied on by the Bakers. They are specifically pled in the Complaint but not restated within Counts VII and VIII. Accordingly, if necessary, the Bakers would seek leave to replead those counts.

## Conclusion

Most critically, there is nothing in the contract Goldman drafted that limits its duties to Dragon alone. "Exclusively" only applies to Goldman's fee and that it will not share it with another advisor. That is what was intended by the parties and how it is used in the investment banking industry. As a result, Goldman's entire motion to dismiss fails for that reason alone. What standard of care is owed Janet Baker under Annex A at the very least is a jury question, as the Court acknowledged its ambiguity.

Respectfully submitted

Dated: June 15, 2009

/s/ Terence K. Ankner
Terence K. Ankner, Esq. (BBO #552469)
Partridge Ankner & Horstmann LLP
200 Berkeley Street, 16th Floor
Boston, MA 02116
(617) 859-9999

and

/s/ Alan K. Cotler
Alan K. Cotler, Esq.
Joan A. Yue, Esq. (BBO #538220)
Steven T. Voigt, Esq.
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
(215) 851-8100

Attorneys for Plaintiffs
Janet Baker and James Baker

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 15, 2009.

  /s/ Joan A. Yue
Joan A. Yue

# EXHIBIT
# A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | : | |
| JANET BAKER and JAMES BAKER, | : | |
| | : | |
| Plaintiffs | : | **JURY TRIAL DEMANDED** |
| | : | |
| v. | : | Civil Action No. 09-10053-PBS |
| | : | |
| GOLDMAN SACHS & CO., | : | |
| GOLDMAN SACHS GROUP, INC., and | : | |
| GOLDMAN SACHS & CO., LLC | : | |
| | : | |
| Defendants. | : | |
| | : | |

**AFFIDAVIT OF R. ALAN MILLER**

COMMONWEALTH OF PENNSYLVANIA )
                                                    ) SS:
COUNTY OF DELAWARE                     )

I, R. Alan Miller, under the pains and penalties of perjury, testify as follows:

1.　　I am submitting this affidavit in Support of Plaintiffs' Motion in Opposition to Defendant's Motion to Dismiss. I have been asked for my opinion as to the meaning of the term "exclusive" in the investment banking community as it arises in this matter.

**Qualifications**

2.　　I am President of Philadelphia Investment Banking Company ("PIBC") and am submitting this report summarizing my opinions in this matter. A copy of my résumé is attached as Exhibit A hereto which outlines my education, professional experience and

expertise.  I have testified at trial and hearings thirty-one times.  I have been qualified or

accepted as an expert on the operations of the securities market, damages, materiality issues,

investment banking practices, valuations, and related corporate finance matters in numerous

federal and state courts nationwide since 1977.  Additionally, I have provided testimony at

many depositions and submitted numerous Declarations, Affidavits, and Reports on matters in

these areas, including many dealing with investment banking practices, materiality and damage

questions and/or the factors relevant to such studies.

      3.     PIBC and I have provided a wide range of corporate finance services to clients.

These services include raising capital through private placements of debt and equity financings;

advisory services concerning public offerings of securities; merger, acquisition and divestiture

advisory services; evaluation and economic analysis services; consulting and litigation support;

and other advisory services.

      4.     PIBC and its staff perform a considerable amount of work in the area of

evaluation of businesses and securities and the factors involved in such evaluation.  These are

done on a formal basis for a wide variety of purposes, as well as continuously on an informal

basis in the process of performing our corporate finance functions such as raising capital,

assisting in mergers and acquisitions, and providing advisory services.  The factors used in

such evaluations and their importance and materiality to the investment community are areas in

which I have developed expertise and have had substantial experience over the last thirty-six

years.  Additionally, PIBC has prepared a substantial number of analyses of market impact and

damages in connection with numerous shareholder litigations.  PIBC staff members have had

substantial experience in securities brokerage, investment management and performance measurement as well.

5.      I received a B.S. in Economics from Cornell University in 1970, and a Masters in Business Administration (major in Financial Accounting) from the Wharton School of Finance and Commerce of the University of Pennsylvania in 1973. I have attended various Practising Law Institute and similar programs and seminars on topics such as corporate finance and due diligence.

6.      I have actively worked in the investment banking field for 36 years. My work experience includes:

- Howard & Co., a corporate finance research and consulting firm, Philadelphia, 1972 to 1976. Performed research, writing and consulting on a wide range of corporate finance topics including bank debt, long term debt—private and public, mergers and acquisitions, equity capital—private and public, going public, being public, etc. Topics included cost of each type of capital or project, terms, advantages and disadvantages to issuer and financing party, sources of capital, roles of participants (agents, underwriters, counsel, accountants, rating agencies, regulators, issuers, sources of financing), time to accomplish tasks, etc. Such research included a detailed and comprehensive study of 550 IPOs that had occurred in the five years prior to 1973; issues studied included determination of required disclosures, materiality, due diligence practices and procedures, terms and pricing, roles of participants, costs, timing, other issues that arose. Authored and/or edited numerous articles in a series of newsletters on above topics and prepared research for presentation at seminars and to clients. Consultation to clients on corporate finance projects and issues.

- Butcher and Singer, a major regional investment banking firm headquartered in Philadelphia, corporate finance department 1976 to 1980. Performed corporate finance functions for investment banking/brokerage firm. Work included private placements and public offerings of debt and equity securities, merger and acquisition work, evaluations, fairness opinions, tender offer management, creating and structuring leasing transactions, corporate finance advisory and consulting work. Created "securitization" financing structures of leasing transactions for railroad and municipal equipment. Obtained professional license as registered representative.

3

- Philadelphia Capital Advisors, a corporate finance services group of Philadelphia National Bank, 1980 to 1983. Continued corporate finance functions, except for public offering activities, for a wide rage of clients. Supervised and instructed other group members.

- Philadelphia Investment Banking Company, a corporate finance services firm, 1983 to present. Continued corporate finance activities, with increasing work in litigation support.

## My Opinion

7.    I have reviewed the Complaint, the engagement letter in this matter, and numerous other documents including transcripts of depositions. I have had experience with engagement letters used by investment bankers throughout my career and have previously testified as to the meaning of exclusivity, among other things, and my testimony has been cited favorably on investment banking relationships, duties and responsibilities in at least two such matters—McKinley Allsopp v. Jetborne, and Daisy Systems Inc. v. Bear Stearns.

The engagement letter in this matter was written by Goldman Sachs and starts with:

> We are pleased to confirm the arrangements under which Goldman Sachs & Co. ("Goldman Sachs") is exclusively engaged by Dragon Systems, Inc. (the "Company") as financial advisor in connection with the possible sale of all or a portion of the Company.

The word "exclusively" here is understood in the investment banking community to mean that Goldman Sachs ("GS") will be Dragon's "exclusive" financial advisor—that is, the only financial advisor to be used. The primary purpose of the language and arrangement is to protect GS's fee. That is, no matter how a transaction is arranged, or ultimately occurs, GS will be paid. Use of this language is intended to preclude any other advisor from claiming (successfully) that they, and not GS, are responsible for arranging a transaction and should be paid instead of GS and also to preclude a client from claiming it arranged a transaction itself

4

and does not have to pay GS. A review of the rest of the engagement letter beyond the first

paragraph confirms this near-total focus on fee protection for GS as the purpose and intent of

this letter. There are seventeen paragraphs in the letter. The first is quoted above in full. The

second provides a one sentence description of GS's functions. Paragraphs 3 through 11 are

about fees. Paragraph 12 is ostensibly about coordinating contacts but when read with

paragraph 16 is clearly about fee protection. Paragraphs 13, 14 and 15 are intended to be

protective of GS, paragraph 16 is about fee protection and the final paragraph is intended to

indicate agreement. So 12, 13 or 14 of the 17 paragraphs are about defining or protecting

GS's fee; the "exclusively" term is as well.


_____

R. Alan Miller


Subscribed and sworn to
before me this 12th day
of June, 2009.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ELIZABETH M. GRIFFITHS, Notary Public
Radnor Twp., Delaware County
My Commission Expires November 5, 2009

# EXHIBIT
# B

# GOLDMAN'S DIRECT DEALINGS WITH THE BAKERS

| Paragraph in Complaint | Date | Description |
|---|---|---|
| 14 | November, 1999 | Goldman draft engagement letter sent to Janet Baker and others at Dragon |
| 44 | December 1, 1999 | Goldman Memorandum sent to Janet Baker and Ellen Chamberlain regarding outline of L&H issues for investigation |
| # | December 2, 1999 | Goldman engagement letter sent to Janet Baker, Ellen Chamberlain. and Donald Waite |
| # | December 8, 1999 | Goldman engagement letter signed by Janet Baker |
| 45 | December 14, 1999 | Goldman list of "Due Diligence Questions" sent to Janet Baker, James Baker, and Dragon |
| 46-47 | December 16, 1999 | Goldman memorandum sent to Janet Baker, James Baker, and Dragon's Board of Directors, comparing possible acquisitions of Dragon by L&H and Visteon |
| 52 | December 17, 1999 | Goldman "Discussion Materials" including merger analysis written for and directed to Janet Baker, James Baker and Dragon's Board of Directors |

| Paragraph in Complaint | Date | Description |
|---|---|---|
| 109 | December 17, 1999 | Goldman teleconference with Janet Baker, James Baker, and Dragon's Board of Directors discussing "open issues" in the L&H merger proposal |
| 110 | December 20, 1999 | Goldman teleconference with Janet Baker, James Baker, and Dragon's Board of Directors discussing potential synergies and numerous aspects of the potential merger |
| 53 | January 20, 2000 | Goldman sends memorandum advising Janet Baker and others at Dragon that no concern about stock price fluctuations |
| 116 | On or about January 20, 2000 | Janet Baker and others at Dragon have private conference call with Goldman at Janet Baker's request so the Bakers could personally confirm Goldman's analyses in the January 20, 2000 memorandum and otherwise |
| 54 | February 17, 2000 | Ellen Chamberlain sends Goldman and Janet Baker a list of questions for Goldman and states expectation for Goldman to drive the analysis and due diligence |
| 55 | February 21, 2000 | Goldman sends email to Janet Baker, James Baker, and Don Waite advising of status of Goldman's investigation and soliciting the Bakers' "input" |
| 56 | February 23, 2000 | Goldman faxes a list of "Due Diligence Questions" to only Janet Baker at a hotel |

| Paragraph in Complaint | Date | Description |
|---|---|---|
| 57 | February 29, 2000 | Goldman sends to Dragon and Janet Baker cut-and-paste memorandum of issues Goldman was expected to investigate |
| 59 | March 13, 2000 | Goldman emails list of "follow-up diligence questions" to Janet Baker, James Baker and others at Dragon |
| 111 | March 27, 2000 | Goldman gives favorable advice about the merger at the Board meeting where the merger was approved; Janet Baker and James Baker attended the meeting |
| # | March 31, 2000 | Goldman letter amending fee to $5 million sent to Janet Baker, Ellen Chamberlain, and Donald Waite |
| 112 | Throughout the six month engagement | Goldman had numerous conversations with Janet Baker and James Baker |

# EXHIBIT
# C

A.    *Young v. Goldman Sachs & Co.*, 2009 WL 247626 (Ill. Cir. Ct. Jan. 13, 2009)

Goldman was hired to prepare a fairness opinion with regard to the potential acquisition

of Wrigley by Mars. *Id.* at p. 1.  The shareholder plaintiffs asserted that the fairness opinion was

biased by Goldman's conflicts of interest.

### 1. The Engagement Agreement and Fairness Opinion Expressly Disclaimed Third Party Rights and Shareholder Reliance

The fairness opinion stated:

> [Goldman Sachs'] advisory services and the opinion expressed herein are provided for the information and assistance of the Board of Directors of the Company in connection with its consideration of the Transaction and <u>such opinion does not constitute a recommendation as to how any holder of Shares would vote with respect to such Transaction or any other matter.</u>

*Id.* (emphasis added).  In addition, the introduction to the fairness opinion disclaimed

shareholder reliance "very clearly in at least two locations":

> GOLDMAN SACHS PROVIDED ITS OPINION FOR THE INFORMATION AND ASSISTANCE OF WRIGLEY'S BOARD OF DIRECTORS IN CONNECTION WITH ITS CONSIDERATION OF THE TRANSACTION. <u>THE GOLDMAN SACHS OPINION IS NOT A RECOMMENDATION AS TO HOW ANY HOLDER OF COMMON STOCK OR CLASS B COMMON STOCK SHOULD VOTE WITH RESPECT TO THE ADOPTION OF THE MERGER AGREEMENT OR ANY OTHER MATTER.</u>

*Id.* at. p. 3 (emphasis added).

The Goldman Engagement Agreement "specifically disavowed any fiduciary obligations

toward the stockholders" and third party rights:

> It is understood and agreed that Goldman Sachs will act under this letter as an independent contractor <u>with duties solely to the Company and nothing in this letter or the nature of our services in connection with this engagement or otherwise shall be deemed to create a fiduciary duty or fiduciary or agency relationship between us and the Company or its stockholders...Except as set forth in Annex A hereto, nothing in this letter is intended to confer upon any other person (including stockholders,... of the Company) any rights or remedies hereunder or by reason hereof.</u>

*Id.* at pp. 3-4 (emphasis added).

### 2. There Was No Relationship

The court found that "Plaintiff is a Wrigley shareholder <u>and has no privity or relationship</u> with Goldman Sachs." *Id.* at p. 3 (emphasis added).

### B.   *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642 (7th Cir. 2006)

Conseco retained Merrill Lynch to provide a fairness opinion pertaining to a proposed valuation of an acquisition. *Id.* at 643. The plaintiffs were former directors who purchased shares in Conseco based on alleged misrepresentations in the fairness opinion. *Id.* at 642. They asserted claim for breach of fiduciary duty and fraud.

### 1. The Fairness Opinion And Engagement Agreement Expressly Negate Third Party Rights And Shareholder Reliance

The Fairness Opinion provided:

> The opinion is for the use and benefit for the Board of Directors of the Acquiror [Conseco].  Our opinion addresses only the financial fairness of the Exchange Ration, and does not address the merits of the underlying decision by the Acquiror to engage in the Merger, and <u>does not constitute a recommendation to any stockholder as to how the stockholder should vote on the proposed merger or any matter related hereto</u>

*Id.* at 650 (emphasis added).  Unlike in this case, "Merrill Lynch's retention and opinion letters . . . <u>unambiguously establish</u> that Merrill Lynch's duties are exclusively to Conseco, not the plaintiffs as individual investors." *Id.*  (emphasis added).

### 2. There Was No Relationship

The plaintiffs relied on a fairness opinion and a single presentation to the entire Board of Directors.  The plaintiffs did "<u>not allege</u> that Merrill Lynch <u>made any misrepresentations to them</u>

as individual shareholders. To the contrary, the allegations in the complaint consistently state

that Merrill Lynch was retained by Conseco and made representations to Conseco or the Board."

*Id.* (emphasis added).

C.    ***Joyce v. Morgan Stanley & Co., Inc.*, 538 F.3d 797 (7th Cir. 2008)**

Morgan Stanley was hired to prepare a fairness opinion for a proposed merger. The

shareholders alleged a breach of fiduciary duty. *Id.* at 799-801.

### 1. The Engagement Agreement Expressly Limited Morgan Stanley's Duties To The Company And The Fairness Opinion Disclaimed Shareholder Reliance

The engagement agreement, which provided for a fairness opinion, stated:

> Morgan Stanley will act under this letter agreement as an independent contractor *with duties solely to 21st Century.* . .We have acted as financial advisor *to the Company* in connection with this transaction. . .

*Id.* at 802 (emphasis original). The fairness opinion stated:

> *Morgan Stanley expresses no opinion or recommendation as to how the holders of the 21st Century Common Stock should vote at the shareholders' meetings held in connection with the Merger.*

*Id.* (emphasis original).

### 2. There Was No Relationship

The Court of Appeals "saw no way that the Shareholders can show that their relationship

with Morgan Stanley possessed the 'special circumstances' necessary to give rise to an extr-

contractual duty . . . ." *Id.* at 802. The district court stated in dismissing the complaint that the

shareholders did not show that they "actively sought out Morgan Stanley" for advice. 2007 WL

967933, *7.

**D.**    ___Ormond v. Anthem, Inc.___, **2008 WL 906157 (S.D. Ind. Mar. 31, 2008)**

Goldman was hired to draft a fairness opinion for a proposed price for an initial public

offering.  *Id.* at \*1.  Future shareholders alleged claims for negligence, breach of contract, and

unjust enrichment.  *Id.* at \*19, 23.

> **1. The Member Information Statement, Engagement Agreement, and Fairness Opinion All Expressly Disclaimed Third Party Rights And Shareholder Reliance**

The Member Information Statement, which was sent to the policyholders who would

become shareholders in the new company, stated that the fairness opinion was:

> solely for the information and assistance of Anthem's Board of Directors and [was] not a recommendation to Anthem Insurance's Statutory Members as to how to vote on the Plan.

*Id.* at \*26.

Goldman's Engagement Agreement stated:

> This Agreement shall be binding upon, <u>and inure solely to the benefit</u> of, the Underwriters, the Company and Anthem Insurance and . . . the officers and directors of the Company and Anthem Insurance and each person who controls the Company or any Underwriter, and their respective heirs, executors, administrators, successors and assigns, <u>and no other person shall acquire or have any right under or by virtue of this Agreement</u>.

*Id.* at \*27 (emphasis added).

Goldman's Fairness Opinion stated:

> Our advisory services and the opinion expressed herein are provided solely for the benefit and use of the Board in connection with its consideration of the transactions contemplated by the Plan <u>and may not be relied upon by any other person.</u> This opinion does not constitute a recommendation to any Statutory Members as to how such Statutory Members should vote on the proposed Plan or as to the form of Consideration that any policyholder should elect.

*Id.* at \*26 (emphasis added).

### 2. There Was No Relationship

The only connection between the future shareholders and Goldman was that the shareholders received a copy of the fairness opinion. *Id.* at *5, 26.

### E.    *Meyer v. Goldman Sachs & Co.*, 234 A.D.2d 129 (N.Y. App. Div. 1996)

### 1. There Was No Relationship

The plaintiffs were former shareholders in a company in a buy-out auction. Their Complaint was dismissed because they "failed to allege sufficient facts evidencing they had a relationship substantially approaching privity with dependent investment bank or the existence of a principal and agent relationship with defendants." *Id.* at 130. The one-paragraph opinion does not set forth the language of the engagement agreement.